[No. S005620. Jan. 2, 1997.]

THE PEOPLE, Plaintiff and Respondent, v.
DENNIS MAYFIELD, Defendant and Appellant.

674

**COUNSEL**

Jay L. Lichtman and Roberta K. Thyfault, under appointments by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Holly D. Wilkens and Esteban Hernandez, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**KENNARD, J.**—Defendant Dennis Mayfield appeals from a judgment of death upon his conviction by jury verdict of one count of first degree murder

(Pen. Code, § 187; all further statutory references are to this code unless otherwise indicated) with the special circumstance that the murder victim was a peace officer engaged in performing his duties and that defendant intentionally killed the officer even though defendant knew, or reasonably should have known, that the victim was a peace officer engaged in performing his duties (§ 190.2, subd. (a)(7)). The jury also convicted defendant of two counts of attempted murder (§§ 187/664), one count of kidnapping for extortion (§ 209, subd. (a)), one count of grand theft from the person (§ 487, former subd. (3) [now subd. (c)]), and two counts of assaulting a peace officer with a deadly weapon (§ 245, subd. (b)). As to each of these offenses except grand theft, the jury found, for the purpose of sentence enhancement, that defendant had been armed with and had personally used a firearm (§§ 12022, subd. (a), 12022.5). The jury also found that defendant had personally and intentionally inflicted great bodily injury on the victim of the kidnapping count and one of the attempted murder counts (§ 12022.7). After the jury returned its guilt verdicts, the trial court found, for the purpose of sentence enhancement, that defendant had two prior felony convictions (§ 667, subd. (a)).

The issue of penalty for the first degree murder with special circumstances was tried to the jury, which returned a penalty verdict of death. The trial court denied the automatic motion to modify penalty (§ 190.4, subd. (e)) and sentenced defendant to death on the murder count, to life imprisonment without possibility of parole on the kidnapping for extortion count, and to an aggregate prison term of 20 years on the remaining counts and enhancement allegations, with a restitution fine of $10,000.

This appeal from the judgment of death is automatic. (§ 1239, subd. (b).) We shall affirm the judgment in its entirety.

## I. Facts and Proceedings

Rialto Police Sergeant Gary Wolfley, while in uniform, was fatally wounded by a bullet from his own service revolver during an encounter with defendant at the rear of a gasoline station at approximately 1:40 a.m. on March 3, 1986. Defendant fled the area with Sergeant Wolfley's revolver, pursued by other officers. Defendant fired two shots at the pursuing officers, wounding Officer Joseph Cirilo. A short time later, defendant dove through the living room window of a residence and shot one of the occupants, William Haverstick, who had gotten up to investigate the commotion. Police surrounded the residence. Defendant surrendered to the police at 6:40 a.m.

At trial, the prosecution maintained that defendant had disarmed Sergeant Wolfley to avoid arrest and then had deliberately shot and killed him. The

defense maintained that Sergeant Wolfley had shouted racial slurs and verbal threats while pointing his gun at defendant's head; that defendant, fearing for his life, had grabbed the officer's hands; and that the gun had fired accidentally twice during the ensuing struggle.

A. *Prosecution's Guilt Phase Case-in-chief*

On the evening of March 2, 1986, Tyrone Thomas went to an apartment complex in San Bernardino to purchase cocaine. There, a man grabbed Thomas, pulled him into an apartment, demanded that Thomas repay a debt for an earlier cocaine purchase, took all of Thomas's money, and threatened Thomas with a gun. Upon leaving this apartment, Thomas formed the impression that some men who were standing outside the apartment complex intended to kill him. Thomas ran from the area and eventually contacted San Bernardino Police Officer Craig Armstrong, who drove Thomas to Rialto, where Thomas lived, leaving him in a commercial area.

Thomas was still in fear of his life, believing that some of the men might have followed him from San Bernardino. He ran to a gasoline service station with a minimart on the northwest corner of Foothill Boulevard and Eucalyptus Avenue, and he asked the clerk, Carlos Price, to telephone the Rialto police. Thomas told Price that he had been robbed and that some men were after him. It was then between 1:00 and 1:30 a.m. on March 3, 1986. Price telephoned the police, stating: "Ah, we have a black male here that says two other black guys are after him and he's hiding in the store." The police dispatcher promised to send someone. While waiting for the police to arrive, Thomas remained inside the minimart portion of the station.

A short while later, defendant arrived at the service station with Howard Bell, who was driving his mother's car, which Bell parked by the pump nearest the service station. Bell had agreed to give defendant a ride to the service station so that defendant could purchase cigarettes, in exchange for which defendant agreed to buy some gasoline for Bell's mother's car. Bell and defendant entered the minimart together, and defendant purchased the cigarettes and gasoline. Price told them that if they "had anything on them" such as an open container of beer, they should "get rid of it" because he had called the police.

Thomas believed that he had seen Bell earlier at the apartment complex in San Bernardino, and he decided that Bell and defendant intended to kill him. When defendant put his hand into the pocket of his jacket, Thomas believed he saw the outline of a gun.

Thomas ran outside just as a patrol car pulled up behind Bell's mother's car. The driver of the patrol car was Sergeant Wolfley; riding with him was

his wife, Candette Wolfley, who was a police officer for the City of Fontana. Unlike her husband, she was not on duty or in uniform. With his hands raised, Thomas ran up to Sergeant Wolfley, who grabbed Thomas, pushed him across the hood of the patrol car, and pat-searched him for weapons, finding none. Thomas told Sergeant Wolfley that two men in "the store" were "after" him, that they were "going to kill" him, and that "the guy in the coat" had a pistol. Thomas would not stand still, kept looking around him, appeared to be badly frightened, and looked as if he "possibly was under the influence of a narcotic." As Thomas was talking to Sergeant Wolfley, defendant and Bell left the minimart. Bell began pumping gasoline into his mother's car, while defendant walked over to a telephone booth in front of the service station and picked up the receiver. Speaking to Sergeant Wolfley, Thomas said: "Don't let them get away."

The prosecution witnesses gave somewhat varying accounts of what happened next.

According to Thomas, Sergeant Wolfley started walking toward the telephone booth. Defendant put down the receiver and walked away from the booth at a normal pace. Sergeant Wolfley told defendant to "Stop." Defendant did not stop but continued walking along the west side of the service station and out of Thomas's view. Sergeant Wolfley then drew his service revolver and pointed it in the direction taken by defendant. Thomas looked away and when he looked back, he could see neither Sergeant Wolfley nor defendant.

According to Price, who observed events from inside the minimart by looking through its windows, defendant was walking toward the restrooms on the west side of the service station. After defendant went around the southwest corner of the building, Sergeant Wolfley drew his gun and ran after defendant. Defendant then began to run. They both disappeared from Price's view. Price could not remember whether he heard Sergeant Wolfley say anything to defendant. When Price last saw defendant and Sergeant Wolfley, they were about 20 feet apart.

According to Bell,[1] Sergeant Wolfley called Bell over to the patrol car and asked him who he was with. Bell turned and looked toward defendant. As he did so, defendant began to run from the phone booth toward the west side of the service station and Sergeant Wolfley drew his service revolver and called out to defendant to "Stop" or "Halt." Defendant "paused" or slowed almost

---

[1]Analysis of a urine sample taken from Howard Bell later that day indicated he was under the influence of phencyclidine, commonly known as PCP, at the time of the incidents to which he testified.

to a standstill on Sergeant Wolfley's command and turned toward Sergeant Wolfley, who was running toward defendant with the gun in his extended hand pointed straight at defendant. Defendant had no weapons in his hands, made no threatening gestures, and said nothing. When the distance between Sergeant Wolfley and defendant was reduced to about five feet, defendant backed away from Sergeant Wolfley, and the two disappeared from Bell's view around the west side of the service station. When he last saw them, Sergeant Wolfley and defendant were both walking, not running.

According to Candette Wolfley, Sergeant Wolfley met Bell midway between the patrol car and Bell's mother's car. Their contact lasted only one or two seconds, after which Sergeant Wolfley looked toward the pay phones. Defendant was just leaving the pay phones, walking toward the west side of the service station. Sergeant Wolfley began walking toward defendant, saying, "Stop, come here, I want to talk to you." Instead of complying, defendant quickened his pace and continued to walk away from Sergeant Wolfley, out of Candette Wolfley's view. Sergeant Wolfley again said, "Stop, I want to talk to you." When he reached the southwest corner of the building, Sergeant Wolfley drew his service revolver, "took a full combat stance," and said, "Freeze." Sergeant Wolfley remained stationary for "less than a second," then ran in the direction defendant had taken, out of her sight. She heard the sound of Sergeant Wolfley's voice coming from behind the building; the tone was firm and commanding, but she was unable to distinguish the words. While they were both in her sight, Sergeant Wolfley was never closer to defendant than 15 to 20 feet, and she never saw defendant walking backwards.

After an interval that Thomas estimated to be three minutes, Price five minutes, Bell between thirty seconds and one minute, and Candette Wolfley four to seven seconds, there was the sound of gunfire from behind the service station.[2] Thomas and Price each heard two shots, two or three seconds apart. Bell heard a single shot. Candette Wolfley could not recall whether there was more than one shot. A few seconds after the gunfire, defendant ran from behind the station, "staggered" or "stumbled" sideways, and then ran north on Eucalyptus Avenue.[3] Candette Wolfley grabbed a shotgun and ran toward the rear of the service station, where she found her husband lying on the ground on his stomach, bleeding profusely. His service

[2]Candette Wolfley testified that she had verified her time estimates by listening to a tape recording of police radio dispatch transmissions, including her own and Sergeant Wolfley's transmissions from the service station at the time of the incident in question. The appellate record includes a cassette tape and transcripts of these transmissions.

[3]Candette Wolfley testified that the total elapsed time from her arrival at the service station with Sergeant Wolfley until she saw defendant running northbound on Eucalyptus was two minutes and ten seconds.

revolver was missing and his portable radio, or handy-talkie, was not on his belt. Sergeant Wolfley's handy-talkie was later found "near the northwest corner of the station." Nearby was a watch cap that defendant had been wearing and what was variously described as a kitchen knife or butcher knife.

In the Sunstone Apartments on Eucalyptus Avenue, Curtis Alan Corbin had been looking out his bedroom window at the service station. He saw a uniformed officer walking around the station toward a Black man who was 20 to 25 feet in front of him. Corbin heard some shouting but was unable to make out the words. The officer approached to within two to three feet of the Black man. Although Corbin could see only the upper bodies of the two men, the movements of the Black man's upper arms and shoulders caused Corbin to think that he was fumbling in his pants pockets. Corbin could not see whether the officer had anything in his hands. The officer said something in a "demanding" tone. Corbin looked away briefly; when he looked back, he saw two muzzle flashes and heard two shots.

In a house immediately north of the service station, William Judevine was awakened by a voice yelling "Halt" followed by the sound of a struggle, consisting of the noises of scuffling or shuffling feet and muffled grunts. The noises were coming from the area between the service station building and Judevine's house. The struggling noises lasted six to seven seconds and ended with the sound of a gunshot, followed five seconds later by a second gunshot. Then there was the sound of someone running away. Walking to the window of the kitchen, he looked out and saw a police officer lying on the ground with a woman in civilian clothes next to him, speaking into a walkie-talkie. Another officer joined her within seconds.

Rialto Police Officer Joseph Cirilo, who was then on duty in a marked patrol car, was driving toward the service station when he heard a series of radio messages that Candette Wolfley sent from the scene of the shooting. Hearing Candette Wolfley say that "he" was "running northbound," Cirilo turned north onto Eucalyptus Avenue with his spotlight on. When he reached the driveway to the Sunstone apartment complex, a shot was fired that shattered the front windshield of Cirilo's patrol car, wounding him on the hand. Cirilo put the patrol car in reverse and backed up 10 to 15 feet. He then saw a person whom he identified at trial as defendant. With a revolver in his hand, defendant was running northbound on the west side of Eucalyptus Avenue, just north of the driveway to the Sunstone Apartments. Cirilo drove after him, followed closely by Rialto Police Corporal Ruschel Pierson in another patrol car. Defendant stopped, looked back at Cirilo and Pierson, and fired the gun toward them. Defendant then continued running northbound to the corner of Eucalyptus Avenue and Grove Street. Defendant turned west on Grove, out of Cirilo's view.

In the Sunstone Apartments, James Prendergast was awakened by the sound of two gunshots, two or three seconds apart. Approximately 15 seconds later, he heard 2 more shots "back to back" that sounded like they were coming from right outside his bedroom window. Looking out the window, he saw two police cars going northbound on Eucalyptus. A few seconds later, he saw a man he identified as defendant come around the corner of the apartment building holding a revolver in his hand. Defendant hunched over as if trying to catch his breath, put the revolver in his jacket, then walked away through the apartment building.

Curtis Corbin also saw defendant outside the Sunstone Apartments. Corbin went outside after hearing a total of four shots. Defendant was in the driveway of the Sunstone Apartments, "running as fast as he could." Defendant fell down and a gun "flew out of his right hand," landing about two feet from where defendant came to rest on the ground. Defendant picked up the gun and ran away.

West of the Sunstone Apartments was an open field. San Bernardino Deputy Sheriff Jay Blankenship, near the southwest corner of this field, was scanning the area with binoculars when he saw a man about 50 yards to the east behind an old motel. The man started to walk northwest through the field holding an object in his right hand that appeared to be a gun. Using a portable radio, Blankenship broadcast: "If there's an officer crossing the field, identify." He repeated the message two or three times without receiving any response. The man was then about halfway across the field and 60 to 70 yards away. Blankenship yelled: "Halt, Sheriff's Office." The man "immediately started running." Blankenship ran after the man but soon lost sight of him.

Along the western edge of the field, San Bernardino Deputy Sheriff Joanne Hensley had stationed herself behind a warehouse on Acacia Avenue. A few seconds after hearing Deputy Blankenship's radio calls ("If there's an officer crossing the field, identify"), Hensley saw an adult Black male moving very slowly in a crouched position along a dirt roadway between the field and the back of the warehouse. She yelled: "Halt, police." The man paused, then "made a slight turn" toward a house that was south of the warehouse. Hensley pulled the trigger on her rifle, which she had aimed at the man. She heard a "click" sound as the rifle's hammer struck a cartridge, but the rifle did not fire. Hensley racked another round into the chamber as the man ran full speed toward the house. She aimed at the man and again pulled the trigger. The rifle fired, but the bullet missed the man and struck the frame of a large plate glass window just as the man dove head first through the glass and into the house.

The sound of breaking glass in the living room awakened William Haverstick,[4] who was sleeping in an adjacent bedroom. Haverstick jumped out of bed and opened the bedroom door; he saw a man he identified as defendant standing directly outside. Defendant immediately shot Haverstick, the bullet entering his upper right thigh. As he collapsed, Haverstick fell backward, pivoting against the bedroom door and forcing it shut; he came to rest sitting on the bedroom floor with his back against the door.

Anthony Terry Fifelski, sleeping in a bedroom behind the garage, was also awakened by a loud noise. He put on a robe and walked into the main portion of the house. He found the living room window broken. He called out, "Bill." He heard William Haverstick calling, "Get out of the house. There's robbers in the house. Call the police." Fifelski ran out the front door to the front yard and started yelling for the police. Someone said, "Don't say nothing." Turning, Fifelski saw a Black man in the front doorway pointing a gun at him. Fifelski was then called and led away from the house by police officers. Deputy Blankenship, standing nearby, saw a door on the east side of the house open, and "heard a male voice yelling out that he had hostages and to back off."

Defendant pushed his way into Haverstick's bedroom, dragged Haverstick out of the doorway, and started rummaging through a desk in the bedroom. Defendant asked Haverstick if he had a gun. Haverstick told defendant he had only an old shotgun that had been dismantled and was then in the garage. Defendant started making calls from the telephone in the bedroom. During the next four hours, until his surrender, defendant was engaged on the telephone most of the time.

Haverstick overheard one of defendant's telephone conversations that Haverstick summarized this way: ". . . he was saying that—words to the effect 'the police officer started harassing me.' All he went in there for was a pack of cigarettes and to buy some gasoline, and the police officer started harassing him. . . . He said he just tried to get away from him and started running, and the police pulled a gun on him and he just took it away from him."

The house was quickly surrounded by officers from various law enforcement agencies, and a sheriff's helicopter flew over the area and illuminated it with a powerful spotlight. Defendant threatened to shoot "the hostage" if the helicopter was not withdrawn. The helicopter was removed and the sheriff's "SWAT" team was brought in.

---

[4]Haverstick died in October 1986. At defendant's trial, in 1987, the court admitted in evidence the testimony Haverstick had given at defendant's preliminary hearing.

During a telephone conversation with police officers, defendant kicked Haverstick twice, once in the thigh and once in the groin, so that Haverstick would scream and the officers hearing the scream would know he was still alive. But defendant also assisted Haverstick in preparing a tourniquet for his leg, brought him cigarettes to smoke, and assisted him into bed when he said he thought he was going to pass out.

Fifelski gave Rialto police officers the telephone number of the residence. When they established telephone contact with defendant, defendant said that he had a hostage, that he wanted to take the hostage with him and leave in one of the cars outside the residence, and that if anyone shot at him, he would kill the hostage. Somewhat later and apparently referring to the shooting of Sergeant Wolfley, defendant had this exchange with a sheriff's officer:

Officer: "So you need a car, huh?"

Defendant: "—I mean, like, like ya know, I just don't know why, ya know, I got rushed like I did, that's all. And, ya know, somebody puttin a gun in my face ain't cool. If he ain't gonna use it, he shouldn't of pulled it out."

Officer: "That's true."

Defendant: "Ya know, so that gave me proper action to take it from him."

A hostage negotiation team was brought in, headed by San Bernardino Sheriff's Sergeant Mike Stodelle. Defendant said he would drive Haverstick to the hospital and surrender there. Defendant's cousin Yvonne Hester joined the negotiations and offered to drive defendant and Haverstick to a hospital where Haverstick could be treated. Defendant said, "I'm gonna take him to the hospital—that's the only way I'm comin outa this door. . . . And when I get to the hospital, and there's enough people around, they can see me get arrested."

During this part of the conversation, Hester questioned defendant about what had occurred. Defendant admitted that he had "fired five shots already" and that "two of those shots went straight to—at the police." Asked by Hester how many policemen he had shot, defendant replied "Just the one." Defendant also said that when he "came out the store" he saw the police car arrive. He continued: "I went to the telephone, . . . and then on my way back, you see I heard him sayin, ya know, who'd you come here with . . .

and then I turned around and ah, I tried to leave . . . . And he pulled his gun out—okay—and said put your hands up, and I said for what? He says put your hands up or I'll blow your head off." Asked by Hester why he "didn't just put [his] hands up," defendant replied, "Cause I didn't do nothing." Somewhat later, speaking to his father, defendant said: "This police put the gun in my face and I just took it from him."

Defendant talked about shooting himself and admitted that he knew he would be going to "the penitentiary." He offered to surrender at the house if Hester was where he could see her. When told that his father, Roy Mayfield, was nearby, defendant asked that his father be brought to the front of the house. "With my daddy out there, I know I'm not gonna get shot." "If my dad is in front of the house, I'll come out."

Defendant's father was brought to the front of the house. As instructed, defendant tossed Sergeant Wolfley's gun through the broken living room window onto the front lawn. He then walked outside with his hands on his head and lay facedown on the ground. Deputy Emmerson then placed handcuffs on defendant and brought him to Deputy Stein's patrol car.

When Deputy Stein asked defendant to be seated in the patrol car, defendant replied: "Can't I just stand here? I'm just scared. I'm not really a bad guy. You can ask Bill, the guy I shot. He can tell you I tried to help him. It's just that when I entered the house he startled me, so I shot him."

Defendant asked how "the officer" was doing. When Deputy Stein did not reply, defendant asked: "How's the officer I shot." Deputy Stein replied that the officer had been taken to the hospital.

Defendant then told Deputy Stein that "he had to do it, he didn't want to go back to jail." Defendant said: "I've been there too many times before. When I took off and he caught me, all I could think about was getting his gun and shooting him so he couldn't arrest me. I took his gun and shot him. . . . Then I got scared and I started running." Defendant added that "some other cops started chasing him so he shot at them so they would stop chasing him." Defendant said that when he reached that area (that is, the area near the Haverstick house) "he heard someone shout, 'Police, freeze.'" Defendant said "he didn't want to get hurt, so he dove through a window, . . . Bill [Haverstick] startled him so he shot him." After persuading defendant to take a seat in the back of the patrol car, Deputy Stein wrote down on a steno pad the statements he had just heard defendant make.

As Deputy Stein was driving defendant to the Rialto police station, defendant asked if they "couldn't just go straight to [the county jail] because he had shot one of their officers and they would want to hurt him."

At the police station, defendant received medical treatment for minor scratches on his chest and left calf. He had no other injuries. In defendant's clothing, police found a set of keys belonging to William Haverstick.

Sergeant Wolfley was taken from the scene of the shooting to a hospital where he was pronounced dead at 3:10 a.m. The cause of death was a single gunshot wound to the face, the bullet shattering the left side of the jaw at the angle and completely severing the external carotid artery, causing profuse bleeding, immediate loss of consciousness, and a rapid decline in blood pressure. Apart from the gunshot wound, Sergeant Wolfley suffered minor cuts and scrapes on his face and knees consistent with collapsing and falling face forward onto an asphalt or concrete surface after being shot.

Sergeant Wolfley's hands were tested for gunshot residue. The test showed "very low levels of antimony." These levels were consistent with having handled a firearm but were inconclusive as to whether Sergeant Wolfley had been holding a firearm when it was fired.

Dr. Irving Root, the forensic pathologist who performed the autopsy on Sergeant Wolfley, testified that in the area around the gunshot wound he found no evidence of gunpowder residue or of skin damage of the kind that gunpowder residue causes. Residue from a handgun travels a distance of 27 to 36 inches, depending on the particular characteristics of the gun and the ammunition. Although the residue itself may be washed or wiped away, it would normally leave visible damage to the skin, in the form of stippling or tattooing, except at the very outer limit of the range of travel. He did not believe that the shot could have been fired from as close as 18 inches without leaving any residue or residue damage, but a test firing of the same gun with the same ammunition would be needed to reach any certain conclusion.

Sergeant Wolfley's gun was test-fired by Norm Wallis, a criminalist employed by the San Bernardino Sheriff's crime laboratory. The test was conducted by firing the gun at 1-foot-square pieces of poster board at distances ranging from 12 inches to 42 inches. The ammunition used in the test was of the same brand and type as the ammunition that had been in the gun when Sergeant Wolfley was shot, although not from the same manufacturing lot. Based on these tests, Wallis concluded that gunpowder particles from this gun would travel 30 to 36 inches from the end of the barrel.

B. *Defense Case at the Guilt Phase*

Howard Bell testified to a conversation with Tyrone Thomas during which Thomas said that Bell and defendant were not among the men who had been

bothering him at the apartment complex in San Bernardino on the night of March 2 and 3, 1986.

San Bernardino Sheriff's Sergeant Donald Hankerson testified that on March 3, 1986, he assisted in taking defendant to Deputy Stein's patrol car after defendant had surrendered. Hankerson remained near the patrol car, keeping an eye on defendant, and he heard defendant ask how the officer was, but he did not remember defendant making any other statements, nor did he remember seeing Deputy Stein writing notes in a steno pad.

Roy Mayfield, defendant's father, gave similar testimony. He was present when defendant surrendered and heard defendant ask how the officer was and whether he could speak to his father, but "no other words were exchanged."

Defendant testified in his own behalf, giving the following account:

On March 2, 1986, defendant was staying with his father, who lived about six blocks from the service station at Foothill and Eucalyptus. Late that night, defendant was talking to some casual acquaintances on a street near his father's house when he met Howard Bell, whom he vaguely knew. Bell apparently heard defendant say he wanted to get some cigarettes, and Bell offered to drive defendant to a store, saying that he needed to get some gasoline. They agreed to meet in 15 minutes so defendant would have time to leave his bicycle at his father's residence.

As they had agreed, Bell picked defendant up on the corner near defendant's father's house and drove to the service station at Foothill and Eucalyptus. They went inside the station, and defendant purchased cigarettes and gasoline. Tyrone Thomas, whom defendant had never seen before, was inside the station "acting peculiar" and appearing to be "very paranoid, scared." Thomas approached defendant and Bell and asked "Why me?" Defendant did not reply but asked Bell if he knew Thomas. Bell said he did not. Thomas left the station. The clerk told defendant and Bell that the police would be arriving soon and that if they "had anything" they should "get rid of it."

Defendant put the cigarettes in his pocket and walked out of the station with Bell. Thomas was talking to an officer near a police car in which a woman was seated. After telling Bell he was going to make a phone call, defendant walked to the phone booth. He attempted to make a call, but the line was busy so he hung up. Defendant turned around and began walking toward the service station bathrooms.

Approaching defendant with his gun drawn and pointed at defendant, the officer said, "Hey, mother fucker, hold it." Defendant turned to face the officer, who said, "Black mother fucker, freeze." Defendant backed away and asked, "What's going on?" But the officer, who appeared to be very angry, "just continued to cuss [him] out," repeating "Black mother fucker, hold it." Referring to defendant as a "black mother fucking nigger," the officer told defendant to put his hands up. Defendant stopped walking and put up his hands. Defendant and the officer were then at the northwest corner of the service station. Defendant did not have a knife and did not drop the knife that was later found behind the service station.

Bringing the gun to within a few inches of defendant's face, the officer "said he was going to blow [defendant's] mother-fucking head off." Defendant, who was then both frightened and angry, saw the gun's cylinder start to turn and believed the officer was going to shoot him. Defendant grabbed the gun, and as he did so the gun went off. Defendant placed both of his hands over the officer's hands, which were still holding the gun, and they "started tussling."

The officer said, "Mother fucker, I'm going to kill your ass." As they struggled, they moved east behind the station toward Eucalyptus. The gun fired again and fell to the ground. Defendant picked up the gun and ran toward Eucalyptus. Glancing back, defendant saw the officer on the ground, not moving. There was blood on the ground. Defendant had not at any time intended to shoot or kill the officer, only to take the gun away from him.

Defendant ran up Eucalyptus intending to go to his father's home. A police car came speeding up behind him, shining a spotlight on defendant. Defendant fired what he intended to be a warning shot "in the air," but he noticed a "big flash" on the police car, which immediately backed up. Defendant turned into the driveway of the Sunstone Apartments and dropped onto some grass behind a boulder. He then ran up Eucalyptus again. Seeing more police cars, he fired another "warning shot." He ran around the corner and into the first backyard.

Defendant went through the backyard and over a wall. He found himself back at the Sunstone Apartments, where he observed two or three adults and a small child. Defendant put the gun in his waistband. He walked and then ran to the back of the Sunstone Apartments's parking lot. Looking over a wall at the service station, he saw some officers around the area where the officer had been lying on the ground. He heard a voice say, "If you see the mother fucker, kill him."

After scaling another fence, defendant found himself near the corner of a building. Because he was "fed up with running" and believed there were

officers nearby, he threw the gun around the corner and walked forward with his hands up, but no one was there so he picked up the gun and continued on. After pausing for a few minutes to pray, defendant went through a gate and over another fence. He began running through a field.

Defendant saw some police officers and crouched down to avoid being shot. After crossing the field, defendant found himself on a dirt road. Moving along the road, he "heard a shotgun pump." The sound came from the area in front of him. Defendant slowed down. He heard someone say: "Mother fucker, hold it." He stopped. When he heard the sound of a gun racking, he started running toward a house. He heard gunshots and dove through a window of the house.

Inside the house, defendant quickly got up off the floor and moved away from the window and into a hall. A door suddenly opened. Defendant "turned and the gun went off." The person in the doorway went back into the room and the door closed again. Defendant tried the knob, but the door would not open. Noticing a man coming from the other end of the house, defendant told him to leave. The man went outside and was immediately snatched by the police.

The man inside the room, who defendant later learned was William Haverstick, refused to open the door, so defendant forced his way inside. He found Haverstick sitting on the floor with his back against the door. There was blood on Haverstick's leg. Defendant asked Haverstick if he was "hurt bad," and Haverstick said he was. Defendant asked if there was anything he could do for him. They decided to try to stop the bleeding, so defendant retrieved some long socks from Haverstick's dresser, and he tied them around Haverstick's leg as a tourniquet. Defendant went to the kitchen to get Haverstick a glass of water. At the same time, he looked in the other rooms of the house, and he removed the empty cartridges from the gun, finding he had one live cartridge left. Returning to the bedroom, he gave Haverstick the glass of water and also Haverstick's medication, which was on the night-stand. When Haverstick said he wanted to get off the floor, defendant brought a chair from another room and placed Haverstick in it. He positioned the chair in the bedroom doorway so that Haverstick would be between defendant and the police if the police entered the house.

Defendant used the telephone in the bedroom to place a series of calls to his mother, his stepfather, his cousin Yvonne Hester, and a woman named Irene. When Hester asked him how many police officers he had shot, and he replied "Just the one," defendant was referring to Sergeant Wolfley. Defendant also spoke to various police officers. On two occasions, an officer

wanted to hear Haverstick's voice to make sure he was alive. Defendant asked Haverstick to say something, but Haverstick only mumbled. Defendant used his hand to nudge Haverstick's foot, and Haverstick yelled. Defendant denied ever kicking Haverstick. Defendant had not intended to take a hostage and would have used the last cartridge to kill himself if the police had attempted to storm the house.

While in the house, defendant believed that every officer outside would kill him if given the chance. Defendant wanted to drive Haverstick to a hospital so he could surrender in the presence of civilian witnesses. Defendant eventually surrendered by following his father's instructions. He was handcuffed and taken to a patrol car. The only statement he made while in or near the patrol car was to ask a deputy if he could speak to his father. He did not make the statements that Deputy Stein had attributed to him.

Rialto Police Detective Valerie Hankerson testified that she interviewed Curtis Corbin on March 13, 1986, 10 days after the shooting of Sergeant Wolfley. During that interview, Corbin reported that he was awakened by the sound of gunshots. He did not say that he had seen any of the events that occurred behind the service station. Detective Hankerson also testified that she found two bullet holes, four inches apart, in the frame of the living room window of the Haverstick residence.

## C. Guilt Phase Rebuttal and Surrebuttal

Rialto Police Officer Peter Sorensen testified that he was the first officer to assist Candette Wolfley in providing emergency care to Sergeant Wolfley in the area behind the service station. He remained in that area until Sergeant Wolfley was taken in an ambulance to the hospital. During this time, Sorensen did not hear anyone say, "If you see the mother fucker, kill him."

At the Rialto police station, where defendant was taken after his arrest, defendant was permitted to speak to his father, Roy Mayfield. When asked afterwards what defendant had said, Roy Mayfield replied: "Basically the officer confronted him with a gun. He pressed him, and he took it. The officer tried to take it back, and that's when the shot was fired."

Deputy Sheriff Joanne Hensley, recalled on rebuttal, testified that she did not hear the sound of a shotgun being racked and that when she spoke to defendant she did not use profanity. She said, "Halt, police." She fired a single shot at defendant as he dove through the window of the Haverstick residence.

Anthony Terry Fifelski, recalled on rebuttal, testified that when he entered the living room of the Haverstick house to investigate the noises that had

awakened him, he heard Haverstick yell: "Get out of the house. There's robbers in the house. Call the police." He immediately ran outside without seeing or hearing any other person. It was only after he was outside that he heard someone say "Don't say nothing." Turning, he saw a Black man in the doorway.

Dr. Irving Root, recalled on rebuttal, was asked to assume that the gunpowder range of Sergeant Wolfley's gun was 30 to 36 inches and that the shooting occurred in the manner described in defendant's testimony—that is, defendant and Sergeant Wolfley were standing side by side with both of Sergeant Wolfley's hands on the gun and defendant's hands over Sergeant Wolfley's hands. Given these circumstances, it was Dr. Root's opinion that there would necessarily have been gunpowder stippling or tattooing on Sergeant Wolfley's face. He testified that if Sergeant Wolfley was gripping the gun firmly with both hands, he would have had to bend his elbows to permit the gun to turn toward his face, and the distance between the muzzle and Sergeant Wolfley's chin would have been no greater that 14 inches. Even assuming that Sergeant Wolfley's arms were fully extended and the gun was coming loose from his grip when it fired, the distance would have been at least 18 or 19 inches, and there would have been gunpowder injury to Sergeant Wolfley's skin in the form of stippling or tattooing.

V. Parker Bell, a criminalist employed by the defense, conducted a test firing of Sergeant Wolfley's gun to determine the distance at which gunshot residue would leave a lasting impression on human flesh. For purposes of the test, he used ammunition that Detective Amicone had represented to be from the same manufacturing lot as that issued to Sergeant Wolfley. Taking one of the cartridges apart, Bell determined that it contained disc flake gunpowder, which has poor aerodynamic ability compared to the two other kinds of gunpowder, ball powder and flattened ball powder. The test firing was recorded on videotape, which was shown to the jury. First, the gun was fired at cloth-covered targets at distances from 12 to 48 inches. Even at 48 inches, some gunpowder particles were visible on the target. The gun was fired at human flesh by placing the exposed forearm of defense counsel one to one and one-half inches above the bullet's point of impact. At a distance of 18 inches, some particles that may have been gunpowder were visible on the skin but they came off without leaving any lasting impression. At 12 inches, gunpowder particles were found embedded in the skin, and the skin surface had the characteristic abrasion known as stippling.

After this test firing had been conducted, Bell, the defense criminalist, and Wallis, the prosecution criminalist, jointly compared a cartridge of the ammunition supplied by Detective Amicone with a cartridge from the belt

that Sergeant Wolfley had been wearing on the night of his death and the single cartridge that was left in Sergeant Wolfley's revolver when defendant surrendered. They found that although all three cartridges contained disc flake powder, the powder in the cartridges differed in color and quantity, indicating chemical differences that could affect the results of skin penetration tests. The powder in the cartridge supplied by Detective Amicone weighed 8.0 grains, the powder in the cartridge from Sergeant Wolfley's belt 9.4 grains, and the powder in the cartridge from Sergeant Wolfley's revolver 9.1 grains.

Some of the ammunition from Sergeant Wolfley's belt was test-fired against cardboard targets at ranges from 12 to 48 inches. Bell considered the tests useful only for determining the range of travel of gunpowder particles and not the range at which the particles would damage or penetrate human skin. Although the test showed that particles could travel as far as 48 inches, he remained of the view that the maximum distance at which they would damage or penetrate human skin was 18 to 24 inches. Gunpowder particles that are deposited on human skin without damaging or penetrating the skin are easily wiped away.

Dr. Root, the pathologist, further testified that the abrasions on the left side of Sergeant Wolfley's face that apparently resulted from his fall onto pavement after being shot could have covered over and concealed gunpowder stippling, but in that event he would have expected to find stippling in the areas close to the wound on which there were no such abrasions. He therefore remained of the opinion that the fatal shot had been fired from "beyond the gunpowder range" of the weapon. In his opinion, the absence of stippling on defense counsel's forearm after the test firing at 18 inches did not necessarily mean that 18 inches was beyond the range at which stippling would occur. Most of the particles would strike within a tight circle around the bullet's point of impact. Only a few particles would be dispersed to the forearm, and those few could have been filtered out by the arm hairs. He explained the appearance of stippling on the arm after the test firing at 12 inches on the basis that the particles were traveling at a higher velocity and in greater concentration.

## D. *Prior Convictions*

The information's allegations that defendant had suffered two prior felony convictions were bifurcated and tried to the court after the jury had returned its guilt phase verdicts on the substantive offenses. Based on certified court records, the trial court found true the allegations that defendant had been convicted of grand theft from the person (§ 487, former subd. (3) [now subd.

(c)]) as a felony on August 30, 1977, and that he had been convicted of the felony offense of robbery (§ 211) on August 19, 1982.

E. *Penalty Phase*

The parties stipulated that in June 1977, defendant used a knife to rob 15-year-old Thomas Glore of $4, the robbery occurring near a high school during the lunch hour. The parties also stipulated that in October 1981, defendant stole merchandise from a department store and, when confronted by a store security agent in the parking lot, pointed a gun at the security guard to make good his escape.

Mark Fister testified for the prosecution that on the night of March 2-3 of 1986 (the same night that Sergeant Wolfley was killed), he was working as the clerk in a 7-Eleven market in Rialto when a man entered the store and robbed him. The man approached the counter with a small bag of sunflower seeds and tendered some money, but when Fister opened the register the man drew a knife, cut Fister on the hand, and instructed Fister to give him all the money. The knife was a kitchen carving knife with a wooden handle and an eight- to nine-inch blade. The man left the store with the money from the register and rode away on a 10-speed bicycle.

Fister made an in-court identification of defendant as the man who committed the robbery, but he also said that he had thought the robber was shorter than himself (Fister testified he is six feet one inch), of average build, and "not muscular." Fister admitted that at the time of the offense he had estimated the robber's height to be 5 feet 10 or 11 inches (whereas defendant's height was 6 feet 3 inches), he had estimated the robber's weight as 115 to 120 pounds (whereas defendant's weight was 180 to 185 pounds), and he had reported that the robber had no facial hair (whereas defendant had a mustache and goatee). Fister testified that he was shown a photo lineup after the offense, and it was stipulated that he selected the photograph of a person other than defendant. When shown the knife found at the service station where Sergeant Wolfley was killed, Fister testified that its blade was "a little bit broader" than the knife used in the robbery.

The parties stipulated that defendant's fingerprints were not found at the 7-Eleven robbery site or on the knife found at the service station where Sergeant Wolfley was killed.

Defendant did not testify in his own behalf at the penalty phase. The defense presented the testimony of Sandra Brewer (defendant's mother), Donna Brewer (defendant's sister), Gregory Snowden (defendant's cousin

and an officer in the California Highway Patrol), and Judith Snowden (defendant's aunt). Each of these witnesses testified to a close and loving relationship with defendant, each affirmed that the relationship would be maintained if defendant were sentenced to life in prison without possibility of parole, and each expressed the hope that the jury would spare defendant's life. They gave the following account of defendant's life history and character.

Defendant's parents were never married. Defendant's birth was difficult. Defendant was born with a heart murmur and congenital heart problems. When defendant was approximately one year old, he developed a fever of 106 degrees and was taken to the hospital, where he was packed in ice. A fever this high may result in brain damage. Defendant's mother began living with Spencer Brewer, whom she married when defendant was about two years old. The family moved to Pasadena where defendant grew up believing he was Spencer Brewer's child and having no contact with Roy Mayfield, his father.

Spencer Brewer disciplined defendant for normal childhood behavior very harshly, hitting him in the chest with his fist and beating and whipping him with a belt. On several occasions, Judith Snowden, who was like a second mother to defendant, observed welts and bleeding on defendant's back and legs and knots on his head. The physical abuse stopped when defendant was about seven years old. Spencer Brewer also verbally abused defendant, telling him he was "stupid" and referring to him as a "nigger" and other abusive terms. Spencer Brewer abused defendant's mother and older brother as well.[5]

Thomas Hester, defendant's uncle, was killed by a drunk driver when defendant was seven years old. Thomas Hester had been a significant person in defendant's life. Defendant idolized him because of his athletic ability. He had broken many records running track in high school, and at the time of his death he was a member of the track team at Arizona State University and had qualified for the United States Olympic team. When Hester was killed, defendant "took it hard"; he was angry with God because he thought that God had killed Hester.

As a child, defendant participated in Cub Scouts and baseball, and he was a loving son. When defendant was about 13 or 14 years old, Roy Mayfield

---

[5]Judith Snowden was the only witness to testify to abusive behavior by Spencer Brewer. Defendant's mother was suffering from a brain tumor, believed to be malignant, at the time she testified. The tumor caused recurring and severe headaches, and also caused her to forget some things in her past.

sent a message that he wanted to establish contact with defendant. Defendant was then told he was not Spencer Brewer's son, but Roy Mayfield's. At first defendant was confused, but when he learned that Roy Mayfield had played football at San Bernardino Valley College, defendant began to idolize Roy Mayfield, even though Roy Mayfield had provided no support for him and even though defendant knew little about him. He began to have visits with Roy Mayfield.

In high school, defendant played football and ran track. He also had a series of part-time jobs. When defendant was 15 years old, his mother was badly injured in a car accident. She spent weeks in the hospital and had recurring back problems requiring additional hospitalizations and surgery. Defendant telephoned his mother while she was in the hospital, and he helped with the cooking and cleaning at home in her absence.

Defendant has a son of his own, Dennis Junior, who is being raised by the child's maternal grandparents. Defendant is a loving father to his son. When defendant was convicted of crimes, his family did not turn away from him but tried to counsel and assist him. As an adult, defendant has had some periods of full-time employment.

Defendant has been "slow" and has had "emotional problems" all his life that may be the result of brain damage in childhood.

## II. PRETRIAL PROCEEDINGS

Defendant contends that the trial court erred in denying his pretrial motion to sever the counts charging offenses against William Haverstick from the remaining counts and that this error denied him his federal constitutional rights to due process of law, an impartial jury, and a reliable guilt determination in a capital case (U.S. Const., 5th, 6th, 8th, & 14th Amends.).[6] We reject this contention.

As defendant concedes, the offenses charged in the information satisfied all statutory requirements for joinder. (See § 954.) Therefore, we review the trial court's ruling under the deferential abuse of discretion standard. (*People* v. *Davis* (1995) 10 Cal.4th 463, 508 [41 Cal.Rptr.2d 826, 896 P.2d 119].) To establish an abuse of discretion, defendant must make a clear showing, based on the record before the trial court when it denied the severance motion, that joinder of these offenses presented a substantial danger of prejudice. (*Ibid.*)

---

[6]The trial court granted the defense motion to sever a count charging defendant with the 7-Eleven market robbery about which the prosecution introduced evidence at the penalty phase.

To determine whether joinder posed a substantial risk of prejudice, we inquire first whether evidence of the charged offenses would have been cross-admissible in separate trials. If so, then "any inference of prejudice is dispelled." (*People* v. *Balderas* (1985) 41 Cal.3d 144, 172 [222 Cal.Rptr. 184, 711 P.2d 480]; accord, *People* v. *Memro* (1995) 11 Cal.4th 786, 850 [47 Cal.Rptr.2d 219, 905 P.2d 1305].)

 Based on the record of the preliminary hearing, which was the record before the trial court when it denied severance, the trial court could reasonably conclude that in a separate trial of the Haverstick offenses, evidence of the earlier offenses—that is, the murder of Sergeant Wolfley, the attempted murder of Officer Cirilo, the theft of Sergeant Wolfley's gun, and the deadly weapon assaults on Officers Cirilo and Pierson—would have been admissible to establish defendant's motive for entering Haverstick's residence, shooting Haverstick, and holding him hostage. In a separate trial on the non-Haverstick charges, moreover, evidence of statements by defendant describing his encounter with Sergeant Wolfley would have been admissible. Because defendant made some of those statements during the telephone conversations that occurred while he was inside the Haverstick residence, it is likely that evidence of the circumstances surrounding those statements would also have been received. Thus, most if not all of the evidence would have been cross-admissible.

 Furthermore, to establish prejudice defendant must show more than the absence of cross-admissibility of evidence. He must show also, for example, that evidence of guilt was significantly weaker as to one group of offenses, or that one group of offenses was significantly more inflammatory than the other. (*People* v. *Sandoval* (1992) 4 Cal.4th 155, 172-173 [14 Cal.Rptr.2d 342, 841 P.2d 862].) Defendant has shown neither. The prosecution's evidence was equally strong as to both groups of offenses, and neither was significantly more inflammatory than the other. Accordingly, defendant has failed to demonstrate that the trial court abused its discretion in denying the motion for severance.

### III. JURY SELECTION

A. *Discriminatory Exercise of Peremptory Challenges*

 During jury selection, the defense moved for mistrial on the ground that the prosecutor had used peremptory challenges to excuse three African-American prospective jurors because of their race. The trial court denied the motion, finding both that the defense had failed to establish a prima facie case that the prosecution had exercised peremptory challenges on the basis

of race and that, in any event, the prosecutor had provided satisfactory, nondiscriminatory reasons for excusing these jurors by peremptory challenge. Defendant contends that in so ruling the trial court committed error requiring reversal of the judgment.

After the prosecutor had used a peremptory challenge against prospective juror Franklin Atkins, defense counsel moved for a mistrial[7] on the ground that the prosecutor was "systematically excluding all black jurors on the panel." Specifically, defense counsel charged that the prosecutor had excused prospective jurors Franklin Atkins and Carla Hunter because of their race. The trial court announced it would hold a hearing on the motion the following morning, at which time it would ask the prosecutor "to justify the excusal of those two jurors" and suggested that counsel continue with jury selection for the remainder of the day.

Shortly thereafter, the prosecutor exercised a peremptory challenge against a third Black prospective juror, Harris Jones. Defense counsel asked that the pending motion be expanded to include this peremptory challenge as well. The trial court then discontinued jury selection pending a ruling on the defense motion.

On the following morning, the trial court announced that after reviewing the law it now realized that the defense had the burden of establishing a prima facie case of intentional discrimination in the use of peremptory challenges, and that if the defense succeeded in doing so the burden would then shift to the prosecution to establish a nondiscriminatory reason for the challenges. Defense counsel then explained the basis for his conclusion that the prosecutor had excused the three Black jurors on the basis of their race. The trial court made a finding that the defense had failed to establish a prima facie case. But the trial court nonetheless directed the prosecutor "for the record" to explain why he had exercised peremptory challenges against each of the three Black prospective jurors. The prosecutor then explained the reasons for these challenges. The trial court reiterated the finding that the defense had not made a prima facie case and added a second finding that the basis of the prosecutor's challenge to the three jurors in question was "not group bias but rather a specific bias that relates to the issues in this case" and that the challenges "were justified in that sense."

■ The use of peremptory challenges to eliminate prospective jurors because of their race is prohibited by the federal Constitution (*Powers* v.

---

[7]Because no jury had yet been sworn, it is doubtful that a motion for a mistrial was the proper procedural vehicle to raise the objection. The trial court appears to have treated the motion, correctly, as one to quash or dismiss the venire.

*Ohio* (1991) 499 U.S. 400, 409 [113 L.Ed.2d 411, 424, 111 S.Ct. 1364]; *Batson* v. *Kentucky* (1986) 476 U.S. 79, 89 [90 L.Ed.2d 69, 82-83, 106 S.Ct. 1712]) and by the California Constitution (*People* v. *Wheeler* (1978) 22 Cal.3d 258, 276-277 [148 Cal.Rptr. 890, 583 P.2d 748]). A defendant claiming such discrimination has the initial burden of establishing a prima facie case. (*People* v. *Arias* (1996) 13 Cal.4th 92, 134-135 [51 Cal.Rptr.2d 770, 913 P.2d 980].) When the trial court has expressly found that a prima facie case has not been established, a challenge to that finding is not rendered moot by the trial court's subsequent determination that the prosecution has supplied genuine and race-neutral explanations. (*People* v. *Turner* (1994) 8 Cal.4th 137, 166-167 [32 Cal.Rptr.2d 762, 878 P.2d 521].)

To establish a prima facie case, a party must make as complete a record as the circumstances permit, must establish that the challenged prospective jurors are members of a cognizable group, and must show a "strong likelihood" that they were challenged because of their group association. (*People* v. *Howard* (1992) 1 Cal.4th 1132, 1154 [5 Cal.Rptr.2d 268, 824 P.2d 1315]; *People* v. *Wheeler, supra,* 22 Cal.3d 258, 280.) ▉ Here, defense counsel based the motion on the prosecutor's peremptory challenge of three Black jurors. It is undisputed that the prospective jurors were Black and as such were members of a cognizable group. To establish that the jurors were probably challenged because of their race, defense counsel observed that all three prospective jurors had middle-class backgrounds, no strong opposition to the death penalty, and no apparent reason for exclusion other than race. In addition, defense counsel observed that the prosecutor had challenged a high percentage of prospective jurors who were Black (three of five, or 60 percent), that the prosecutor's voir dire of these three Black jurors was lengthier than the voir dire of non-Black jurors, and that the prosecutor had provoked an argument with one of them, prospective juror Atkins.

▉ "[W]hen a trial court denies a *Wheeler* motion without finding a prima facie case of group bias the reviewing court considers the entire record of voir dire. [Citations.] As with other findings of fact, we examine the record for evidence to support the trial court's ruling. Because *Wheeler* motions call upon trial judges' personal observations, we view their rulings with 'considerable deference' on appeal. [Citations.] If the record 'suggests grounds upon which the prosecutor might reasonably have challenged' the jurors in question, we affirm. [Citation.]" (*People* v. *Howard, supra,* 1 Cal.4th 1132, 1155.)

▉ Here, the trial court did not explain the basis for its finding that there was no prima facie case. Rather than search the record independently for race-neutral grounds upon which the prosecutor might reasonably have

challenged the jurors in question, we find it convenient to examine the reasons that the prosecutor gave in explanation for the challenge of these jurors.

### 1. *Carla Hunter*

The prosecutor explained that he exercised a peremptory challenge against Carla Hunter because her voir dire responses indicated that she might find it unusually difficult to vote for a penalty verdict of death. When asked to categorize her views according to a chart placed in the courtroom, Hunter stated that her views fell in category D, which the chart described as: "opposes or has doubts about death penalty but will not automatically vote against it in every case." When asked why she chose category D, she replied: "I have uneasy feelings about someone's life being taken away." She added that if she participated in a death verdict, "My conscience might bother me." She was asked, "Can you visualize that you would ever vote for the death penalty in this case?" She replied: "I really don't know."

Later, during general voir dire, prospective juror Hunter answered "No" when asked if she wanted to be a juror in this case. She explained that her aversion was related to the nature of the case and how serious the charges were. She described herself as being "more nervous than other people seem to be," and she said that she had had nightmares about this case.

The prosecutor stated that, based on these responses, he had concluded that although prospective juror Hunter might be "a good juror on a drunk driving or on a robbery case," he had decided that he would be remiss as a representative of the People if he left her on the jury in this capital case. The record amply supports the prosecutor's conclusion that prospective juror Hunter might well have difficulty serving as a juror in a capital case and, in particular, might have difficulty returning a penalty verdict of death. (See *People* v. *Davenport* (1995) 11 Cal.4th 1171, 1202-1203 [47 Cal.Rptr.2d 800, 906 P.2d 1068] [prosecutor may exercise peremptory challenges against death penalty skeptics].)

### 2. *Franklin Atkins*

The prosecutor explained that he exercised a peremptory challenge against prospective juror Atkins because he was unable to determine Atkins's attitude toward the death penalty, because Atkins had expressed some suspicion of prosecutors in general, and because Atkins appeared to lack confidence in the ability of the judicial system to "convict the right people." As with prospective juror Hunter, the record amply supports these reasons.

When asked to categorize his views on the death penalty using the chart in the courtroom, Atkins at first stated that his views fell in category A, which is a person who "will automatically vote for the death penalty." Upon further questioning by the court, he said that was not what he had meant. Upon questioning by defense counsel, he said his views fell in category D, which is a person who "opposes or has doubts about death penalty but will not automatically vote against it in every case" or perhaps in category C, which is a person who "neither favors nor opposes the death penalty." From these responses, the prosecutor might well conclude that it was impossible to determine with reasonable certainty whether Atkins was or was not a death penalty skeptic.

On general voir dire, Atkins stated that the role of a defense attorney in a "trial such as this" was to "make sure that the prosecuting attorney do[es] not lead a witness astray or make it look like a person actually—or is doing something or saw something they really didn't." Under further examination, Atkins explained that he was not suggesting that prosecutors would deliberately elicit distorted testimony but only that it was the function of each attorney, defense counsel and prosecutor, to act as a check on the other to ensure that the evidence was fairly presented. Nonetheless, the prosecutor's concern that Atkins's initial response might reflect some animus toward prosecutors as a group was legitimate and understandable.

In response to a question in the juror questionnaire asking whether he thought "[c]onvicted murderers should be swiftly executed," Atkins had written: "in due time mainly because a person could be inno[cent] a person should be proven [guilty and] there has been time[s] when the wrong person has take[n] the blame." From this response, the prosecutor might reasonably be concerned that Atkins's distrust of the judicial system could make him reluctant to return a verdict of death.

### 3. Harris Jones

The prosecutor explained that he had excluded Jones by peremptory challenge because Jones gave unsatisfactory answers when questioned about his death penalty views, at one point expressing opposition to the death penalty and at other points repeatedly answering "I don't know" when asked to state his views. In addition, Jones stated that he had ignored the 55 mile-per-hour speed limit, thereby displaying a "cavalier attitude" toward the law.

When asked to categorize his death penalty views, Jones stated they belonged in category C, which is a person who "neither favors nor opposes

the death penalty." Under further questioning, however, he said that he did not think the death penalty acted as a deterrent to crime, that he would not automatically impose the death penalty, and that he would "automatically reject the death penalty." Asked whether he was sure he understood the question, Jones replied: "[T]o me I would say maybe life in prison without the possibility of parole would be better than death."

Questioned further about his views on the death penalty, Jones replied: "I really have none as far as me saying I'm for it or against it. I don't have an opinion about it. I don't have any feelings about it, because I've never really thought that much about it." From these responses, the prosecutor might well conclude that Jones should be excluded as an actual or potential death penalty skeptic.

During the general voir dire, defense counsel questioned Jones as follows:

"Have you ever found a law that you didn't like?

"No.

"What about the 55 mile an hour speed limit?

"Didn't bother me any.

"Did you go 55?

"No.

"So there was a law you were willing to ignore?

"Yeah.

"In this courtroom, you're not going to be able to ignore the judge's law. If he says it's 55 it's 55.

"I understand that."

We question whether these responses, by themselves, would provide adequate basis for a challenge for cause. But, when considered in conjunction with the equivocal answers about death penalty views, they might legitimately lead the prosecutor to conclude that there was an unacceptable risk that Jones would not follow the instructions at the penalty phase.

4. *Conclusion*

We conclude that the record, as illuminated by the prosecutor's stated reasons for the peremptory challenges, suggests race-neutral grounds upon

which the prosecutor might reasonably have challenged each of the three jurors in question. Accordingly, substantial evidence supports the trial court's determination that defendant had not established a prima facie case of discriminatory use of peremptory challenges.

B. *Exclusion for Death Penalty Views*

■ Defendant contends that the trial court erred in sustaining the prosecution's "for cause" challenges to two prospective jurors based on their death penalty views, and that this error violated defendant's right to an impartial jury under the Sixth and Fourteenth Amendments to the federal Constitution and article I, section 16, of the California Constitution.

The trial court may excuse for cause a prospective juror who expresses death penalty views on voir dire that "would 'prevent or substantially impair' the performance of the juror's duties as defined by the court's instructions and the juror's oath." (*People* v. *Crittenden* (1994) 9 Cal.4th 83, 121 [36 Cal.Rptr.2d 474, 885 P.2d 887], quoting *Wainwright* v. *Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 851-852, 105 S.Ct. 844].) On appeal, we will uphold the trial court's ruling if it is fairly supported by the record, accepting as binding the trial court's determination as to the prospective juror's true state of mind when the prospective juror has made statements that are conflicting or ambiguous. (*People* v. *Crittenden, supra*, 9 Cal.4th 83, 122; *People* v. *Mincey* (1992) 2 Cal.4th 408, 456-457 [6 Cal.Rptr.2d 822, 827 P.2d 388].)

Defendant urges us not to accord the trial court's ruling the deference to which it would normally be entitled because in this case the trial court announced that it was not applying the standard enunciated in *Wainwright* v. *Witt, supra*, 469 U.S. 412, 424 [83 L.Ed.2d 841, 851-852]. What defendant fails to mention is that the trial court stated it would apply the even stricter standard of *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770] because this court had not yet stated whether it would adopt the *Witt* standard as a matter of California law, and the trial court considered it more prudent to continue to apply the *Witherspoon* test as described in decisions of this court such as *People* v. *Lanphear* (1980) 26 Cal.3d 814, 821, 840-841 [163 Cal.Rptr. 601, 608 P.2d 689]. Because a determination that a prospective juror is subject to challenge for cause under the *Witherspoon/Lanphear* test necessarily implies a determination also that the prospective juror's death penalty views "would 'prevent or substantially impair' the performance of the juror's duties as defined by the court's instructions and the juror's oath" (*People* v. *Crittenden, supra*, 9 Cal.4th 83, 121), we will not depart from the normal standard of review.

### 1. Virginia Luna

During voir dire, prospective juror Virginia Luna, after initially characterizing her views on the death penalty as neutral (that is, neither supporting nor opposing), then said she did not "like" the death penalty, that even when she "thought it was right" she would not vote for death, and that "regardless of what the evidence showed" she "could never vote to put someone to death." Given these responses, the trial court did not err in sustaining the prosecution's challenge for cause.

### 2. Adeline Villasenor

Quoting the biblical command "thou shall not kill," prospective juror Adeline Villasenor admitted she had reservations about the death penalty based on her religious beliefs. Although initially she said only that she was opposed to the death penalty "in some cases," she later explained that if given the choice between the death penalty and life imprisonment without parole, she would automatically vote for the latter penalty in every case regardless of the evidence. Again, we are satisfied that the trial court did not err in sustaining the prosecution's challenge for cause.

### C. Nonrandom Selection Method

Jury selection proceeded by first questioning each prospective juror individually regarding death penalty views and then proceeding with general voir dire at which the parties exercised their peremptory challenges. During the death-qualification voir dire, the prospective jurors were called in the alphabetical order of their last names. During general voir dire, the prospective jurors were called in random order, except that all the prospective jurors called for general voir dire had last names beginning with letters in the first half of the alphabet. The record does not explain how this occurred.

■ Defendant contends that this procedure violated defendant's statutory right to random jury selection, created an opportunity for discrimination, and limited the exercise of his peremptory challenges in violation of his federal constitutional rights to due process of law and to an impartial jury (U.S. Const., 5th, 6th, & 14th Amends.).

Because the defense did not raise the present objection to the selection procedure before the jury was sworn, the claim has been forfeited. (*People v. Visciotti* (1992) 2 Cal.4th 1, 38 [5 Cal.Rptr.2d 495, 825 P.2d 388].) Recognizing that we might reach this conclusion, defendant contends that his trial counsel's failure to object deprived him of his constitutional right to effective assistance of counsel. We reject the claim of ineffective assistance for lack of prejudice.

Exclusion of prospective jurors whose last names began with a letter in the second half of the alphabet did not skew the jury selection procedure. There is no evidence, and no claim, that jurors of either gender or of any religious or racial or ethnic group are present in disproportionate numbers in the group of excluded jurors. Defendant does make the argument that the excluded jurors contain a higher percentage of death penalty skeptics as revealed by their responses during the death-qualification voir dire, but the argument is based on an invalid comparison. Instead of comparing the number of death penalty skeptics among the prospective jurors whose last names began with a letter in the second half of the alphabet with the number of death penalty skeptics among the prospective jurors whose last names began with a letter in the first half of the alphabet, defendant compares the former group with the jurors actually selected. Because this comparison completely disregards the effects of general voir dire and the exercise of peremptory challenges, it cannot be used to demonstrate that the selection method deprived defendant of the benefits of a completely random selection procedure.

Although there was no prejudice on the facts of this case, procedures that unnecessarily narrow the jury pool are disfavored, and courts should strictly adhere to statutory provisions designed to provide criminal defendants with juries constituting as nearly as reasonably possible a random cross-section of the community. (See *People* v. *Wright* (1990) 52 Cal.3d 367, 394-395 [276 Cal.Rptr. 731, 802 P.2d 221].)

## IV. GUILT PHASE

### A. *Defendant's Statements to Police*

At trial, the defense moved to exclude evidence of defendant's statements to the police during the hostage negotiations at the Haverstick residence and his postarrest statements to Deputy Stein. After a hearing out of the jury's presence (see Evid. Code, §§ 402-403), the trial court denied the motion. Defendant contends on appeal that the trial court erred in so ruling because the statements were obtained in violation of defendant's Fifth Amendment rights under *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], and because Deputy Stein's testimony was inherently improbable.

### 1. *Facts*

After defendant dove through the living room window of the Haverstick residence, officers of the Rialto Police Department and the San Bernardino

Sheriff's Department surrounded the house and set up a command post in the residence next door. The officers established telephone communication with the Haverstick residence and engaged in a series of conversations with defendant. Roy Mayfield (defendant's father) and Yvonne Hester (defendant's cousin) participated in some of these conversations as the officers attempted to resolve the situation without further injury or loss of life. These telephone conversations were recorded on tape. During the conversations, defendant made damaging admissions. For example, he referred to Haverstick as his "hostage" and threatened to "blow his head off." Speaking to Hester, defendant said he had "fired five shots already" and that "two of those shots went straight to—at the police." When Hester asked defendant how many policemen he had shot, defendant replied, "Just the one." At no time during the telephone conversations was defendant advised of his rights under *Miranda* v. *Arizona*, *supra*, 384 U.S. 436.

The officers surrounding the Haverstick residence were heavily armed and would not have permitted defendant to leave the area had he attempted to do so. Defendant finally agreed to surrender when he could see his father outside. At 6:40 a.m., defendant threw Sergeant Wolfley's gun outside, then walked out with his hands on his head. Deputy Emmerson (part of the San Bernardino Sheriff's SWAT team) placed handcuffs on defendant and seated him in the backseat of Deputy Stein's patrol car. A few moments later, defendant was removed from the patrol car so that Deputy Emmerson's handcuffs could be removed and replaced by those of Deputy Stein.

After the handcuff exchange had been completed, defendant said, "They promised me I could talk to my dad after I surrendered."

Deputy Stein told Sergeant Stodelle, who was standing about 20 feet from Deputy Stein's patrol car, that defendant was asking to speak to his father. Sergeant Stodelle asked Deputy Stein to wait a minute. Deputy Stein then told defendant to be seated.

Defendant said, "You mean I'm not going to get to talk to my father?"

Deputy Stein told defendant that the other officers were discussing the matter and again told defendant to be seated.

Defendant said, "Can't I just stand here? I'm not going to cause any problems or do anything stupid. I'm just scared and not really that bad of a guy. You can ask Bill, the guy I shot. I think he understands, and I tried to help him after I shot him. It's just that when I went through the window and then I saw him, I was startled. So I shot him."

Deputy Stein looked at defendant, who inquired: "How's the officer I shot?" Deputy Stein replied that he had heard the officer had been taken to the hospital.

Defendant said, "I had to do it. I didn't want to go to jail. I've been there too many times. When I took off and he caught me, all I thought about was getting his gun and shooting him so he couldn't arrest me. I took his gun and I shot him. Then I got scared, so I started running. Some other cops started chasing me so I shot them so they would stop chasing me. When I got over here, somebody shouted, 'Police, freeze,' and I didn't want to get hurt, so I ran and dove through that window. When I got inside, Bill startled me, and I shot him."

Sergeant Stodelle told Deputy Stein that defendant would not be permitted to speak to his father at that time. After seating defendant in the rear of the patrol car, Deputy Stein walked to the back of the vehicle and wrote in a steno pad everything defendant had said to him. Deputy Stein then drove defendant to the Rialto Police Department, arriving at 7:03 a.m.

During the drive, defendant said, "Can't you take me directly to San Bernardino? Those guys are going to want to hurt me because I shot one of their officers."

At the Rialto Police Department, Deputy Stein told Detective Amicone that defendant had made statements, seemed cooperative, and would probably be willing to talk to Detective Amicone. Deputy Stein summarized for Detective Amicone the statements defendant had made.

That afternoon, Deputy Stein dictated his report onto a cassette tape, using his steno pad to quote defendant's exact words. On the following day, he received a typewritten report prepared from the cassette tape. After comparing the typewritten report with the steno pad, Deputy Stein discarded the steno pad notes and returned the cassette tape for reuse by other deputies.

### 2. Waiver

The People argue that defendant has waived any challenge to the admissibility of either the statements he made in the Haverstick residence during the tape-recorded telephone conversations or the statements he made to Deputy Stein after his arrest. The People acknowledge that the defense at trial sought to exclude both sets of statements, that a hearing was held under Evidence Code section 402, and that the trial court ruled the evidence admissible, but the People maintain that the issues are not preserved for

review because the defense did not renew its objections when the evidence was offered during the trial.

We find no waiver. Because the defense motion to exclude evidence raised a specific objection and identified the evidence to which it was directed, because it was made to the trial court at the outset of trial, and because the trial court was then able to view the evidence in its appropriate context, the trial court's ruling is subject to review on appeal even though the motion to exclude was not renewed when the prosecution offered the evidence during the trial. (*People* v. *Crittenden, supra,* 9 Cal.4th 83, 125-127; *People* v. *Wharton* (1991) 53 Cal.3d 522, 549, fn. 3 [280 Cal.Rptr. 631, 809 P.2d 290]; *People* v. *Morris* (1991) 53 Cal.3d 152, 189-190 [279 Cal.Rptr. 720, 807 P.2d 949].)

### 3. *Miranda*

■ Before being subjected to "custodial interrogation," a suspect "must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." (*Miranda* v. *Arizona, supra,* 384 U.S. 436, 444 [16 L.Ed.2d 694, 706-707].) Statements elicited in violation of this rule are generally inadmissible in a criminal trial. (*Id.* at pp. 492, 494 [16 L.Ed.2d at pp. 733-735]; but see also *Harris* v. *New York* (1971) 401 U.S. 222 [28 L.Ed.2d 1, 91 S.Ct. 643] [permitting otherwise inadmissible statements to be used for impeachment of testifying defendant].) An officer need not give the *Miranda* warnings, however, in a situation posing such a threat to the public safety that the officer's need for answers "outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." (*New York* v. *Quarles* (1984) 467 U.S. 649, 657 [81 L.Ed.2d 550, 558, 104 S.Ct. 2626].)

In applying *Miranda,* as this court has explained, one normally begins by asking whether custodial interrogation has taken place. "The phrase 'custodial interrogation' is crucial. The adjective [custodial] encompasses any situation in which 'a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' (*Miranda* v. *Arizona, supra,* 384 U.S. at p. 444 [16 L.Ed.2d at p. 706].) The noun [interrogation] 'refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.' (*Rhode Island* v. *Innis* (1980) 446 U.S. 291, 301 [64 L.Ed.2d 297, 308, 100 S.Ct. 1682], fn. omitted.)" (*People* v. *Mickey* (1991) 54 Cal.3d 612, 648 [286 Cal.Rptr. 801, 818 P.2d 84].)

■ Here, defendant sought to exclude statements he made to police negotiators over the telephone while he was inside the Haverstick residence and statements he made to Deputy Stein after he had surrendered and while he was in handcuffs. The trial court denied the motion to exclude, concluding that defendant was not in custody, for purposes of the *Miranda* rule, while he was inside the Haverstick residence, and that the statements he made to Deputy Stein were not made in response to police interrogation.

■ In reviewing this ruling, we accept the trial court's factual findings, based on its resolution of factual disputes, its choices among conflicting inferences, and its evaluations of witness credibility, provided that these findings are supported by substantial evidence. (*People* v. *Crittenden, supra,* 9 Cal.4th 83, 128.) But we determine independently, based on the undisputed facts and those properly found by the trial court, whether the challenged statements were legally obtained. (*Ibid.*)

■ We consider first the statements defendant made on the telephone while inside the Haverstick residence.

Although the issue appears not to have arisen often, every court that has faced it has decided that telephone conversations between police negotiators and an armed suspect who has taken refuge in a building that is surrounded by law enforcement officers do not constitute custodial interrogation for purposes of the *Miranda* rule. (See, e.g., *United States* v. *Mesa* (3d Cir. 1980) 638 F.2d 582, 586 (lead opn. by Seitz, C. J.); *id.* at p. 589 (conc. opn. of Adams, J.); *People* v. *Treier* (1995) 165 Misc.2d 665, 669 [630 N.Y.S.2d 224, 227]; *State* v. *Pejsa* (1994) 75 Wn.App. 139, 149 [876 P.2d 963, 969]; *State* v. *Stearns* (1993) 178 Wis.2d 845, 846-847 [506 N.W.2d 165, 167-168]; *People* v. *Brewer* (Colo.Ct.App. 1985) 720 P.2d 583, 586.) As these courts have emphasized, an officer who is talking to a suspect under these conditions is not physically in the suspect's presence and thus lacks immediate control over the suspect, who retains a degree of freedom of action inconsistent with a formal arrest; indeed, the suspect can readily terminate communications at any time by hanging up the phone. (*United States* v. *Mesa, supra,* at pp. 585-587 (lead opn. by Seitz, C. J.); *State* v. *Pejsa, supra,* 75 Wn.App. 139, 149 [876 P.2d 963, 969]; *People* v. *Brewer, supra,* 720 P.2d at p. 586.) Moreover, the main purpose of the officers in communicating with the suspect is not to investigate a crime but to convince the suspect to surrender peacefully; accordingly, there is little risk that the officers will use coercive techniques to elicit incriminating information. Finally, giving the *Miranda* warnings might make the officers' task more difficult, thereby increasing the risk of a violent confrontation. (*United States* v. *Mesa, supra,* 638 F.2d at p. 590 (conc. opn. of Adams, J.); *State* v. *Stearns, supra,* 178 Wis.2d 845, 851-852 [506 N.W.2d 165, 167-168].)

We agree with the reasoning of these courts. We also agree with the court in *People* v. *Treier, supra,* 165 Misc.2d 665, 670-671 [630 N.Y.S.2d 224, 227-228], that the "public safety" exception to *Miranda* applies during police negotiations to obtain the release of a hostage held at gunpoint. Accordingly, we conclude that the statements defendant made while speaking to police negotiators over the telephone from the Haverstick residence were not unlawfully obtained and that, accordingly, the trial court properly denied the defense motion to exclude them from evidence under *Miranda* v. *Arizona, supra,* 384 U.S. 436.

We consider next the statements defendant made to Deputy Stein after he had been formally arrested and handcuffed. There is no dispute that defendant was in custody when he made these statements and that he had not previously been advised of his constitutional rights under *Miranda* v. *Arizona, supra,* 384 U.S. 436. The admissibility of these statements turns on whether they were the product of police interrogation or instead were freely volunteered.

Defendant concedes that Deputy Stein did not expressly question defendant, but he argues that at the time of his surrender the police engaged in actions that they should have known were "reasonably likely to evoke an incriminating response from" defendant (*Rhode Island* v. *Innis* (1980) 446 U.S. 291, 301 [64 L.Ed.2d 297, 308, 100 S.Ct. 1682]). In particular, he cites evidence that police negotiators told defendant that they would or might permit him to speak to his father if he surrendered. After he surrendered, however, he was not immediately permitted to speak to his father, and Deputy Stein would not give him a direct answer when defendant asked whether he would be permitted to speak to his father. Defendant insists that the officers present should have known that defendant would interpret this equivocation as an implied demand that he cooperate by making incriminating statements.

We find this argument unpersuasive. Defendant spoke to his father on the telephone from the residence and surrendered only after he could see his father outside. Defendant evidently regarded his father's presence as an assurance of defendant's own physical safety during the process of surrender. Once that process was complete, the officers had no reason to believe that further communication with his father was a matter of such grave importance to defendant that he would feel compelled to incriminate himself in order to persuade the officers to grant his request. Nothing in the officers' statements to defendant or in defendant's statements to Deputy Stein suggested that either had any such bargain in mind.

Accordingly, we conclude that defendant's statements to Deputy Stein were not the product of custodial interrogation. The trial court properly

denied the defense motion to exclude them from evidence under *Miranda* v. *Arizona, supra,* 384 U.S. 436.

### 4. *Inherent Improbability*

 Defendant contends that the trial court erred in denying his motion to exclude the testimony of Deputy Stein regarding defendant's postarrest statements on the ground that the testimony was inherently improbable. Defendant cites no authority for the proposition that the testimony of an ordinary witness may be excluded on this ground. Instead, he relies on authority that (1) testimony that is inherently incredible is insufficient to support a conviction (e.g., *United States* v. *Chancey* (11 Cir. 1983) 715 F.2d 543, 546-547); (2) a conviction will be reversed if it was obtained by evidence that the prosecution knew or should have known was false (e.g., *United States* v. *Agurs* (1976) 427 U.S. 97, 103 [49 L.Ed.2d 342, 349-350, 96 S.Ct. 2392]); (3) a conviction will be reversed if it was obtained by scientific evidence using techniques the reliability of which had not been adequately proven (e.g., *People* v. *Hayes* (1989) 49 Cal.3d 1260, 1268-1270 [265 Cal.Rptr. 132, 783 P.2d 719]); and (4) one reason for excluding evidence of an involuntary or coerced confession is that such confessions are unreliable (e.g., *Brown* v. *Mississippi* (1936) 297 U.S. 278 [80 L.Ed. 682, 56 S.Ct. 461]).

We are skeptical of the claim that the testimony of an ordinary witness who claims to have heard the confession or damaging admission of a criminal defendant may be excluded from evidence on the ground that it is inherently improbable. Generally, "doubts about the credibility of [an] in-court witness should be left for the jury's resolution." (*People* v. *Cudjo* (1993) 6 Cal.4th 585, 609 [25 Cal.Rptr.2d 390, 863 P.2d 635].) Assuming for the sake of argument that such a ground of exclusion exists, defendant has not shown that it should have been invoked to exclude the testimony of Deputy Stein.

In claiming that Deputy Stein's testimony was inherently incredible, defendant focuses primarily on Deputy's Stein testimony that he remembered every word defendant spoke and that he wrote down defendant's statement, after a lapse of five to ten minutes, without the slightest error. But even if we assume that Deputy Stein's memory is not as precise as he claimed (a proposition that was never tested), this would not destroy the credibility of his testimony or its relevance as evidence of defendant's guilt. Defendant's statement, as recorded by Deputy Stein, that he shot Sergeant Wolfley because he did not want to return to prison, would be no less inculpatory if it was to some extent paraphrased rather than recorded with

complete accuracy. The relevance of the statement lies in its substance, not in the precise words used.

Defendant also relies on the testimony of Sergeant Hankerson, who stated that he was standing near Deputy Stein's patrol car at the time the alleged statements were made, and that he did not hear defendant make any statements other than an inquiry about the condition of Sergeant Wolfley, nor did he see Deputy Stein writing in his notebook. This was a simple conflict in the evidence for the jury to resolve; it was not grounds for excluding the testimony of Deputy Stein.

## B. *The Jury View*

During the prosecution's case-in-chief, the jury was taken to view the scene of the charged offenses. Defendant chose not be present during this part of the trial.[8] Defendant contends: (1) holding the jury view in defendant's absence violated his right to be present at trial under the federal Constitution (U.S. Const., 6th & 14th Amends.), the state Constitution (Cal. Const., art. I, § 15), and sections 977, 1043, and 1119 of the Penal Code; (2) the trial court's active participation during the jury view was misconduct and denied defendant his due process right to a fair trial and his Eighth Amendment right to a reliable verdict; and (3) the actions and omissions of defense counsel during the jury view denied defendant his right under the federal Constitution's Sixth Amendment to the effective assistance of counsel.

### 1. *Facts*

After jury selection but before opening statement, defendant's trial counsel, in defendant's presence, stated that the defense would be requesting that the jury be taken to view the scene of the charged offenses. The prosecutor indicated he "would concur with that." The trial court granted the request. The court and counsel agreed that the view should occur after the jurors had heard at least some of the testimony concerning the places they would be viewing.

As the trial unfolded, the court and counsel held further discussions in defendant's presence about the proposed jury view. On October 1, 1987, during a hearing out of the jury's presence, the court set the jury view for the afternoon and evening of October 14, 1987. The jury would view the various areas in daylight, recess for dinner, and reconvene to view the areas again at

---

[8]During the defense case-in-chief, the jury was taken for a second and briefer view of the scene. Defendant again waived his presence. Defendant does not here raise any issue concerning this second jury view.

night. Defense counsel stated that defendant intended to waive his presence during the jury view. The court indicated that defendant could change his mind at any time before the afternoon of the jury view, and that his waiver would be formally taken on the record at a later time. It was agreed that the court reporter would attend the jury view. The prosecutor indicated his intention to take testimony from the owner of the service station during the jury view. The court asked that police cars be positioned at the service station as they were at the time Sergeant Wolfley was killed. The trial court stated that it would permit jurors to ask questions, and that the court would "rule upon it just like any other questions . . . as if we were in court."

On October 8, 1987, the jury view was again discussed. Defense counsel suggested the court "take a waiver" from defendant that day, but the court suggested they wait until the day of the jury view. The prosecutor stated that arrangements were being made to have demonstration firings of Sergeant Wolfley's gun during the jury view. Defense counsel questioned whether the lighting at the service station was still as it was on the night Sergeant Wolfley was killed. The court stated that the station's owner should be able to provide that information.

The matter was discussed again later that day. The court and counsel agreed on the order in which the various places would be viewed and where the jurors would be positioned during the proposed demonstration firings of Sergeant Wolfley's gun. The court overruled a defense objection to the test firings insofar as they involved muzzle flashes rather than merely the sound of gunfire. Addressing defendant directly, the court assured him that he was "entitled to be present outside there with us" and described the arrangements that would be made if defendant decided to attend the jury view. Defendant affirmed that he intended to waive his presence. The court told him he would have until noon on the day of the jury view to change his mind.

On the day of the jury view, after the jury was excused for the noon recess, the court and counsel again discussed details of the proposed gunfire demonstration. The court stated: "Mr. Mayfield, I told you before that you have a right to be with us on our trip here with the bus, look at all the places where it's been testified to. Your attorney, Mr. Bristoll, has told me before that you did not want to go. Is that still your feeling, sir?" Defendant answered, "Yes." Defense counsel stated: "I have conferred with Mr. Mayfield about his right to go to the scene. We have discussed as a matter of trial tactic reasons pro and con for his not being there. And we have decided that, mutually decided, that in terms of our position in this case that it would be best if he were not present during the jury's visit to the scene."

The jury view was held that evening, beginning at 5:00 p.m. and concluding at 10:10 p.m., with a dinner break from 6:00 p.m. to 8:05 p.m. During

the jury view, testimony was taken from the owner of the service station and from officers participating in the gunfire demonstrations.

### 2. *Defendant's Absence*

■■■ Defendant contends that both the federal and the state Constitutions (U.S. Const., 6th Amend. [confrontation clause]; *id.,* 14th Amend. [due process clause]; Cal. Const., art. I, § 15) confer on criminal defendants a right to be present at critical stages of a capital trial; that a jury view of the crime scene, at least when accompanied by the taking of testimony, is such a critical stage; and that the right of presence is of such fundamental importance that the defendant lacks power to waive the right.

This court has repeatedly rejected the third component of defendant's contention, that a criminal defendant may not waive the right of presence at a critical stage of a capital trial. (See, e.g., *People* v. *Price* (1991) 1 Cal.4th 324, 405 [3 Cal.Rptr.2d 106, 821 P.2d 610]; *People* v. *Breaux* (1991) 1 Cal.4th 281, 307 [3 Cal.Rptr.2d 81, 821 P.2d 585]; *People* v. *Medina* (1990) 51 Cal.3d 870, 903 [274 Cal.Rptr. 849, 799 P.2d 1282].) We decline defendant's invitation that we reconsider our conclusion on this issue. Here, the record demonstrates that defendant, in open court and on the record, made a voluntary and intelligent waiver of presence at the jury view. Therefore, holding the jury view in defendant's absence did not violate defendant's right of personal presence under the state or federal Constitution.

Defendant argues that his waiver was invalid and ineffective because he was not advised, before making the waiver, that testimony would be taken and demonstrations conducted during the jury view. The record belies the factual assertion on which this argument is based. It shows that defendant was present during the extensive discussions between the court and counsel about the plans for the jury view, including the proposed gunfire demonstrations and the proposed testimony by the owner of the service station.

Defendant contends, next, that the waiver of personal presence is invalid under sections 977 and 1043. As this court recently explained, "a capital defendant may not voluntarily waive his right to be present during the proceedings listed in section 977, including those portions of the trial in which evidence is taken . . . ." (*People* v. *Jackson* (1996) 13 Cal.4th 1164, 1211 [56 Cal.Rptr.2d 49, 920 P.2d 1254].) Because evidence was taken at the jury view, defendant is correct that the trial court erred under sections 977 and 1043 in granting defendant's request to voluntarily absent himself during the jury view.

The error being one "of purely statutory dimension" (*People* v. *Jackson, supra,* 13 Cal.4th 1164, 1211), reversal is required only if " 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of error' " (*ibid.,* quoting *People* v. *Watson* (1956) 46

Cal.2d 818, 836 [299 P.2d 243]). Defendant does not persuade us that it is reasonably probable the guilt verdicts would have been more favorable to him had he been present at the jury view. He provides no sound basis to question the contemporaneous judgment of defense counsel, with which defendant then agreed, that defendant's trial interests would be better served by *not* attending the jury view. We therefore conclude that the error was not prejudicial.

Before leaving this subject, we sound a note of caution. Had the trial court obeyed the letter of the statutory commands by refusing to accept defendant's waiver of presence, defendant might well have argued on appeal that requiring him to attend the jury view, thereby exposing the jurors to the strict security precautions that would be necessary in such a situation, had so prejudiced him before the jury as to deny him his constitutional rights to due process and a fair trial. We do not imply any view on the merits of such a contention, which is not now before us; we suggest only that trial courts should proceed with caution and that the Legislature may wish to reconsider the wisdom of statutory provisions that deprive capital defendants of the ability to waive their presence at trial proceedings outside the courtroom.

### 3. *Judicial Misconduct*

██ Defendant contends that the trial judge committed misconduct by his "active participation during the jury visit." In particular, defendant complains that the trial judge: (1) answered questions posed by the jurors; and (2) asked questions of the attorneys and elicited stipulations from them. Defendant complains that "the court took on the role of a partisan advocate, much like a witness, through its questions and directives during the visit, especially its involvement in the placement of exhibits to demonstrate the location of Sergeant Wolfley's body."

We reject defendant's underlying assumption that a trial judge, except when ruling on objections, must remain passive at the trial while the attorneys are presenting the evidence. "Numerous courts including our own have recognized that it is not merely the right but the duty of a trial judge to see that the evidence is fully developed before the trier of fact and to assure that ambiguities and conflicts in the evidence are resolved insofar as possible." (*People* v. *Carlucci* (1979) 23 Cal.3d 249, 255 [152 Cal.Rptr. 439, 590 P.2d 15]; see generally, Gitelson, *A Trial Judge's Credo* (1966) 7 Santa Clara L.Rev. 1.)

Having carefully examined the record of the jury view, we conclude that the trial judge committed no misconduct and, in particular, did not become an advocate for either side.

### 4. *Ineffective Assistance of Counsel*

Defendant contends that the actions and omissions of his trial attorney during the jury view denied him the effective assistance of counsel guaranteed by the federal and state Constitutions. In particular, he complains that

trial counsel failed to object to the trial court's actions, entered into stipulations readily, and did not object when evidence was received.

We have already concluded that the trial court's actions were proper and thus not objectionable. Similarly, we conclude that defense counsel did not act inappropriately when he stipulated to certain facts, such as the location of Sergeant Wolfley's body. Absent evidence to the contrary, we may assume that the facts as stipulated were consistent with prosecution evidence that defendant never intended to dispute. Finally, we find no sound basis upon which counsel could have objected to the taking of testimony at the scene. As we have previously observed, defendant was aware, when he waived his personal presence during the jury view, that some testimony would be taken. In addition, we note that defense counsel did object, albeit unsuccessfully, to the gunfire demonstration insofar as it involved attempts to view the muzzle flashes from the window of Curtis Corbin's apartment. The basis of the objection was that Corbin's testimony was not specific enough to permit a reenactment that duplicated the exact position of the firearm. The trial court overruled the objection, reasoning that the problem could be overcome by firing the weapon from whatever positions counsel might suggest that fell within the ambit of Corbin's testimony. We find no basis upon which to conclude that defendant's trial counsel did not provide him with the effective assistance of counsel that the state and federal Constitutions guarantee.

## C. *The Haverstick/Hester Conversation*

 Defendant contends that the trial court erred in overruling a hearsay objection to a tape recording of a telephone conversation between William Haverstick, Sergeant Stodelle, and Yvonne Hester during the time that defendant was holding Haverstick as a hostage. He further contends that the erroneous ruling violated his federal constitutional rights of confrontation, due process of law, and capital verdict reliability (U.S. Const., 5th, 6th, 8th, & 14th Amends.).

Defendant had been speaking on the telephone with Hester and Stodelle when Hester asked about Haverstick's condition and told defendant she wanted to speak to him. Haverstick then came on the line with Hester and Stodelle, stating that defendant had shot him, describing his condition, and pleading for help. Hester then said, "Dennis?" Defendant answered, "Hmm?" Hester said, "Dennis, you didn't say the man was shot." Defendant replied, "Okay, so now y'all know."

In a hearing outside the jury's presence to determine the admissibility of the evidence (Evid. Code, §§ 402-403), Hester testified that she could hear

defendant in the background as she was speaking to Haverstick. The trial court ruled the evidence admissible under the hearsay exceptions for adoptive admissions (Evid. Code, § 1221), spontaneous declarations (*id.,* § 1240), and present physical and mental condition (*id.,* § 1250).

We find no error in the court's ruling. The trial court found that defendant was able to hear both sides of the telephone conversation. Substantial evidence supports the conclusion. The conversation began when defendant agreed to let Haverstick speak to Hester, the conversation lasted only about a minute and a half, during the conversation Hester could hear defendant in the background, and when Hester addressed defendant ("Dennis?"), defendant immediately responded. Because defendant was able to hear the entire conversation and to reply to any untrue or unfair accusations against him, Haverstick's statements that defendant had shot him and that defendant was then threatening him with the pistol ("he's got a pistol right between my eyes right now") were admissible as adoptive admissions. (See *People* v. *Medina, supra,* 51 Cal.3d 870, 889-891.) Haverstick's statements describing his present mental and physical condition (for example, "I am about to pass out" and "I am numb from the waist down") were admissible under the hearsay exception for statements describing the declarant's present mental and physical condition. The remaining statements by Haverstick, including his pleas for help, were not hearsay because they were not admitted for the truth of the matter stated.

We also reject defendant's additional contention that the trial court should have excluded the evidence on the ground that its probative value was outweighed by the risk of undue prejudice. (See Evid. Code, § 352.) Because the defense did not object on this ground at trial, the issue is not preserved for review. (See *id.,* § 353, subd. (a).)

D. *Haverstick Preliminary Hearing Testimony*

Over defense objection, the trial court admitted in evidence most of the preliminary hearing testimony of William Haverstick, excluding only those portions of the testimony to which the defense had asserted a valid and contemporaneous objection. Defendant contends that the trial court erred in so ruling and thereby denied him his federal constitutional right of confrontation (U.S. Const., 6th Amend.), because the witness's inability to remember certain details precluded effective cross-examination and because the defense did not have adequate time to prepare for the cross-examination. Alternatively, defendant contends that the trial court erred in overruling defense objections to specific portions of the preliminary hearing testimony.

1. *The Witness's Memory*

■ Although the testimony of a witness at an earlier proceeding is hearsay if offered to prove the truth of the matters to which the witness testified, it is admissible under the prior testimony exception to the hearsay rule if (1) the witness is unavailable, and (2) the party against whom the testimony is offered was a party to the earlier proceeding and either offered it in evidence at the earlier proceeding or "had the right and opportunity to cross-examine" the witness "with an interest and motive similar to that which [the party] has at the [current proceeding]." (Evid. Code, § 1291, subd. (a)(2).) When these requirements are satisfied, admitting former testimony in evidence does not violate a defendant's right of confrontation under the federal Constitution. (*California* v. *Green* (1970) 399 U.S. 149, 165-166 [26 L.Ed.2d 489, 501-502, 90 S.Ct. 1930]; see *People* v. *Cudjo, supra,* 6 Cal.4th 585, 618.)

■ Defendant concedes that Haverstick, because he had died, was unavailable as a witness at defendant's trial. But defendant argues that he did not have an adequate opportunity to cross-examine Haverstick at the preliminary hearing because Haverstick at that time was unable to remember some important facts.

The right of confrontation does not protect against "testimony that is marred by forgetfulness, confusion, or evasion." (*Delaware* v. *Fensterer* (1985) 474 U.S. 15, 22 [88 L.Ed.2d 15, 21, 106 S.Ct. 292]; accord, *U. S.* v. *Owens* (1988) 484 U.S. 554, 557-559 [98 L.Ed.2d 951, 956-958, 108 S.Ct. 838].) Having carefully reviewed Haverstick's preliminary hearing testimony, we find that despite his gunshot wound and the attendant loss of blood, his memory of the traumatic events during the hours after the shooting and before defendant's surrender was largely intact. Despite some lapses of memory, his testimony at the preliminary hearing was lucid and coherent. Under these conditions, the process of direct examination and cross-examination provided the jury with an adequate basis to evaluate Haverstick's credibility. "The Sixth Amendment's confrontation clause requires no more. (*U.S.* v. *Owens, supra,* 484 U.S. 554, 559 [98 L.Ed.2d 951, 957-958].)" (*People* v. *Cudjo, supra,* 6 Cal.4th 585, 622.)

2. *Defense Opportunity to Prepare*

The events to which Haverstick testified occurred on March 3, 1986. Defense counsel was appointed on March 5, 1986, and Haverstick testified at the preliminary hearing on June 20, 1986. Therefore, counsel had over three months to prepare for the preliminary hearing. Moreover, defendant was

present during the events to which Haverstick testified and presumably gave an account of them to counsel. Finally, it appears that counsel had received written reports of statements Haverstick had made to police investigators. Under these circumstances, we are satisfied that defense counsel's opportunity to prepare for the preliminary hearing was adequate to afford meaningful adversarial testing of Haverstick's testimony, and therefore the requirements of both the prior testimony exception to the hearsay rule and the constitutional right of confrontation were satisfied.

### 3. Objections to Specific Testimony

■ Defendant contends that the trial court improperly ruled on four defense trial objections to specific portions of the transcript of Haverstick's preliminary hearing testimony.

The first such objection concerns questions by the prosecutor concerning whether Haverstick recalled overhearing defendant say, during one of defendant's telephone conversations, that he had shot a police officer. Initially, Haverstick said he did not recall defendant making such a statement. The prosecutor then asked if, based on what defendant said during these telephone conversations, Haverstick *understood* that defendant had shot an officer. When the magistrate sustained a defense objection to this form of question, the prosecutor attempted to refresh Haverstick's recollections by reminding him of statements he had made to a police detective. Haverstick answered that he could not recall the interview by the police detective, but he did now remember that defendant had said that "if the dude was dead" defendant was going to let Haverstick die and use the last bullet on himself. Haverstick also testified, without objection, that he understood that defendant was referring to a police officer by the word "dude."[9]

At trial, the defense asked the court to edit out the portion of the transcript containing questions by the prosecutor to which the defense had successfully

---

[9]The preliminary hearing transcript shows the following:

"Q [By the prosecutor:] To the best of your recollection, did Mr. Mayfield ever indicate while he was talking on the telephone that he had shot a police officer in any of these conversation?

"A I can't really say that he did.

"Q During the time that he was there and talking on the telephone, did you understand from his conversation that he had shot a police officer?

"[Defense counsel]: Objection. Calls for speculation.

"The Court: Sustained.

"Q By [the prosecutor]: Based on your knowledge and understanding of the conversation?

"[Defense counsel]: Renew the objection.

"The Court: Sustained.

"Q By [the prosecutor]: During that conversation that you had with the officer at the hospital, do you recall telling him or do you recall the question put to you: 'Okay, you're real

objected. The trial court declined to do so, remarking that the witness had not answered the questions and that the jury would be instructed that unanswered questions are not evidence.

On appeal, defendant contends the trial court committed prejudicial error in not editing out the prosecutor's questions to which the magistrate had sustained objections at the preliminary hearing. We agree that the trial court should have edited out such questions. Reading the questions served no legitimate purpose and posed a risk, albeit slight, that the jurors would draw factual inferences from the questions despite the instruction that they not do so. But we do not agree that the error was prejudicial. The only factual inference the jury could have drawn from the objected-to questions was that defendant had in fact admitted shooting a police officer. But this fact was supported not only by Haverstick's subsequent testimony, which was properly admitted, but also by the tape recordings of defendant's telephone conversations.

The next objection concerns the same sequence of preliminary hearing testimony. At trial, defendant asked the court to delete all references in that testimony to statements Haverstick allegedly had made during the police interview. The objection was that there was no foundation for the questions because Haverstick could not remember the police interview. The trial court granted the request in part, excluding references to the interview as such, but retaining a part of the prosecutor question quoting a statement Haverstick had allegedly made during the interview ("Yes. And he says if this dude's dead what have I got to look forward to. And he says I'm just going to let Bill die and use my last bullet on me.") because Haverstick responded by testifying "I remember that distinctly."

We find no error. Although Haverstick did not recall the interview, he independently remembered the statements he had heard defendant make. As edited, the transcript properly reflects Haverstick's admissible testimony.

---

positive from his conversation, though, you—you knew that he'd shot a policeman?' And your answer: 'Yes.'

" 'Q And he knew it?'

" 'A Yes. And he says if this dude's dead what have I got to look forward to. And he says I'm just going to let Bill die and use my last bullet on me.'

"A I remember that distinctly.

"Q And did you tell the officer that?

"A I can't remember. I don't remember the conversation with the officer whatsoever.

"Q All right. Let me ask you do you remember Mr. Mayfield—

"A On the telephone saying that to somebody. I don't know who.

"Q But if the dude was dead he was going to let you die and then use the last bullet on him?

"A Yes, that's what he said.

"Q And did you understand that to mean that Mr. Mayfield, when he used the term 'dude' was referring to a police officer?

"A I believe so, yes."

Next, defendant contends that the trial court should have excluded Haverstick's testimony that defendant threatened to let him die. The prosecutor had asked: "Now, did Mr. Mayfield, when he was in your home, at any time threaten to kill you?" Haverstick had answered: "He threaten [*sic*] to let me die . . . . Quoting him, 'I'll just let Bill die and use this last bullet on myself.' " Defendant objected at trial that the answer was nonresponsive. The trial court overruled the objection, remarking that it thought the answer was responsive. We agree. It was at least debatable whether defendant's statement, as quoted by Haverstick, could be characterized as a threat to Haverstick's life. In any event, defendant could not have been prejudiced because the tape recordings, whose authenticity defendant has never challenged, include defendant's very explicit and unmistakable threats to kill Haverstick if defendant's demands were not met.

The final objection is to this question: "Do you feel that if you didn't comply with [defendant's] demands, that your life might be ended?" Haverstick replied: "Yes. I shut up." At trial, defendant objected that the question called for speculation. The trial court overruled the objection. At the time the trial court ruled, the charges against defendant included robbery of Haverstick, as to which it was relevant whether defendant's conduct had caused Haverstick to fear for his life. Although the question should have been phrased in terms of Haverstick's beliefs at the time of the incident, rather than at the time of the preliminary hearing, Haverstick's reply indicates he interpreted the question as calling for his belief at the time of the incident. Accordingly, the trial court did not err in overruling the objection.

## E. *The Crime Scene Videotape*

Defendant contends that the trial court erred in overruling defense objections to a videotape of a portion of the crime scene.

### 1. *Facts*

The prosecutor's cross-examination of defendant lasted for several days. After a weekend recess, and out of the jury's presence, defense counsel informed the court that the prosecutor had given him a copy of a videotape, about 10 minutes in length, that the prosecutor intended to use in cross-examining defendant. The videotape showed various areas around the Sunstone Apartments and the service station; it had been made a few days earlier at the prosecutor's direction to demonstrate the falsity of some of defendant's testimony. The defense objected that the videotape did not fairly and accurately represent the area depicted and that it was "kind of staged." The prosecutor stated that the videotape would be used to impeach defendant.

The trial court viewed the videotape as the prosecutor explained the relevance of each portion. Apparently, the prosecutor intended to use the videotape to impeach defendant's testimony on these points:

(1) Defendant testified that while in the parking lot of the Sunstone Apartments he pulled himself up to look over a wall into the service station, saw some officers in the area where he had seen Sergeant Wolfley on the ground, and heard someone say, "If you see the mother fucker, kill him." The video would show that defendant could not have seen that area from the place where defendant said he had looked over the wall and that the wall was not so high that defendant would have had to pull himself up to see over it.

(2) Defendant testified that he left the Sunstone Apartments parking lot area by scaling a wall that was so high that he had to extend his arms and jump to grab the top of the wall. The video would show that the wall was not so high that defendant would have had to jump to reach its top edge.

The defense did not dispute the prosecution's representation that the size and position of the walls had not changed since the night that Sergeant Wolfley died, but the defense nonetheless argued that the videotape was not fair and accurate because the lighting conditions were entirely different (the videotape was made during daylight), because the vegetation had changed, and because the video camera distorted the apparent height of the walls and what could be seen from different locations.

The trial court ruled that the portions of the videotape relevant for the purposes indicated above could be admitted, but the balance should be edited out. Defense counsel then objected that the videotape was improper because the prosecutor appeared in it. Counsel suggested that taking the jury to again view the area would be preferable to showing them a videotape. Counsel also objected that the evidence was cumulative because it was the "third time through this area now with a film." The court overruled the objections, noting that portions of the videotape that it found to be cumulative would be edited out.

Later, the defense objected on yet another basis, that the videotape's probative value was outweighed by the risk of undue prejudice, and the defense requested a jury view of the area in the event the videotape was received in evidence. The trial court overruled the objection, finding that "the probative value does outweigh the undue prejudice as argued by the defendant." The court eventually granted the request for a jury view of the area shown in the videotape.

## 2. Sufficiency of the Foundation

 To be admissible in evidence, an audio or video recording must be authenticated. (Evid. Code, §§ 250 [defining "Writing" to include recording], 1401 [requiring authentication of "writings"]; *People* v. *Rich* (1988) 45 Cal.3d 1036, 1086, fn. 12 [248 Cal.Rptr. 510, 755 P.2d 960]; *People* v. *Patton* (1976) 63 Cal.App.3d 211, 220 [133 Cal.Rptr. 533].) A video recording is authenticated by testimony or other evidence "that it accurately depicts what it purports to show." (*People* v. *Bowley* (1963) 59 Cal.2d 855, 859 [31 Cal.Rptr. 471, 382 P.2d 591, 96 A.L.R.2d 1178].)

 Defendant argues that the prosecution failed to establish that the videotape fairly and accurately represented the scene as it existed at the time of the charged offenses because it was made during daylight hours, whereas the relevant events occurred at night, and because it was made almost 18 months after the relevant events. But the videotape was admitted only to show the height and location of walls and fences and what could be seen by looking over them at certain locations. For these limited purposes, the lighting was irrelevant, and the prosecution elicited testimony that the walls and fences had not changed since the events in question. Moreover, the jury could determine this by comparing the videotape to photographs taken within hours or a few days after those events. Accordingly, the videotape was sufficiently authenticated.

Defendant also argues that the videotape should have been excluded as an inaccurate reconstruction of events on the night of March 3, 1986. But the videotape did not purport to be, nor was it offered as, a reconstruction of events. Rather, it was offered to establish the height and location of walls and fences and what could be seen from them at certain locations. As we explained, the prosecution offered evidence sufficient to establish the accuracy of the videotape for these purposes. Moreover, even if we assume that the videotape gave a distorted impression of what it purported to show, defendant could not have been prejudiced because the trial court granted the defense request for a jury view. At the jury view, the jurors could see for themselves the very objects and views depicted in the videotape.

## 3. Prosecutor's Appearance in Video

Defendant argues that by appearing in the video the prosecutor effectively became a witness at the trial, but one who was not subject to cross-examination, thereby depriving defendant of his federal constitutional rights of confrontation and due process of law.

We remain unpersuaded. The video was played to the jury without any audio component. The prosecutor appeared in the video merely to provide a

sense of scale for the walls and fences. He did not function as a witness. Although prosecutors should generally avoid appearing in such demonstrations, we conclude here that the prosecutor's appearance in the video did not deny defendant his right to confront the witnesses against him or his right to due process of law.

### 4. Probative Value Compared to Risk of Undue Prejudice

Defendant contends that the trial court erred in concluding, under Evidence Code section 352, that the videotape's probative value outweighed the risk of undue prejudice to defendant. The trial court acknowledged that the issues that the videotape was intended to address were collateral to the issue of guilt or innocence of the charged offense, but the court concluded that the videotape bore directly on the credibility of defendant's testimony. Defendant argues, in essence, that defendant's credibility as to collateral issues was not of sufficient importance to warrant admission of the evidence.

■ To determine the credibility of a witness, the trier of fact may consider, among other things, "[t]he existence or nonexistence of any fact testified to by" the witness. (Evid. Code, § 780, subd. (i).) Although it is improper to elicit otherwise irrelevant testimony on cross-examination merely for the purpose of contradicting it (*People* v. *Lavergne* (1971) 4 Cal.3d 735, 744 [94 Cal.Rptr. 405, 484 P.2d 77]), the trial court has discretion to admit or exclude evidence offered for impeachment on a collateral matter (*People* v. *Douglas* (1990) 50 Cal.3d 468, 509 [268 Cal.Rptr. 126, 788 P.2d 640]; *People* v. *Lang* (1989) 49 Cal.3d 991, 1017 [264 Cal.Rptr. 386, 782 P.2d 627]; *People* v. *Thompson* (1988) 45 Cal.3d 86, 110 [246 Cal.Rptr. 245, 753 P.2d 37]).

■ Here, the trial court did not abuse its discretion in permitting the impeachment. Defendant's testimony that the prosecution sought to contradict was elicited on direct, not cross-examination. Moreover, that testimony concerned defendant's actions during the time the charged offenses were allegedly committed and the physical setting of those events. Finally, as the trial court recognized, defendant's credibility was of critical importance in this case because of the absence of other eyewitnesses to the shooting of Sergeant Wolfley. Because the videotape could have assisted the jurors in evaluating defendant's testimony, and because it presented minimal risks of undue prejudice to defendant, the trial court committed no error in allowing its admission for purposes of impeachment. (See *People* v. *Sims* (1993) 5 Cal.4th 405, 452 [20 Cal.Rptr.2d 537, 853 P.2d 992].)

### F. Evidence of the Knife

During the prosecution's case-in-chief, certain police officers testified that after the shooting of Sergeant Wolfley they found what they described as a

kitchen knife or butcher knife at the northwest corner of the service station, close to a knitted watch cap. Near the end of the prosecution's case-in-chief, during a review of the prosecution's exhibits, the defense objected to admission in evidence of the knife and photographs showing the location of the knife at the service station. The objection was on the grounds that the evidence was irrelevant and that its probative value, if any, was substantially outweighed by the risk of undue prejudice. The prosecutor argued that the jury could reasonably infer that defendant had brought the knife with him to the service station and that Sergeant Wolfley drew his revolver and took a "combat stance" (as Candette Wolfley had described in her testimony) because he saw defendant remove the knife from his pocket. Initially, the trial court overruled the objection and admitted the exhibits in evidence, but it stated that the ruling was "without prejudice" and invited counsel to submit legal authorities bearing on the issue. A few days later, the court reversed itself and excluded the knife on relevance grounds for lack of evidence that the knife had ever been in defendant's possession or had played any role in the commission of the charged offenses. The trial court also excluded photographs showing only the knife. But the trial court denied a defense motion to bar cross-examination of defendant concerning the knife. During cross-examination, defendant denied that he had been carrying any knife, although he admitted ownership of the watch cap found near the knife.

Defendant now contends that evidence concerning the knife—including testimony describing the knife and its location, photographs showing the knife together with other objects, and cross-examination of defendant concerning the knife—should have been excluded as irrelevant and as being substantially more prejudicial than probative. He further contends that failure to exclude this evidence denied him his right under the Eighth Amendment to the United States Constitution to reliable guilt and penalty determinations in a capital case, and that if consideration of these issues on their merits is barred by his trial counsel's failure to object, then he has been denied his right under the Sixth Amendment to the United States Constitution to the effective assistance of counsel.

We conclude that evidence concerning the knife was relevant and admissible. Evidence is relevant if it has *any* tendency in reason to prove or disprove a disputed fact at issue. (Evid. Code, § 210; see *People* v. *Edelbacher* (1989) 47 Cal.3d 983, 1015-1016 [254 Cal.Rptr. 586, 766 P.2d 1]; *People* v. *Burgener* (1986) 41 Cal.3d 505, 527 [224 Cal.Rptr. 112, 714 P.2d 1251].) Here, the presence of the knife at the scene of defendant's encounter with Sergeant Wolfley, in close proximity to defendant's watch cap, particularly when considered in conjunction with Candette Wolfley's testimony

about the change in Sergeant Wolfley's demeanor when he drew his revolver and took a "combat stance" and Curtis Corbin's testimony that shortly before the shots were fired he saw a Black man behind the station who appeared to be fumbling in his pockets, supports a reasonable inference that defendant attempted to arm himself with the knife when Sergeant Wolfley pursued him, thereby escalating the encounter to one involving deadly force. This probative value was not outweighed by any risk of undue prejudice. The only form of prejudice defendant suggests is that the jury would infer that he had possession of the knife, but this was a permissible inference and not a basis for exclusion. To the extent the trial court concluded otherwise, the trial court erred.

These conclusions dispose of defendant's claim of ineffective assistance of counsel. Defendant faults trial counsel for failing to bring a motion before the trial began to exclude all evidence of the knife. Had counsel made such a motion, defendant argues, the jury would never have learned that a knife was found behind the service station and could not have speculated that defendant had been in possession of the knife. The flaw in this argument is the assumption that a motion to exclude all evidence of the knife would have been meritorious. In fact, as we have explained, evidence of the knife was relevant and admissible.

### G. *Other Evidentiary Rulings*

Defendant challenges the trial court's rulings admitting, over various defense objections, evidence of (1) Tyrone Thomas's statement to Sergeant Wolfley that defendant might be armed with a gun; (2) test results of Howard Bell's urine indicating the presence of PCP; and (3) the results of a gunshot residue test of Sergeant Wolfley's hands.

#### 1. *Tyrone Thomas's Statement That Defendant Carried a Gun*

On direct examination, Tyrone Thomas testified that when he saw defendant and Bell inside the service station minimart, defendant put his hand in the pocket of his jacket, and Thomas thought he saw the shape of a gun. Without objection, Thomas testified that he then ran outside and told Sergeant Wolfley, who had just arrived, that "the guys in the store were after me and that they had a gun." The trial was then interrupted for two weeks because of the prosecutor's illness. When it resumed, the prosecutor, continuing with direct examination, asked Thomas whether he had said anything to Sergeant Wolfley about weapons. The defense objected on hearsay grounds, and the trial court overruled the objection. Thomas then testified that he told Sergeant Wolfley that one of the men might have a gun.

The trial court's ruling was correct. The evidence was admissible for a nonhearsay purpose. One of the issues in the case was whether Sergeant Wolfley had used excessive force or behaved improperly in his confrontation with defendant. (See pt. V.A., *post.*) Evidence that Sergeant Wolfley had received information that defendant might be armed with a gun was relevant on this issue. Although evidence of Thomas's statement to Sergeant Wolfley was not admissible to prove that defendant in fact possessed a gun, it was admissible for the nonhearsay purpose of establishing Sergeant Wolfley's state of mind and the appropriateness of his ensuing conduct. (See *People* v. *Turner, supra,* 8 Cal.4th 137, 189.)

Finally, even assuming the ruling was error, defendant was not prejudiced because the evidence was merely cumulative. Thomas had already testified, without objection, that he had told Sergeant Wolfley that the men in the store had a gun. Also, because Thomas testified and was subjected to cross-examination about the basis for his belief that defendant was armed with a gun, the usual reasons for excluding hearsay evidence as unreliable were not present.

### 2. *Howard Bell's Urine Test*

The prosecution called as a witness David Blackburn, who testified that he is a forensic laboratory technician employed by the San Bernardino Sheriff's crime laboratory. Defense counsel then objected that it appeared the prosecutor was proposing to impeach his own witness, Howard Bell, and that this was improper procedure. The prosecutor replied that evidence of Bell's PCP intoxication was relevant to his ability to perceive. The trial court overruled the defense objection. Blackburn testified that he had analyzed a urine sample taken from Howard Bell; and that the test results were positive for phencyclidine, commonly known as PCP. The prosecutor then inquired whether, according to the laboratory records, another technician who was no longer employed by the laboratory had previously analyzed the same sample. The defense objected on hearsay grounds, but the trial court overruled the objection. The witness answered that the laboratory records so indicated. Without objection, the prosecutor then inquired whether that analysis had "also come back positive," and the witness replied that it had.

Defendant contends, first, that the trial court erred in overruling his objection that the entire testimony was inadmissible because its purpose was to impeach the prosecution's own witness. We find no error. The rule in this state is that a party may impeach his or her own witness. (Evid. Code, § 785; *People* v. *Gordon* (1973) 10 Cal.3d 460, 474, fn. 8 [110 Cal.Rptr. 906, 516 P.2d 298].) Defendant also argues that the evidence was irrelevant because

Bell's ability to perceive was not a contested issue and because no evidence was ever introduced to establish exactly when the urine sample was obtained from Bell or that the concentration of PCP in that sample was sufficient to impair perception or memory. No objection having been made on any of these grounds at trial, the issues are not preserved for review. (Evid. Code, § 353, subd. (a).)

Defendant contends, next, that the trial court erred in admitting, over a hearsay objection, evidence of the results of the analysis by the technician who did not testify. Assuming for argument's sake that the trial court erred, defendant was not prejudiced. Evidence of the previous analysis by the other technician was merely cumulative of evidence of the results of the analysis performed by the technician who testified, and the latter evidence was uncontradicted. On cross-examination, the defense sought to challenge the significance of the positive test result, but the defense never challenged the validity of the test result as such.

### 3. *Gunshot Residue Test*

■ Norman Wallis, a criminalist employed by the San Bernardino Sheriff's crime laboratory, testified for the prosecution that he had analyzed a gunshot residue kit. Over defense objection on hearsay grounds, Wallis testified that a laboratory report, which Wallis had not written, stated that the kit had been collected at the county morgue by "Mr. Gregonis." Wallis then testified to the results of his analysis.

Defendant now contends that the trial court erred in overruling his hearsay objection to statements in the laboratory report about the source of the kit. We agree that the trial court erred, but we conclude that defendant was not prejudiced. Daniel Gregonis had already testified that he attended the autopsy of Sergeant Wolfley and that at that time he had collected a GSR (gunshot residue) kit with a kit number of 02868. Wallis testified that the kit he analyzed had a kit number of 02868. Thus, the prosecution introduced admissible evidence independent of the laboratory report to establish that the kit Wallis analyzed was the kit that Gregonis had collected at the autopsy of Sergeant Wolfley.

### H. *Prosecutorial Misconduct in Cross-examination of Defendant*

■ Defendant contends that the prosecutor committed misconduct during cross-examination of defendant by repeatedly asking questions that (1) assumed facts not in evidence, (2) sought to elicit testimony only to contradict it, (3) were argumentative or irrelevant, or (4) tended to demean

or abuse defendant; that the trial court erred in denying a motion for mistrial on the grounds of improper cross-examination; and that the improper cross-examination denied defendant his constitutional rights to a fair trial, to testify and present a defense, to a trial by jury, and to a reliable guilt verdict in a capital case (U.S. Const., 5th, 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 1, 7, & 15).

■ "To preserve for appeal a claim of prosecutorial misconduct, the defense must make a timely objection at trial and request an admonition; otherwise, the point is reviewable only if an admonition would not have cured the harm caused by the misconduct." (*People* v. *Price, supra,* 1 Cal.4th 324, 447.)

### 1. *Assumption of Facts Not in Evidence*

■ Defendant asserts that the prosecutor committed misconduct on numerous occasions by asking questions that insinuated facts that the prosecutor knew the defendant would deny, even though the prosecutor had no intention of proving those facts by other means. (See *People* v. *Visciotti, supra,* 2 Cal.4th 1, 52 [improper to examine a witness solely to imply or insinuate the truth of the facts about which questions are posed]; accord, *People* v. *Price, supra,* 1 Cal.4th 324, 481.) At trial defendant objected on this ground (that is, that the question "assumed facts not in evidence" or "misstated the evidence") as follows:

After defendant conceded he had caused Haverstick pain by "nudging" his foot to make him cry out, the prosecutor asked: "But you went ahead and caused him some more injury to the leg that had already been shot?" The trial court sustained an objection that the question assumed that the "nudging" had caused "injury" rather than "pain."

After defendant testified that Sergeant Wolfley had been "making statements to me indicating the fact that I was through or . . . something to that effect," the prosecutor asked: "Well, that's not how you testified the other day, was it?" The trial court sustained a defense objection that this misstated the evidence.

The prosecutor asked: "You indicated that you at some point pulled yourself up on the wall and looked over the wall and saw some officers around Sergeant Wolfley that was on the ground. Do you recall that?" In response to a defense objection and the trial court's inquiry whether the prosecutor was intimating that defendant had seen Sergeant Wolfley on the ground, the prosecutor rephrased the question.

The prosecutor asked a series of questions about fences defendant had gone over or walked next to after leaving the Sunstone Apartments parking lot. At one point the prosecutor asked a question referring to the "south fence." Upon defense objection that the question assumed facts not in evidence, the prosecutor amended the question to refer to the "west fence."

Referring to events behind the service station, the prosecutor asked: "Did you have to turn after you got possession of the gun to run eastbound because you were facing west when you shot Sergeant Wolfley?" Defense counsel objected that the question assumed facts not in evidence. The trial court sustained the objection on the ground that the question was argumentative because it assumed a fact—that defendant had shot Sergeant Wolfley—that defendant had expressly denied.

In each instance, the trial court sustained the defense objection or the prosecutor voluntarily rephrased the question. In each instance, defendant made no request for an admonition. We do not find misconduct or prejudice based on these isolated and relatively insignificant incidents.

Another incident deserves mention here. After defendant testified he did not have a knife while he was inside the Haverstick residence, the prosecutor asked: "Lost your knife by the station, didn't you?" Defense counsel objected but stated no ground. The trial court overruled the objection. Defendant then testified that he never had a knife at the station. As we have previously explained, evidence concerning the knife was admissible. (See pt. IV.F., *ante.*) For the same reason, we conclude that the knife was a legitimate subject for cross-examination.

### 2. *Eliciting Testimony Solely to Contradict*

Defendant asserts that the prosecutor repeatedly violated the rule against eliciting otherwise irrelevant testimony on cross-examination merely for the purpose of contradicting it (*People* v. *Lavergne, supra,* 4 Cal.3d 735, 744) by questioning defendant about the height, shape, construction, and appearance of a wall located behind the service station.

We find no misconduct. Once a defendant takes the stand and testifies to the circumstances of the charged offenses, the prosecutor on cross-examination is permitted "to explore the identical subject matter in much greater detail." (*People* v. *Green* (1979) 95 Cal.App.3d 991, 1007 [157 Cal.Rptr. 520]; accord, *People* v. *Cooper* (1991) 53 Cal.3d 771, 822 [281 Cal.Rptr. 90, 809 P.2d 865] [stating that "the permissible scope of cross-examination is 'very wide' "].) On direct examination, defendant testified that he had looked

over the wall, had seen some officers, and had heard a voice say, "If you see the mother fucker, kill him." It was part of the defense theory of the case that hearing this statement caused defendant to fear for his life and served in some fashion to justify or excuse his subsequent conduct at the Haverstick residence. The prosecutor could properly challenge the veracity of this testimony by showing that it was inconsistent with the physical characteristics of the wall.

### 3. *Argumentative and Irrelevant Questions*

Defendant asserts that the prosecutor repeatedly violated the rule against argumentative questions—that is, questions designed to engage the witness in an argument rather than to elicit facts within the witness's knowledge. (See *People* v. *White* (1954) 43 Cal.2d 740, 747 [278 P.2d 9].) Having reviewed each claimed instance of argumentative question, we observe that the trial court sustained most of the defense objections on this ground (see *People* v. *Pinholster* (1992) 1 Cal.4th 865, 943 [4 Cal.Rptr.2d 765, 824 P.2d 571] [generally a party is not prejudiced by a question to which an objection has been sustained]), and we conclude that the trial court did not permit the prosecutor to engage defendant in an argument but instead kept the cross-examination properly focused on relevant facts.

A witness may not be examined on matters that are irrelevant to the issues in the case. (Evid. Code, § 350; *People* v. *Gloria* (1975) 47 Cal.App.3d 1, 4 [120 Cal.Rptr. 534].) Defendant cites four instances in which the defense objected on grounds of relevance. In three of these, the objection was sustained, and in the fourth instance the question related to whether defendant could have purchased cigarettes somewhere more convenient than the service station at which Sergeant Wolfley was shot, and the trial court's ruling that this subject was relevant to defendant's credibility was not an abuse of discretion.

We conclude that defendant has not demonstrated prosecutorial misconduct in asking argumentative or irrelevant questions.

### 4. *Abusive or Repetitive Questions*

A trial court must control cross-examination "to protect the witness from undue harassment or embarrassment." (Evid. Code, § 765, subd. (a).) On the other hand, as we have observed, the permissible scope of a prosecutor's cross-examination of a defendant is " 'very wide.' " (*People* v. *Cooper*, *supra*, 53 Cal.3d 771, 822.) Here, as was appropriate in a case of such complexity and seriousness, the trial court permitted the prosecutor to

question defendant in detail. The questioning did not always follow a strict chronological sequence of the events on the night in question, and the trial court gave the prosecutor some latitude to return to events that had been the subject of previous questioning. But as soon as the cross-examination threatened to become unduly repetitive and unproductive, the trial court advised the prosecutor he would no longer be permitted to cross-examine in areas previously covered. Defendant has not demonstrated an abuse of trial court discretion in the control of cross-examination, nor has defendant demonstrated prosecutorial misconduct in repetitive questioning.

### 5. *Mistrial Motion*

The defense moved for a mistrial immediately after the trial court cautioned the prosecutor that further cross-examination concerning topics previously covered on cross-examination would not be permitted. The trial court denied the motion. On appeal, we review this ruling under the deferential abuse of discretion standard. (*People* v. *Price, supra,* 1 Cal.4th 324, 428.) We find no abuse of discretion. Although the prosecutor's lengthy cross-examination tested the limits of what is permissible, the trial court exercised firm control, and those limits were not exceeded. Accordingly, we conclude that the cross-examination did not deny defendant his federal and state constitutional rights to a fair trial, to testify and present a defense, to a trial by jury, and to a reliable guilt verdict in a capital case.

### I. *Defendant's Postarrest Statements to His Father*

During the prosecution's case in rebuttal, and over defense objection, Detective Amicone testified about certain statements of defendant's father apparently recounting statements that defendant had made to his father at the police station. Defendant now contends that the trial court erred in overruling his objection to this testimony because (1) defendant's statements to his father were elicited in violation of defendant's Fifth Amendment rights under *Miranda* v. *Arizona, supra,* 384 U.S. 436; (2) the evidence was tainted by surreptitious tape recording of defendant's conversation with his father in violation of section 2600, defendant's state constitutional right of privacy, the federal wiretap statute (18 U.S.C. § 2511), and the Fourth Amendment to the federal Constitution; (3) the evidence was improper rebuttal; and (4) the evidence was inadmissible hearsay. Defendant further contends that, assuming the evidence was properly admitted, his trial attorney's failure to elicit exculpatory evidence on cross-examination of Detective Amicone and Roy Mayfield violated defendant's rights under the state and federal Constitutions to effective assistance of counsel.

## 1. *Facts*

After his arrest, defendant was taken to the Rialto police station, where he was eventually placed in an interview room. There, Detective Amicone advised defendant of his rights per *Miranda* v. *Arizona, supra,* 384 U.S. 436. Defendant declined to waive his rights and requested an attorney.

Defendant also asked to speak to his father, Roy Mayfield. Amicone brought Roy Mayfield to the interview room and left him alone there with defendant. The interview room contained a hidden microphone, and the entire conversation between defendant and Roy Mayfield was recorded on tape by Rialto Police Sergeant Danny Kidwell.

After Roy Mayfield left the interview room, Amicone asked him whether he would tell the officers what defendant had said. It is undisputed that Roy Mayfield at first said he would not, but whether he later responded to the question, and if so what he said, was the subject of conflicting testimony. According to the testimony of Detective Amicone, Roy Mayfield eventually responded this way: "Basically the officer confronted him with the gun. He pressed him, and he took it. The officer tried to take it back, and that's when the shot was fired." According to Rialto Police Corporal Richard Henriksen, Roy Mayfield replied "that Dennis had told him that the officer had pushed him or pressed him or something like that. And he had taken the gun. That it had—that the officer had tried to get it, and it went off or a shot was fired." On the other hand, Roy Mayfield testified that he never made any kind of statement describing the events that occurred behind the gas station. He also testified, inconsistently, that what he told the officers was this: "From what I gather there was a struggle over the gun, the gun went off. And that's all I know."

To determine the admissibility of evidence concerning Roy Mayfield's statement to Detective Amicone, and of the tape recording of the conversation between defendant and Roy Mayfield, the trial court held a hearing outside the jury's presence. At the conclusion of the hearing, the trial court ruled that Roy Mayfield's statement to Detective Amicone would be admissible during the prosecution's case-in-rebuttal, but also that the tape recording of the conversation between defendant and Roy Mayfield would not be admissible because the existence of the tape, or at least of an electronically enhanced copy of the tape, had not been previously disclosed to the defense.

## 2. *Miranda*

■ Defendant contends that defendant's statements to Roy Mayfield were obtained in violation of his Fifth Amendment right against compulsory

self-incrimination as implemented by the protective measures that the United States Supreme Court has ordained in *Miranda* v. *Arizona, supra*, 384 U.S. 436, and its progeny.

In support of this contention, he argues first that the conduct of Detective Amicone in placing Roy Mayfield in the interview room alone with defendant was itself a form of custodial interrogation because it was conduct that was "reasonably likely to elicit an incriminating response" (*Rhode Island* v. *Innis, supra*, 446 U.S. 291, 301 [64 L.Ed.2d 297, 308], fn. omitted) from defendant. We reject this argument "because it is clear that defendant's conversations with his own visitors are not the constitutional equivalent of police interrogation." (*People* v. *Gallego* (1990) 52 Cal.3d 115, 170 [276 Cal.Rptr. 679, 802 P.2d 169]; see *Arizona* v. *Mauro* (1987) 481 U.S. 520, 530 [95 L.Ed.2d 458, 468-469, 107 S.Ct. 1931]; see also *Lowe* v. *State* (Fla. 1994) 650 So.2d 969, 972-974.) This is particularly true here because defendant had specifically and repeatedly asked to be allowed to speak with his father. The meeting occurred on defendant's initiative, not that of the police. Granting defendant's request cannot be equated with custodial interrogation.

Defendant's second argument is that the statement was obtained in violation of his rights under *Miranda* v. *Arizona, supra*, 384 U.S. 436, because Roy Mayfield was acting as an unwitting or implied police agent who interrogated defendant after defendant had invoked his right to counsel under *Miranda*. We reject the claim for two reasons. ▮ First, as the United States Supreme Court has explained, "[c]onversations between suspects and undercover agents do not implicate the concerns underlying *Miranda*." (*Illinois* v. *Perkins* (1990) 496 U.S. 292, 296 [110 L.Ed.2d 243, 251, 110 S.Ct. 2394]; see also *People* v. *Webb* (1993) 6 Cal.4th 494, 525-526 [24 Cal.Rptr.2d 779, 862 P.2d 779].) ▮ Second, Roy Mayfield was not a police agent sent to elicit incriminating information from defendant. (See *People* v. *Gallego, supra*, 52 Cal.3d 115, 170.) "None of the police agent cases cited by defendant indicates that it would have been improper for the officers to grant an inmate's relatives special visitation privileges in the *unspoken* hope that they might elicit statements from defendant and inform the officers thereof." (*People* v. *Medina, supra*, 51 Cal.3d 870, 892, original italics.)

In this connection, the trial court expressly found that Roy Mayfield was not a police agent during his conversation with defendant at the Rialto police station. At the hearing to determine the admissibility of the evidence in question, Roy Mayfield testified that an officer (he did not remember which officer) told him that he could speak to defendant only if he agreed to help

the officers obtain information from defendant about the shooting of Sergeant Wolfley, that after he spoke with defendant the officer asked him what defendant had said, and that the officer became "furious" when Roy Mayfield refused to relate defendant's statements. But this testimony was directly contradicted by Detective Amicone, who testified that Roy Mayfield was not asked to obtain a statement from defendant, nor was the permission for Roy Mayfield to speak to defendant conditioned on Roy Mayfield's agreement to obtain a statement from defendant. Further, Amicone denied that he became upset when Roy Mayfield initially declined to relate the substance of his conversation with defendant.

The trial court resolved this conflict in favor of the prosecution, expressly finding that no condition was imposed on Roy Mayfield's visit with defendant and, as previously mentioned, that Roy Mayfield was not a police agent. Because they are supported by substantial evidence, we accept these factual findings. (*People* v. *Crittenden, supra,* 9 Cal.4th 83, 128.) Therefore, Roy Mayfield's conversation with defendant did not violate defendant's rights under *Miranda* v. *Arizona, supra,* 384 U.S. 436.

Defendant argues, third, that defendant's statements to his father were involuntary, even in the absence of overt coercion, because he believed his father was his ally when in fact his father was acting as a police agent. (See *People* v. *Whitt* (1984) 36 Cal.3d 724, 745-746 [205 Cal.Rptr. 810, 685 P.2d 1161].) Defendant's argument fails because it is based on the erroneous premise that Roy Mayfield was acting as a government agent. █ A finding of coercive *police* activity is a prerequisite for a finding that a confession was involuntary under the due process clauses of the federal or the state Constitution. (*Colorado* v. *Connelly* (1986) 479 U.S. 157, 167 [93 L.Ed.2d 473, 484-485, 107 S.Ct. 515]; *People* v. *Clark* (1993) 5 Cal.4th 950, 988 [22 Cal.Rptr.2d 689, 857 P.2d 1099]; *People* v. *Benson* (1990) 52 Cal.3d 754, 778 [276 Cal.Rptr. 827, 802 P.2d 330].) █ Because Roy Mayfield was not a police agent, his conduct in speaking to defendant could not render defendant's responses involuntary under the due process clauses of the federal or the state Constitution.

Defendant argues, fourth, that it was improper to impeach Roy Mayfield with a statement that was obtained in violation of defendant's rights under *Miranda* v. *Arizona, supra,* 384 U.S. 436. Because we have rejected its premise—that the statement was obtained in violation of *Miranda*—this argument necessarily fails.

### 3. *Tainted Fruit of Illegal Tape Recording*

Defendant contends that the police conduct in electronically monitoring and tape recording his conversation with his father, Roy Mayfield, violated

the Fourth Amendment to the federal Constitution; the right to privacy under article I, section 1, of the California Constitution; the federal wiretap statute (18 U.S.C. § 2511); and Penal Code section 2600. He further contends that the trial court should have excluded evidence of Roy Mayfield's subsequent statement to Detective Amicone apparently describing what defendant had told him about the shooting of Sergeant Wolfley because that statement was the "tainted fruit" of this illegal police conduct.

For purposes of considering this contention, we may assume without deciding that the police conduct at issue was illegal. Nevertheless, defendant's contention fails because Roy Mayfield's statement to Detective Amicone was not the product of this police conduct. The relevant principles are well established and have been summarized by this court as follows:

"If the challenged police conduct is shown to be violative of the Fourth Amendment, the exclusionary rule requires that all evidence obtained as a result of such conduct be suppressed. [Citations.] [¶] Such evidence includes not only what was seized in the course of the unlawful conduct itself—the so-called 'primary' evidence [citations]—but also what was subsequently obtained through the information gained by the police in the course of such conduct—the so-called 'derivative' or 'secondary' evidence [citations]. Thus, the 'fruit of the poisonous tree,' as well as the tree itself, must be excluded." (*People* v. *Williams* (1988) 45 Cal.3d 1268, 1299 [248 Cal.Rptr. 834, 756 P.2d 221].)

"As for secondary evidence, the defendant bears the burden of making a prima facie case that such evidence was 'tainted' by—i.e., causally linked to—the primary illegality." (*People* v. *Williams, supra,* 45 Cal.3d 1268, 1300.) To do this, the defendant "must show more than that the challenged evidence 'would not have come to light *but for* the illegal actions of the police'; rather, [the defendant] must establish that it ' "has been come at by *exploitation* of that illegality . . . ." ' " (*Ibid.,* original italics.)

Here, defendant has not made a prima facie case that Roy Mayfield's statement to Detective Amicone was causally linked to the claimed illegal police conduct (that is, the monitoring and tape recording of defendant's conversation with Roy Mayfield). Defendant argues that the police permitted him to speak to Roy Mayfield only because they hoped to obtain evidence by secretly recording the conversation, and therefore the conversation would not have occurred, and Roy Mayfield would have had nothing to tell Amicone, but for the illegal taping. But the claimed illegality occurred not in permitting defendant to converse with Roy Mayfield, but in the secret monitoring and recording of that conversation. Defendant must show that but

for this illegal conduct, Roy Mayfield's statement to Amicone would not have occurred. Defendant has not done so. He has not shown that Roy Mayfield would not have made the statement but for the monitoring and tape recording, much less that the police obtained the statement by exploitation of that conduct. Therefore, evidence of Roy Mayfield's statement to Detective Amicone was not subject to suppression as the "tainted fruit" of the claimed illegal police conduct.

### 4. *Improper Rebuttal*

Defendant contends that evidence of Roy Mayfield's statement to Detective Amicone, apparently recounting a statement by defendant, was not proper rebuttal evidence, and should have been excluded on that ground, because it was material incriminating evidence, known to the prosecution before trial, that the prosecution could have presented during its case-in-chief. Defendant further contends that the trial court's error in permitting the use of this evidence in rebuttal violated his right to due process of law under the Fifth and Fourteenth Amendments to the federal Constitution and his right to a reliable guilt determination in a capital case under the Eighth Amendment to the federal Constitution. We disagree.

"If evidence is directly probative of the crimes charged and can be introduced at the time of the case in chief, it should be." (*People* v. *Thompson* (1980) 27 Cal.3d 303, 330 [165 Cal.Rptr. 289, 611 P.2d 883].) "[P]roper rebuttal evidence does not include a material part of the case in the prosecution's possession that tends to establish the defendant's commission of the crime. It is restricted to evidence made necessary by the defendant's case in the sense that he has introduced new evidence or made assertions that were not implicit in his denial of guilt." (*People* v. *Carter* (1957) 48 Cal.2d 737, 753-754 [312 P.2d 665].)

The reasons for the restrictions on rebuttal evidence are "to (1) ensure the orderly presentation of evidence so that the trier of fact is not confused; (2) to prevent the prosecution from 'unduly magnifying certain evidence by dramatically introducing it late in the trial;' and (3) to avoid 'unfair surprise' to the defendant from sudden confrontation with an additional piece of crucial evidence." (*People* v. *Bunyard* (1988) 45 Cal.3d 1189, 1211 [249 Cal.Rptr. 71, 756 P.2d 795], quoting *People* v. *Carter*, *supra*, 48 Cal.2d 737, 753.)

"The decision to admit rebuttal evidence over an objection of untimeliness rests largely within the sound discretion of the trial court and will not be disturbed on appeal in the absence of an abuse of that discretion." (*People* v. *DeSantis* (1992) 2 Cal.4th 1198, 1232 [9 Cal.Rptr.2d 628, 831 P.2d 1210].)

Here, we reject defendant's assertion that the Roy Mayfield statement ("Basically the officer confronted him with the gun. He pressed him, and he took it. The officer tried to take it back, and that's when the shot was fired.") properly belonged in the prosecution's case-in-chief because it was crucial and material evidence that was directly probative of defendant's guilt of the crimes charged. It was never disputed that Sergeant Wolfley was shot during an encounter with defendant. The crucial contested issue was whether defendant shot Sergeant Wolfley deliberately and without provocation, as the prosecution contended, or whether the gun discharged accidentally while defendant struggled with Sergeant Wolfley and while defendant was acting in self-defense. During its case-in-chief, the prosecution relied on forensic evidence to establish that the fatal shot was not fired at close range and thus that the gun could not have discharged accidentally during a hand-to-hand struggle. The Roy Mayfield statement was consistent with the prosecution's version of the shooting to the extent it established that the fatal shot was fired after defendant had acquired possession of Sergeant Wolfley's gun. ("Basically the officer confronted him with the gun. He pressed him, and he took it.") But it was inconsistent with the prosecution's proposed scenario to the extent it suggested that the fatal shot may have been fired at close range during a second hand-to-hand struggle as Sergeant Wolfley attempted to retake the gun. ("The officer tried to take it back, and that's when the shot was fired.") On balance, the prosecution may reasonably have concluded that the disadvantages outweighed the advantages.

The calculus changed after the defense had presented its case, which included defendant's testimony that the gun had discharged accidentally while defendant struggled to take it away from Sergeant Wolfley or at least to prevent Sergeant Wolfley from using it against him. After presentation of this evidence, the prosecution could reasonably conclude that the Roy Mayfield statement would be useful for impeachment because it contradicted defendant's testimony that the fatal shot was fired while he was attempting to take the gun from Sergeant Wolfley and not while Sergeant Wolfley was attempting to regain possession.

The trial court did not abuse its discretion when it permitted the prosecution to use the Roy Mayfield statement in rebuttal, even though it was known to the prosecution before trial and could have been used during the prosecution's case-in-chief.

### 5. *Inadmissible Hearsay*

Defendant contends that the trial court erred in overruling his hearsay objection to evidence of the Roy Mayfield statement. Specifically,

he contends that the hearsay exceptions for prior inconsistent statements (Evid. Code, § 1235) and party admissions (*id.*, § 1220) did not apply. He further contends that this trial court error was of constitutional magnitude, violating his right of confrontation under the Sixth Amendment to the federal Constitution, his right to due process of law under the Fifth and Fourteenth Amendments to the federal Constitution, and his right to a reliable guilt determination in a capital case under the Eighth Amendment to the federal Constitution.

The trial court recognized that the evidence of the Roy Mayfield statement contained two levels of hearsay. On the first level, it was an out-of-court statement by Roy Mayfield (that defendant had in fact made a statement describing the shooting of Sergeant Wolfley in a certain way) offered for the truth of the matter stated. On the second level, it contained an out-of-court statement by defendant (that the shooting of Sergeant Wolfley in fact occurred in a certain way) offered for the truth of the matter stated. The trial court ruled that the evidence was admissible because hearsay exceptions existed for each level of hearsay: the prior inconsistent statement exception for the first level (the statement by Roy Mayfield) and the party admission exception for the second level (the statement by defendant).

Defendant argues that the prior inconsistent statement exception does not apply because the statement was not in fact inconsistent with Roy Mayfield's testimony. He points to Roy Mayfield's testimony during the hearing to determine admissibility (Evid. Code, § 402) in which he admitted making this statement: "[F]rom what I gather there was a struggle over the gun. The gun went off." He concedes that this statement is less detailed than the statement as related by Detective Amicone, but he insists that a statement is not inconsistent merely because it is less detailed.

We are unpersuaded. Roy Mayfield's testimony at the admissibility hearing was inconsistent, as we have noted. But in his testimony before the jury, Roy Mayfield squarely denied making the statement to which Detective Amicone testified. The evidence the trial court admitted was clearly inconsistent with this testimony.

Defendant argues that the admissions exception does not apply to the second level of hearsay because the statement did not purport to be a verbatim account of words that defendant spoke to Roy Mayfield; rather, the statement on its face was merely Roy Mayfield's impression of what had occurred during the shooting of Sergeant Wolfley without purporting to reveal the information from which Roy Mayfield had derived that impression.

Again, we are unpersuaded. Detective Amicone testified that he asked Roy Mayfield if he would relate what defendant had told him. The statement at issue appeared to be responsive to this request. Thus, the jury could reasonably infer that the statement's description of the shooting of Sergeant Wolfley was a summary or paraphrase of defendant's statements to Roy Mayfield. This was sufficient to satisfy the hearsay exception for party admissions.

### 6. *Ineffective Assistance of Counsel*

 Defendant contends that defendant's trial counsel should have elicited two items of "critical exculpatory evidence" during cross-examination of Detective Amicone and Roy Mayfield, and that counsel's failure to do so denied defendant his constitutional rights to effective assistance of counsel (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15), due process of law (U.S. Const., 14th Amend.), and a reliable guilt determination in a capital case (*id.*, 8th Amend.).

The first item that defendant characterizes as "critical exculpatory evidence" is testimony that Detective Amicone gave during the admissibility hearing. The trial court asked Amicone to read for the record the Roy Mayfield statement exactly as it appeared in Amicone's report. Amicone replied: "What I said is Mr. Mayfield stated to me, quote, basically the officer confronted him, parenthesis, suspect Mayfield, end parenthesis, with a gun, period. He, parenthesis, Wolfley, end parenthesis, pressed him, parenthesis, Mayfield, end parenthesis, and he, parenthesis, Mayfield, end parenthesis, took it. *The officer took it back,* comma, and that's when the shot was fired, close quote, period." (Italics added.)

Defendant notes that the italicized language was at variance with Amicone's testimony before the jury and was significantly more favorable to defendant, suggesting that the officer had undisputed possession of the gun when the fatal shot was fired. It is clear, however, that the officer simply misspoke. Amicone's report was admitted in evidence as exhibit 266, and is part of the appellate record. As it appears in the report, the Roy Mayfield statement is: " 'Basically the officer confronted him (suspect Mayfield) with a gun. He (Wolfley) pressed him (Mayfield) and he (Mayfield) took it. *The officer tried to take it back,* and that's when the shot was fired.' " (Italics added.) Cross-examination about Detective Amicone's erroneous reading of the report during the admissibility hearing would not have materially assisted the defense; it would merely have served to emphasize the inculpatory aspects of the Roy Mayfield statement.

The other item that defendant characterizes as "critical exculpatory evidence" is Roy Mayfield's testimony at the admissibility hearing that what he

told the officers was "From what I gather there was a struggle over the gun, the gun went off." Defendant contends that his trial counsel should have brought out this testimony on cross-examination of Roy Mayfield because it was entirely consistent with defendant's testimony. But counsel's decision not to elicit this evidence was a reasonable tactical decision. Without the evidence, the jury was presented with a conflict between Roy Mayfield and Detective Amicone as to whether any statement at all was made. With the evidence, the jury would have been presented with a conflict between Roy Mayfield and Detective Amicone only as to the precise contents of the statement. Given that Detective Amicone had made a contemporaneous record of the statement by means of his report, while Roy Mayfield had not, and that Roy Mayfield could not remember which officers he spoke to and other details surrounding the statement, counsel may reasonably have concluded that the jury would surely resolve this conflict in the prosecution's favor.

We conclude that defendant has failed to demonstrate that counsel's performance was deficient when measured against the standard of a reasonably competent attorney. (See *Strickland* v. *Washington* (1984) 466 U.S. 668, 686 [80 L.Ed.2d 674, 692-693, 104 S.Ct. 2052].)

## J. *Foundation for Expert Opinion*

Before permitting Dr. Root, the autopsy surgeon, to testify as a prosecution witness on rebuttal, the trial court held a hearing out of the jury's presence. (See Evid. Code, §§ 402-403.) At the hearing, the prosecutor asked Dr. Root to assume that the gunpowder range of Sergeant Wolfley's gun was 30 to 36 inches and that Sergeant Wolfley was shot in the manner to which defendant had testified, with both of Sergeant Wolfley's hands on the gun and defendant's hands over Sergeant Wolfley's hands. Given these assumed facts, the prosecutor asked Dr. Root to give an expert opinion on whether he would necessarily expect to find gunpowder stippling or tattooing around the wound. Dr. Root testified that in his opinion it would be anatomically impossible for Sergeant Wolfley to have held the gun in both hands so that it was aimed toward his face and yet beyond the range at which gunpowder residue would cause stippling or tattooing, and therefore he would necessarily expect to find stippling or tattooing around the wound. Overruling defense objections that it was not a subject proper for expert testimony and that Dr. Root was not qualified to give an opinion on the subject, the trial court permitted the prosecution to introduce Dr. Root's testimony as rebuttal evidence.

We reject defendant's contention on appeal that the trial court erred in so ruling and that the error violated defendant's federal constitutional rights to due process of law and to a reliable guilt verdict in a capital case (U.S. Const., 8th & 14th Amends.).

Whether a particular subject is a proper one for expert opinion and whether a particular expert is qualified to give an opinion on that subject are closely related issues. An expert is permitted to offer an opinion on "a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a); see *People* v. *Cole* (1956) 47 Cal.2d 99, 103 [301 P.2d 854, 56 A.L.R.2d 1435].) And a particular expert is sufficiently qualified if "the witness has sufficient skill or experience in the field so that his [or her] testimony would be likely to assist the jury in the search for the truth." (*Mann* v. *Cracchiolo* (1985) 38 Cal.3d 18, 38 [210 Cal.Rptr. 762, 694 P.2d 1134].) A trial court's ruling permitting expert testimony is reviewed on appeal under the deferential abuse of discretion standard. (*People* v. *Chavez* (1985) 39 Cal.3d 823, 828 [218 Cal.Rptr. 49, 705 P.2d 372]; *People* v. *Busch* (1961) 56 Cal.2d 868, 878 [16 Cal.Rptr. 898, 366 P.2d 314].)

Here, the trial court did not abuse its discretion when it determined that Dr. Root, an experienced forensic pathologist, was qualified to give an opinion on whether Sergeant Wolfley's fatal wound could have been inflicted in the manner described by defendant in his trial testimony without leaving tattooing or stippling around the wound. As Dr. Root explained, the answer to this question required knowledge of whether it was anatomically and physically possible for a person of Sergeant Wolfley's size to have held the gun in both hands pointed at his own face with the distance between the gun's muzzle and the site of the wound greater than the gunpowder range specified in the hypothetical question. This is a matter that is sufficiently beyond common experience that the opinion of a qualified expert could assist the trier of fact. A medical expert generally may give an opinion as to "the ability or inability of a person to do certain acts." (*Bates* v. *Newman* (1953) 121 Cal.App.2d 800, 803 [264 P.2d 197].) A forensic pathologist who has performed an autopsy is generally permitted to offer an expert opinion not only as to the cause and time of death but also as to circumstances under which the fatal injury could or could not have been inflicted. (See, e.g., *People* v. *Cole, supra*, 47 Cal.2d 99, 104-106 [fatal wound not self-inflicted]; *People* v. *Obie* (1974) 41 Cal.App.3d 744, 756-757 [116 Cal.Rptr. 283] [fatal injuries caused not by auto accident but by repeated blows from blunt instrument].) That is what Dr. Root did here.

Although defendant argues to the contrary, Dr. Root did not give a legally prohibited opinion (see *People* v. *Farley* (1899) 124 Cal. 594, 595 [57 P. 571]) on what positions Sergeant Wolfley and defendant *were* in when the fatal shot was fired. As Dr. Root explained in his testimony during the prosecution's case-in-chief, the information he learned from the autopsy of Sergeant Wolfley was not sufficient to permit him to give an opinion *fixing*

the relative positions of Sergeant Wolfley and defendant when the fatal wound was inflicted, but it was sufficient to support an opinion *eliminating* certain positions from the realm of possibility. There is no rule of law prohibiting such testimony. (See *People* v. *Cole, supra*, 47 Cal.2d 99, 105-106.)

K. *Sufficiency of the Evidence to Prove Premeditation and Deliberation*

■ Defendant contends that there was insufficient evidence of premeditation and deliberation to support his conviction for the first degree murder of Sergeant Wolfley.

■ When considering a challenge to the sufficiency of the evidence to support a criminal conviction, "the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255]; see also *Jackson* v. *Virginia* (1979) 443 U.S. 307, 319-320 [61 L.Ed.2d 560, 572-574, 99 S.Ct. 2781].)

■ In this context, "premeditated" means "considered beforehand," and "deliberate" means "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action." (CALJIC No. 8.20 (5th ed. 1988), quoted with approval in *People* v. *Perez* (1992) 2 Cal.4th 1117, 1123 [9 Cal.Rptr.2d 577, 831 P.2d 1159].) The process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . ." (*People* v. *Thomas* (1945) 25 Cal.2d 880, 900 [156 P.2d 7]; accord, *People* v. *Perez, supra*, 2 Cal.4th at p. 1127.)

■ Here, a rational trier of fact could conclude from the evidence that before shooting Sergeant Wolfley defendant had made a cold and calculated decision to take Sergeant Wolfley's life after weighing considerations for and against. The evidence included Deputy Stein's testimony that after the killing defendant said that "he had to do it" and that when Sergeant Wolfley came after him "all I could think about was getting his gun and shooting him so he couldn't arrest me." The jury could infer that defendant's action in leading Sergeant Wolfley behind the service station was carefully calculated to permit defendant to carry out his plan out of the view of witnesses.

William Judevine testified that he heard the sounds of a struggle, but that these noises ended with the sound of a gunshot, followed five seconds later by a second gunshot. From this testimony, and from defendant's tape-recorded admissions that he took the gun away from the officer, a rational trier of fact could find that although the first shot may have been fired accidentally during a struggle for the weapon, the second shot was fired after defendant had obtained undisputed possession of the gun and that this was the fatal shot. The shot was fired at Sergeant Wolfley's face, which is consistent with a preexisting intent to kill.

In arguing that the evidence was insufficient, defendant relies upon *People v. Anderson* (1968) 70 Cal.2d 15 [73 Cal.Rptr. 550, 447 P.2d 942], in which this court identified three types of evidence that are indicative of premeditation and deliberation: "(1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation]; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2)." (*Id.* at pp. 26-27, original italics.)

The *Anderson* factors provide a "synthesis of prior case law," but they "are not a definitive statement of the prerequisites for proving premeditation and deliberation in every case." (*People v. Hawkins* (1995) 10 Cal.4th 920, 957 [42 Cal.Rptr.2d 636, 897 P.2d 574]; see also *People v. Perez, supra*, 2 Cal.4th 1117, 1125.) In particular, they are not well adapted to a case like this one in which the defendant's postoffense statements provide substantial insight into the defendant's thought processes in the crucial moments before the act of killing. Even so, we find evidence corresponding to each of the *Anderson* categories. Defendant's movement to the back of the service station (where no witnesses would be likely to observe) is planning activity, his statement that he was determined to prevent Sergeant Wolfley from arresting him provides a motive, and the firing of the gun at Sergeant Wolfley's face is a manner of killing that was entirely consistent with a preconceived design to take his victim's life.

Accordingly, we conclude that the evidence is sufficient to support the jury's implied finding of premeditation and deliberation.

## L. *Sufficiency of the Evidence of Attempted Murder*

 Defendant was convicted of attempting to murder both Officer Cirilo and William Haverstick. He contends both convictions must be reversed for insufficiency of the evidence to prove specific intent to kill.

Our review of the record persuades us there is substantial evidence from which a rational jury could find beyond a reasonable doubt that defendant possessed the required intent to kill Officer Cirilo. The evidence includes defendant's statements to Deputy Stein that when Sergeant Wolfley sought to detain defendant, defendant decided that he "had to" shoot Wolfley because "he didn't want to go back to jail." Also relevant is evidence that, to avoid arrest, defendant shot Sergeant Wolfley in the face at close range, and that, moments later, as defendant was fleeing from the scene, defendant fired the gun twice at Officer Cirilo's pursuing patrol car, the first shot shattering the windshield and wounding Cirilo on the hand. The jury could infer that defendant's purpose in firing at Officer Cirilo was to eliminate pursuit and thereby to avoid arrest, and that, having already deliberately killed Sergeant Wolfley for the same purpose, he intended to achieve this purpose by killing Officer Cirilo as well. (See *People* v. *Lee* (1987) 43 Cal.3d 666, 679 [238 Cal.Rptr. 406, 738 P.2d 752] [evidence of intent to kill compelling where a fleeing suspect stopped, turned, aimed, and fired " 'at people he knew to be armed policemen' " from distance of 15 to 20 feet].)

We are persuaded that the record also contains substantial evidence of defendant's intent to kill William Haverstick. Defendant shot Haverstick just a short time after killing Sergeant Wolfley and attempting to kill Officer Cirilo. The jury could reasonably infer that he was still animated by the purpose of escaping at all costs. When Haverstick suddenly confronted him, defendant did not know whether Haverstick was an officer or a civilian, armed or unarmed. Believing that Haverstick might present a threat to his plans, defendant fired at close range, striking Haverstick in the upper thigh. Had Haverstick not been unusually tall (six feet four inches), the bullet would have struck him in the abdomen and could well have proved fatal. Under these circumstances, intent to kill may be inferred.

## M. *Kidnapping for Extortion*

 Defendant contends that his conviction for kidnapping for extortion must be reversed for instructional error and for insufficiency of the

evidence. We hold otherwise. Although we conclude that the instruction failed to adequately describe one element of the offense, we also conclude that this error was harmless and that sufficient evidence supports the verdict.

The trial court gave the jury this instruction:

"Defendant is charged in Count 4 of the information, with the commission of the crime of Kidnapping for Extortion, a violation of Penal Code section 209.

"Extortion is the obtaining of an official act of a public officer, induced by a wrongful use of force or fear.

"In order to prove the commission of such crime, each of the following elements must be proved:

"1. The obtaining of an official act of a public officer,

"2. Such action was induced by a wrongful use of force or fear.

"The wrongful use of force and fear to obtain an official act of law enforcement officers *may include directing them to refrain from resisting and stopping the criminal acts, kidnapping, escape and assault then taking place for fear the kidnapper would kill or further injure the hostage.*

"The crime is complete once the kidnapping for extortion occurs whether or not the official act desired is obtained." (Italics added.)

Defendant challenges the italicized portion of the instruction, which is a close paraphrase of language appearing in *Magee* v. *Superior Court* (1973) 34 Cal.App.3d 201, 219 [109 Cal.Rptr. 758], a decision that this court disapproved in *People* v. *Norris* (1985) 40 Cal.3d 51, 56 [219 Cal.Rptr. 7, 706 P.2d 1141], "[t]o the extent [it] implies that any conduct aimed at interfering with law enforcement duties is punishable [as kidnapping for extortion] under section 209 . . . ." To understand whether, as defendant argues, this remark implies disapproval of the instruction given here, it is necessary to examine *Norris* in some detail.

In *Norris,* two deputies had been transporting a prisoner from Folsom state prison to a branch county jail in Vallejo when the prisoner produced a gun and demanded that the deputies drive him to San Francisco. This court concluded that "although defendant committed a variety of other crimes, his demands neither constituted extortion nor reflected any intent to extort

within the meaning of section 209." (*People* v. *Norris*, *supra*, 40 Cal.3d 51, 53.)

We began our analysis in *Norris* with the statutory definitions of extortion and kidnapping for extortion. (*People* v. *Norris*, *supra*, 40 Cal.3d 51, 54.) As we observed, section 518 defines extortion as "the obtaining of property from another, with his consent, *or the obtaining of an official act of a public officer*, induced by a wrongful use of force or fear, or under color of official right." (Italics added.) The Legislature had added the italicized language to section 518 in 1939, apparently in response to *People* v. *Robinson* (1933) 130 Cal.App. 664 [20 P.2d 369], in which the Court of Appeal had held that blackmailing a judge to obtain an appointment as a receiver did not constitute attempted extortion because public offices such as receiverships are not "property" within the meaning of section 518. ▮▮▮▮ Section 209, as applicable both in *Norris* and in this case, defined kidnapping for extortion in these terms: "Any person who seizes, confines, inveigles, entices, decoys, abducts, conceals, kidnaps or carries away any individual by any means whatsoever with intent to hold or detain, or who holds or detains, such individual . . . to commit extortion . . . is guilty of a felony . . . ."[10]

▮▮▮▮ We framed the issue in *Norris* as "whether the deputies' compliance with defendant's demands would have constituted an 'official act.'" (*People* v. *Norris*, *supra*, 40 Cal.3d 51, 54.) In the absence of a statutory definition or a "plain unambiguous meaning" of "official act," we applied "traditional rules of construction to discern the probable intent of the Legislature in enacting these provisions." (*Ibid.*) Presuming that the Legislature was aware of prior decisional law when it added the "official act" language to section 518 in 1939, we noted that this court had defined "official act" in *Abbott* v. *Cooper* (1933) 218 Cal. 425, 433 [23 P.2d 1027]. At issue in *Abbott* was the act of a deputy sheriff assigned to a county jail in making an arrest without sufficient cause. Concluding that the arrest was an "official act," this court in *Abbott* had reasoned: ". . . [The deputy sheriff] was an officer in charge of a county jail, and had authority to detain persons charged with crime on a suitable writ or process. . . . He exercised every function a jailer or officer could have exercised in the discharge of official duty. [¶] . . . '[A]n official act does not mean what the deputy might lawfully do in the execution of his office. . . . It means . . . whatever is done under color or by virtue of his office.'" (*Ibid.*)

Enlarging on this definition, this court in *Norris* stated: "[I]t is *the functional nature* of the public officer's conduct that establishes its 'official'

---

[10]Because section 209 requires only that the perpetrator "hold or detain" the victim, or seize the victim with intent to hold or detain, asportation is not an element of kidnapping for extortion. (*People* v. *Rayford* (1994) 9 Cal.4th 1, 14 [36 Cal.Rptr.2d 317, 884 P.2d 1369].)

character; an act is official if it is done in an official capacity, rather than privately. The concept of 'official act' is not limited to authorized acts nor is it so broad as to encompass *any* conduct by an officer occurring during his working hours. We held in *Abbott* that although the arrest was illegal 'because it was in excess of [the deputy's] duty,' it was nonetheless an official act since the deputy acted 'in the line—direction—of official duty.' [Citations.]" (*People* v. *Norris*, *supra*, 40 Cal.3d 51, 55, original italics.)

This court then proceeded to apply this definition to the facts before us in *Norris*: "Defendant's demand that the deputies drive him to San Francisco cannot reasonably be characterized as an attempt to obtain an act performed in an *official* capacity, or under color of public office. Indeed, any person able to operate a motor vehicle could have performed the act. In contrast, in *Robinson*, *supra*, 130 Cal.App. 664, only a judge acting by virtue of his public office could have granted the receivership order which defendant sought to obtain by means of blackmail. Because the Legislature expanded the definition of extortion to cover situations like *Robinson*, we conclude that it intended to limit the concept of 'official act' to include only those acts performed by an officer in his official capacity, which make some use of his public office." (*People* v. *Norris*, *supra*, 40 Cal.3d 51, 55-56, original italics.)

Turning to *Magee*, this court stated: "In [*Magee*] v. *Superior Court* (1973) 34 Cal.App.3d 201, 220 [109 Cal.Rptr. 758], the defendant held hostages to prevent law enforcement officials from arresting him. After a mistrial, he challenged the propriety of a retrial on an aggravated kidnaping charge, asserting that sections 209 and 518 were void for vagueness and that his conduct did not constitute extortion. The Court of Appeal dismissed the vagueness claim, holding that the statute adequately encompassed defendant's attempts to make officers 'forego [their] official duty not [*sic*] to interfere with law violations occurring in [their] presence.' (*Id.*, at p. 220.) To the extent [*Magee*] implies that any conduct aimed at interfering with law enforcement duties is punishable under section 209, it is hereby disapproved. A wide range of criminal activity is directed toward that end." (*People* v. *Norris*, *supra*, 40 Cal.3d 51, 56.)

Our limited disapproval of this statement in *Magee* v. *Superior Court*, *supra*, 34 Cal.App.3d 201, 220, did not mean that extortion could *never* be committed by a demand that an officer refrain from engaging in a law enforcement activity. Rather, our statement meant that such a demand was punishable as extortion only if the law enforcement activity in question necessarily included acts done "under color or by virtue of" a public office or, otherwise stated, acts done in an official capacity and by use of a public

office. Significantly, in *Norris* we expressed no disagreement with the Court of Appeal's holding in *Magee* that taking hostages to prevent the hostage-taker's arrest by law enforcement officials is punishable as kidnapping for extortion.[11] (*People* v. *Norris, supra,* 40 Cal.3d 51, 56.)

Under *Norris,* the instruction given in this case was plainly inadequate. ▮ Even in the absence of a request, a trial court must instruct on general principles of law that are commonly or closely and openly connected to the facts before the court and that are necessary for the jury's understanding of the case. (*People* v. *Cummings* (1993) 4 Cal.4th 1233, 1311 [18 Cal.Rptr.2d 796, 850 P.2d 1].) ▮ Under this rule, it was necessary to define for the jury the meaning of "official act" for purposes of extortion and kidnapping for extortion because, as we said in *Norris,* that term does not have a plain, unambiguous meaning (*People* v. *Norris, supra,* 40 Cal.3d 51, 54), and because in this context it carries a particular and restricted meaning including only actions taken in an official capacity that "make some use of [the] public office" (*id.* at p. 56). (See *People* v. *Howard* (1988) 44 Cal.3d 375, 408 [243 Cal.Rptr. 842, 749 P.2d 279] [trial court obligated on its own initiative to define terms having a technical meaning peculiar to the law].) Here, the only part of the instruction in any way clarifying the meaning of "official act" was the statement that it would include actions by the officers "resisting and stopping the criminal acts, kidnapping, escape and assault then taking place." As *Norris* explains, not every such action by the police officers and sheriff's deputies who were present at the Haverstick residence or assisted in the hostage negotiations with defendant would be an "official act" under sections 209 and 518, because not every such action would require "some use" of their official status as law enforcement officers. Actions such as tapping into William Haverstick's telephone line or placing defendant under arrest are actions taken in an official capacity and by use of the officer's official status. Other actions by the officers, however, such as their attempts to persuade defendant to surrender[12] or their merely stationing themselves along defendant's possible escape routes, although performed by on-duty law enforcement officers for the purpose of "stopping the criminal

---

[11]In 1987, after this court's decision in *People* v. *Norris, supra,* 40 Cal.3d 51, and after the events at issue here, the Legislature enacted section 210.5, prescribing the punishment for false imprisonment when it is committed for purposes of protection from arrest or to use the victim as a shield. We have no occasion here to consider the effect of this statute on crimes committed after its effective date.

[12]Attempts to persuade a defendant to surrender, which do not require the use of a public office, must be distinguished from efforts to negotiate the terms of a surrender, in which the negotiator, speaking as a representative of government, necessarily acts in an official capacity. But mere appeals to surrender, of the kind made by defendant's relatives in this case, do not require action in an official capacity.

acts . . . then taking place," were not actions that only officers could perform or that necessarily required some use of their official status. Accordingly we conclude that the instruction was not a reliable guide to the meaning of "official act" under the circumstances of this case.

 An instruction that omits a required definition of or misdescribes an element of an offense is harmless only if "it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " (*People* v. *Harris* (1994) 9 Cal.4th 407, 424 [37 Cal.Rptr.2d 200, 886 P.2d 1193], quoting *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065].) "To say that an error did not contribute to the verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." (*Yates* v. *Evatt* (1991) 500 U.S. 391, 403 [114 L.Ed.2d 432, 449, 111 S.Ct. 1884].)

 Under the instruction that defendant here challenges, the jury would have understood that it was to determine whether defendant had held or detained William Haverstick with the intent to cause a public officer to perform, or to refrain from performing, an official act, and it would have understood that "official acts" included acts of "resisting [or] stopping the criminal acts . . . then taking place." To determine defendant's intent or purpose in holding or detaining Haverstick, the jury would have considered evidence of the demands that defendant directed to law enforcement officers during this time. That evidence showed a number of demands, including that the officers themselves "back off," that they provide defendant with a car, that they hang up the telephone to free the line so that defendant could call out, that they have the sheriff's helicopter removed from the area, and that they refrain from entering Haverstick's house or making any attempt to arrest defendant. Some of the demands were for the performance or nonperformance of "official acts" (for example, an officer acts in an official capacity when making a felony arrest or when placing or interrupting a wiretap) while others were not (for example, no use of a public office is necessary to furnish an automobile[13]).

Given the evidence at trial, therefore, a reasonable juror applying the court's instruction could have rested the verdict finding defendant guilty of kidnapping for extortion on a demand by defendant for the performance of an act that either was or was not an "official act." Although this situation would usually require reversal of the conviction, we conclude that the error

---

[13]Demands for an automobile could be extortion under the "property" rather than the "official act" provision of section 518. (See, e.g., *People* v. *Chacon* (1995) 37 Cal.App.4th 52, 62 [43 Cal.Rptr.2d 434].)

is harmless here because defendant's demands were "so closely connected in time that they formed part of one transaction" (*People* v. *Diedrich* (1982) 31 Cal.3d 263, 282 [182 Cal.Rptr. 354, 643 P.2d 971]), all defendant's demands were proved by the tape recordings of defendant's telephone conversations, and defendant did not dispute the authenticity of the recordings either in whole or in part. In this situation, rational jurors could not disagree on which demand or demands defendant made. If the jurors accepted the authenticity of the tapes (and they were given no reason not to do so), they must necessarily have found that defendant made all the demands shown by the recordings. Otherwise stated, the jurors were presented with no evidence based upon which reasonable jurors could disagree as to which demand defendant made and yet convict him of kidnapping for extortion as defined for them by the court's instructions. (See *People* v. *Brown* (1991) 234 Cal.App.3d 918, 935 [285 Cal.Rptr. 824].) Because the evidence of defendant's demands afforded "no reasonable basis for the jury to distinguish between them" (*People* v. *Stankewitz* (1990) 51 Cal.3d 72, 100 [270 Cal.Rptr. 817, 793 P.2d 23]), a finding that defendant made any one of the demands is "functionally equivalent" (see *Carella* v. *California* (1989) 491 U.S. 263, 271 [105 L.Ed.2d 218, 225-226, 109 S.Ct. 2419] (conc. opn. of Scalia, J.)) to a finding that defendant made all the demands, including demands for the performance or nonperformance of "official acts." For this reason, we are persuaded beyond a reasonable doubt that the instructional error in failing to correctly define "official act" was "unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." (*Yates* v. *Evatt, supra,* 500 U.S. 391, 403 [114 L.Ed.2d 432, 449].)

This reasoning also disposes of defendant's contention that the evidence is insufficient to support the verdict. As we have explained, the tape recordings constitute substantial and indeed virtually uncontrovertible evidence that defendant held and detained William Haverstick, whom defendant repeatedly referred to as his "hostage" and repeatedly threatened to kill, to cause law enforcement officers to perform or refrain from performing "official acts" within the meaning of the statutory definition of extortion and kidnapping for extortion as explained by this court in *People* v. *Norris, supra,* 40 Cal.3d 51.

N. *Jury Instructions Regarding Confessions and Admissions*

 The court instructed the jury that "evidence of an oral confession or oral admission of the defendant should be viewed with caution," but it added that "[t]he caution instruction as to an oral confession or oral admission does not, however, apply when the said oral statement or statements is proved by a tape recording."

As defendant recognizes, a trial court is required on its own initiative to instruct the jury that evidence of a defendant's oral admissions must be viewed with caution (*People* v. *Stankewitz, supra,* 51 Cal.3d 72, 94; *People* v. *Beagle* (1972) 6 Cal.3d 441, 455 [99 Cal.Rptr. 313, 492 P.2d 1]), except that this cautionary instruction is inapplicable, and should not be given, if the oral admission was tape-recorded (*People* v. *Hines* (1964) 61 Cal.2d 164, 173 [37 Cal.Rptr. 622, 390 P.2d 398], overruled on other grounds by *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 774-775, fn. 40 [175 Cal.Rptr. 738, 631 P.2d 446]). Nevertheless, defendant contends that the instructions as given were misleading because the jury might have interpreted them as meaning that if defendant's tape-recorded admissions "proved" the non-tape-recorded admission, then none of defendant's oral admissions needed to be viewed with caution.

We disagree. Defendant's contention is reviewed by asking whether there is a reasonable likelihood that the jury understood the instruction as defendant asserts. (*People* v. *Raley* (1992) 2 Cal.4th 870, 899 [8 Cal.Rptr.2d 678, 830 P.2d 712].) We conclude there is not such a reasonable likelihood. The most obvious meaning of "oral statement . . . proved by a tape recording" is a statement recorded on a tape that was received in evidence at trial. There is no reasonable likelihood that the jury understood the words to apply also to non-tape-recorded oral statements proved through testimony that was indirectly corroborated or supported by a tape recording.

To eliminate any possibility of confusion, the trial court referred to Deputy Stein's testimony about defendant's postarrest statements and Detective Amicone's testimony relating a statement by Roy Mayfield apparently summarizing statements by defendant as evidence to which the cautionary instruction would apply. As an example of evidence to which the cautionary instruction would not apply, the trial court referred to the tape recordings of the hostage negotiations. Defendant argues, however, that the trial court's awkward language added to rather than eliminated the potential confusion and could have caused the jury to conclude that it need not view any admission with caution and that it was to take it as established that Roy Mayfield's statement to Detective Amicone was in fact a summary of an admission by defendant.

We disagree. We have carefully reviewed the trial court's explanation,[14] and we conclude that there is no reasonable likelihood that the jury misconstrued it in the manner asserted by defendant.

---

[14]The trial court stated:

"What does the last two paragraphs mean? Keep in mind, as an example, there was alleged statements made by the defendant to Officer Stein. That's an oral statement, as an example.

"Another example is the testimony of Mayfield Senior as to what the defendant said as told to Detective Amicone. That's an oral statement.

"The statements, if any were made, i.e., confessions and/or admissions on the tape during the negotiation, is a taped recording. Therefore, then, the cautionary aspect of it does not

## O. Jury Instructions Regarding Use of Unreasonable or Excessive Force in Self-defense

The court instructed the jury on self-defense. Among others, the court gave this instruction:

"An officer is not permitted to use unreasonable or excessive force in detaining or attempting to detain a person for questioning.

"If an officer does use unreasonable or excessive force in detaining or attempting to detain a person for questioning, the person being detained may lawfully use reasonable force to protect himself.

"Thus, if you find that the officer used unreasonable or excessive force in making or attempting to make the detention that is in question, *and that the defendant used only reasonable force to protect himself,* the defendant is not guilty of the offense charged in Count 1 *or of any lesser and necessarily included offense.*" (Italics added.)

 Defendant contends that the instruction as given is incomplete and misleading because it does not state that if a person uses unreasonable or excessive force in response to an officer's use of unreasonable or excessive force, a killing that results is without malice and at most voluntary manslaughter. As defendant apparently recognizes, malice is negated in this situation only if the defendant *honestly but unreasonably believed* that the degree of force used was in fact necessary. Absent such a belief, a person's use of excessive force in response to an officer's use of excessive force does *not* negate malice.

 When considering a challenge to a jury instruction, we do not view the instruction in artificial isolation but rather in the context of the overall charge. (*People* v. *Espinoza* (1992) 3 Cal.4th 806, 823-824 [12 Cal.Rptr.2d 682, 838 P.2d 204].) For ambiguous instructions, the test is whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction. (*Boyde* v. *California* (1990) 494 U.S. 370, 380-381 [108 L.Ed.2d 316, 328-330, 110 S.Ct. 1190].)

 Here, in addition to giving the challenged instruction, the trial court instructed the jury that "[a] person who kills another person in the

---

apply if indeed you find that there was an admission made. Okay? That's the distinction. Again, that's only evidence. You must determine what the facts are obviously."

honest but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury kills unlawfully, but does not harbor malice aforethought and cannot be found guilty of murder." Under this instruction, if the jury concluded that defendant killed Sergeant Wolfley by the use of excessive force in the honest but unreasonable belief that the amount of force used was necessary, it would have been required to find that defendant acted without malice. On the other hand, if the jury concluded that defendant killed Sergeant Wolfley by the use of excessive force *without* honestly believing that the amount of force used was necessary, then the jury could properly find, as it evidently did find, that defendant acted with malice, whether or not Sergeant Wolfley had used excessive force. Therefore, we conclude that there is no reasonable likelihood that the jury was misled in the manner defendant suggests, and we reject defendant's contention that the trial court erred in giving the challenged instruction.

## P. *Instructions Regarding Provocation*

The court instructed the jury on provocation in the language of CALJIC No. 8.73 (1979 rev.): "When the evidence shows the existence of provocation that played a part in inducing the unlawful killing of a human being, but also shows that such provocation was not such as to reduce the homicide to manslaughter, and you find that the killing was murder, you may consider the evidence of provocation for such bearing as it may have on the question of whether the murder was of the first or second degree."

■ Defendant contends that the trial court erred to his prejudice in giving this instruction because it is ambiguous and fails to sufficiently specify the subjective factors that the jury ought to consider in deciding how provocation bears on the elements of first and second degree murder. We reject this contention.

CALJIC No. 8.73 is a "pinpoint" instruction (see *People* v. *Saille* (1991) 54 Cal.3d 1103, 1119 [2 Cal.Rptr.2d 364, 820 P.2d 588]) that relates particular facts to an element of the charged crime and thereby explains or highlights a defense theory. (*People* v. *Lee* (1994) 28 Cal.App.4th 1724, 1734 [34 Cal.Rptr.2d 723].) The trial court is not required to give such an instruction on its own initiative, and if the instruction as given is adequate, the trial court is under no obligation to amplify or explain in the absence of a request that it do so. (*People* v. *Kelly* (1992) 1 Cal.4th 495, 535-536 [3 Cal.Rptr.2d 677, 822 P.2d 385]; *People* v. *Ashmus* (1991) 54 Cal.3d 932, 997 [2 Cal.Rptr.2d 112, 820 P.2d 214].) Because the instruction as given was adequate (see *People* v. *Fitzpatrick* (1992) 2 Cal.App.4th 1285, 1293, fn. 5 [3 Cal.Rptr.2d 808]), and because defendant did not ask the trial court to clarify

or amplify it, defendant may not complain on appeal that the instruction was ambiguous or incomplete.

*Q. Rejection of Proposed Instruction on Excusable Homicide in the Heat of Passion*

The court declined defendant's request that the jury be given this instruction:

"The unintentional killing of a human being by accident and misfortune is excusable when committed in the heat of passion upon a sudden combat or upon a sudden and sufficient provocation which would provoke a reasonable man to fight, provided:

"1. The person killing was not the original aggressor;

"2. No undue or unfair advantage was taken of the other by the person killing;

"3. No dangerous or deadly weapon was used by the person who killed during the fight;

"4. The killing was not done in a cruel or unusual manner; and

"5. The act of killing was not the result of gross negligence."

The trial court rejected the instruction as unsupported by the evidence. Noting that the instruction does not apply if the killer used a deadly weapon, while here the prosecution established by undisputed evidence that Sergeant Wolfley died from a gunshot wound, the court reasoned that if defendant was Sergeant Wolfley's killer, then defendant must have used a deadly weapon. Defendant challenges this reasoning, relying on decisions holding, in a different context, that a negligent or involuntary discharge of a firearm is not necessarily a "use" of the firearm. (See, e.g., *People* v. *Chambers* (1972) 7 Cal.3d 666, 674 [102 Cal.Rptr. 776, 498 P.2d 1024].)

Assuming for argument's sake that the trial court erred in refusing to give the instruction, defendant was not prejudiced. In rejecting the lesser included offenses of manslaughter and second degree murder and convicting defendant instead of first degree murder, the jury necessarily found that defendant intended to kill Sergeant Wolfley and that the killing was deliberate and premeditated. Under these circumstances, failure to instruct on a theory of unintentional and accidental killing was harmless. (*People* v. *Mincey, supra,* 2 Cal.4th 408, 438.)

### R. *Rejection of Proposed Instructions on Actual Danger and on Due Caution and Circumspection*

The defense requested that the trial court instruct the jury in the language of CALJIC No. 5.51 (1977 rev.), as follows: "Actual danger is not necessary to justify self-defense. If one is confronted by the appearance of danger which arouses in his mind, as a reasonable person, an honest conviction and fear that he is about to suffer bodily injury, and if a reasonable man in a like situation, seeing and knowing the same facts, would be justified in believing himself in like danger, and if the person so confronted acts in self-defense upon such appearances and from such fear and honest convictions, his right of self-defense is the same whether such danger is real or merely apparent."

The trial court refused the instruction on the ground that the same subject matter was adequately covered by a different instruction, CALJIC No. 5.12 (1979 rev.), which is tailored for use in homicide cases. That instruction states:

"The killing of another person in self-defense is justifiable and not unlawful:

"1. When the person who does the killing has reasonable ground to believe and does believe that there is imminent danger that the other person will kill him or cause him great bodily injury, and

"2. A reasonable person under the same circumstances would believe that it was necessary to kill the other person to prevent death or great bodily injury to himself.

"In order to justify killing another person in self-defense, actual danger or great bodily injury is not necessary. On the other hand, a bare fear of death or great bodily harm is not sufficient.

"In order to justify a killing it must be established:

"1. The circumstances must be sufficient to excite the fears of a reasonable person that there was imminent danger of death or great bodily injury, and

"2. The party killing must have acted under the influence of such fears alone and under the belief that such killing was necessary to save himself from death or great bodily injury."

We agree with the trial court that this instruction rendered defendant's proposed instruction superfluous.

The defense also requested that the trial court instruct the jury in the language of CALJIC No. 8.46 (4th ed. 1979) as follows: "The term 'without due caution and circumspection' as used in these instructions refers to negligent acts which are aggravated, reckless and gross and which are such a departure from what would be the conduct of an ordinarily prudent or careful man under the same circumstances as to be contrary to a proper regard for human life or an indifference to consequences. The facts must be such that the fatal consequences of the careless or negligent acts could reasonably have been foreseen and it must appear that the death was not the result of misadventure but the natural and probable result of a reckless or grossly negligent act."

Defendant contends that the instruction should have been given in conjunction with CALJIC No. 5.00 (4th ed. 1979), which states: "The unintentional killing of a human being is excusable and not unlawful when committed by accident and misfortune in the performance of a lawful act by lawful means and where the person causing the death acted with that care and caution which would be exercised by an ordinarily careful and prudent individual under like circumstances."

We reject this contention. The requested instruction defines a phrase—"without due caution and circumspection"—that does not appear in the instruction given. Therefore, the requested instruction would not have assisted the jury in understanding the instruction given. Although the trial court perhaps should have explained that the standard of care required for an excusable homicide is not the civil negligence standard, but a less exacting criminal negligence standard (see *People* v. *Penny* (1955) 44 Cal.2d 861, 879 [285 P.2d 926]; *People* v. *Velez* (1983) 144 Cal.App.3d 558, 566-567 [192 Cal.Rptr. 686]), the failure to do so could not have prejudiced defendant given the jury verdict finding him guilty of first degree premeditated and deliberate murder.

### S. *Prosecutorial Misconduct in Jury Argument*

Defendant contends that the prosecutor committed misconduct in argument to the jury, and also during jury selection, by expressing his personal belief in defendant's guilt and his personal belief that defendant had lied during his testimony, and that the prosecutor committed additional misconduct in jury argument by injecting racial issues into the proceeding.

#### 1. *Personal Belief*

When arguing to the jury, it is misconduct for a prosecutor to express a personal belief in the defendant's guilt if there is a substantial

danger that the jurors will construe the statement as meaning that the belief is based on information or evidence outside the trial record (*People* v. *Bain* (1971) 5 Cal.3d 839, 848 [97 Cal.Rptr. 684, 489 P.2d 564]), but expressions of belief in the defendant's guilt are not improper if the prosecutor makes clear that the belief is based on the evidence before the jury (*People* v. *Miranda* (1987) 44 Cal.3d 57, 110 [241 Cal.Rptr. 594, 744 P.2d 1127]). Similarly, "[r]eferring to the testimony and out-of-court statements of a defendant as 'lies' is an acceptable practice so long as the prosecutor argues inferences based on evidence rather than the prosecutor's personal belief resulting from personal experience or from evidence outside the record." (*People* v. *Edelbacher*, *supra*, 47 Cal.3d 983, 1030.) ▮ Applying these principles, we find no misconduct.

During jury selection, on general voir dire of a prospective juror, the following exchange occurred:

"Q. [By the prosecutor] Would you agree that if I'm going to step out and make those kinds of charges [that is, the charges against defendant] that I should be pretty much convinced *about the evidence that I have to present*?

"A. Definitely.

"[Defense counsel]: Calls for conclusion and speculation.

"The Court: I'll allow it, however.

"Q. [By the prosecutor] Would you expect me to make those kind of charges and not be convinced *that I could back them up*?

"A. No.

". . . . . . . . . . . . . . . . . . . . . . . .

"Q. You would think it would be kind of strange, or I'd imagine you would think it would be strange, if I come in trying to convince you twelve people that these charges are true if I'm not convinced on my own?

"A. That correct." (Italics added.)

The italicized portion of the prosecutor's statements make clear that the belief to which he was referring was a belief based on evidence that would be presented at trial.

During argument to the jury the prosecutor said: "And I'm going to point out to you later some areas where I think that are very obvious that

[defendant] was willfully false in his testimony. It's not very often that I come right out and call an individual a liar, but sometimes you have to call a spade a spade. And I think that that's what he did, and I'll point out to you some of these areas where I feel it's obvious, blatant that he was lying."

The prosecutor then proceeded to analyze defendant's testimony in light of other evidence to demonstrate that it was necessarily false. We are satisfied that a reasonable juror would understand that the prosecutor's reference to defendant's "lying" during his testimony was grounded in the trial evidence rather than in information outside the record.

Later during jury argument, the prosecutor said: "When [defendant] went back along that wall, and I told you yesterday I had a chance to look at that wall before I cross examined him, he said that down at the east side that he had to get up on it to see over to see what was going on. *You know that's not true.* That just goes to his credibility as to the wall." (Italics added.) As the italicized sentence emphasizes, the prosecutor's argument that defendant had testified falsely was based on evidence in the record, including the jury view, concerning the height of the wall, and not on information outside the record. Accordingly, the prosecutor did not commit misconduct.

### 2. *Injecting Racial Issues*

Defendant contends there were improper racial references in the prosecutor's guilt phase argument to the jury. Because defense counsel did not object to these statements or request that the jury be admonished, the contention is not reviewable on appeal. (*People* v. *Berryman* (1993) 6 Cal.4th 1048, 1072 [25 Cal.Rptr.2d 867, 864 P.2d 40].) We consider below (pt. IV.T.3., *post*) defendant's claim that trial counsel's failure to object denied him his federal constitutional right to the effective assistance of counsel.

## T. *Ineffective Assistance of Counsel*

Defendant contends that his trial counsel's performance at the guilt phase was constitutionally deficient because counsel (1) elicited evidence prejudicial to defendant; (2) failed to present exculpatory evidence that Sergeant Wolfley, not defendant, had possession of the gun when the fatal shot was fired; and (3) failed to object to inadmissible evidence and improper argument. We consider these contentions in turn.

To establish a violation of the constitutional right to effective assistance of counsel, a defendant must show that his counsel's performance

was deficient when measured against the standard of a reasonably competent attorney, and that counsel's performance was prejudicial in the sense that it "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." (*Strickland* v. *Washington, supra*, 466 U.S. 668, 686 [80 L.Ed.2d 674, 692-693]; *id.* at pp. 686-694 [80 L.Ed.2d at pp. 692-698]; see also *People* v. *Wader* (1993) 5 Cal.4th 610, 636 [20 Cal.Rptr.2d 788, 854 P.2d 80].) If a defendant has failed to show that the challenged actions of counsel were prejudicial, a reviewing court may reject the claim on that ground without determining whether counsel's performance was deficient. (*Strickland* v. *Washington, supra*, 466 U.S. at p. 697 [80 L.Ed.2d at pp. 699-700].) If the record contains no explanation for the challenged behavior, an appellate court will reject the claim of ineffective assistance "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation." (*People* v. *Pope* (1979) 23 Cal.3d 412, 426 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].)

### 1. *Eliciting Prejudicial Evidence*

■ Defendant contends that trial counsel elicited evidence prejudicial to defendant by (1) obtaining dismissal of a robbery count, thereby permitting defendant's impeachment with a prior robbery conviction; and (2) eliciting or permitting the prosecutor to elicit prejudicial testimony from prosecution witnesses Tyrone Thomas, Howard Bell, and Candette Wolfley.

During jury selection, the defense sought a ruling from the trial court on whether it would permit the prosecution to introduce evidence of defendant's prior felony convictions to impeach him in the event he testified. (See Evid. Code, § 788.) The trial court ruled that grand theft from the person and robbery (crimes of which defendant had been previously convicted) were both crimes of moral turpitude (see *People* v. *Castro* (1985) 38 Cal.3d 301, 306, 313-316 [211 Cal.Rptr. 719, 696 P.2d 111]), but it reserved until the prosecution had presented its case-in-chief the question of whether the probative value of the prior convictions for impeachment outweighed the risk of undue prejudice (see *id.* at pp. 306-313; Evid. Code, § 352). After the prosecution had presented its case-in-chief, the trial court ruled that defendant could be impeached with his prior conviction for grand theft from the person, but not with his prior conviction for robbery. The court explained that the use of the prior robbery conviction for impeachment presented a very close question, but that it had decided not to permit its use for impeachment because the charges against defendant included robbery of Haverstick, based on the taking of Haverstick's keys, although the "main thrust" of the case was the charge of murder.

Immediately after the court announced its ruling, defense counsel made a motion for a judgment of acquittal (§ 1118.1) on the robbery charge on the ground of insufficiency of the evidence. The prosecutor inquired whether, if the trial court granted the motion, the court would reconsider its decision barring impeachment with the prior conviction for robbery. When the trial court indicated that it would permit impeachment with the robbery prior if the pending robbery charge was removed from the case by judgment of acquittal, the prosecutor stated he would "join in counsel's motion." Defense counsel then requested an opportunity to speak to defendant. The trial court granted the request. After speaking to defendant, defense counsel renewed the motion for judgment of acquittal, and the court granted the motion.

We reject defendant's claim of ineffective assistance of counsel based on the incident. Although the granting of the motion for judgment of acquittal permitted impeachment with the robbery prior, the record shows that counsel was well aware of this consequence and made a considered tactical decision after consultation with defendant. The record does not, however, provide an explanation for the challenged behavior, and the claim may be rejected on this ground. (*People* v. *Pope*, *supra*, 23 Cal.3d 412, 425.) Moreover, it is doubtful that defendant can demonstrate prejudice. The prosecutor joined in the motion for judgment of acquittal. Had the defense not brought the motion, it is reasonably probable that the prosecution itself would have moved to dismiss the robbery charge, as to which the evidence was clearly insufficient to support a conviction (Haverstick testified that he could not find his keys after the events in question, but he did not know who had taken them; he did not testify that defendant took the keys from his person or immediate presence by means of force or fear).

On direct examination by the prosecution, Tyrone Thomas stated that when defendant and Bell entered the service station, Thomas believed he had seen Bell earlier at the apartment complex in San Bernardino, and for this reason Thomas believed that Bell and defendant were pursuing him. Thomas stated that he was unsure whether he had really seen Bell at the apartment complex, although he was sure that he had seen Bell that night at a different location, a street corner that defendant later identified as the place where he had encountered Bell.

After this testimony, the trial was interrupted by the prosecutor's illness. When it resumed two weeks later, the prosecutor ended his direct examination by again asking Thomas whether he had seen Bell at the apartment complex in San Bernardino that night. Thomas answered: "Before I went in the front door I saw him." Defense counsel began cross-examination by asking Thomas whether he did or did not see Bell at the apartment complex

that night. Thomas answered: "Yes, I did." Later, he testified that he had seen Bell when he first arrived at the apartment complex, and that Bell had been standing by a wall.

We reject the claim of deficient performance based on defense counsel's action in eliciting testimony from Thomas that he had seen Bell at the apartment complex. Thomas had given conflicting testimony on direct examination, stating first that he was not sure whether he seen Bell at the apartment complex, and then later, without equivocation, that he had seen Bell at that location. Counsel's question effectively pointed out this inconsistency, thereby undermining Thomas's credibility. Moreover, even assuming deficient performance, defendant has not demonstrated prejudice. Defendant argues that evidence placing Bell at an apartment complex where illegal drug transactions were common would implicate Bell in such transactions and, because Bell and defendant arrived at the service station together, the taint would necessarily affect defendant as well. But Thomas had already testified on direct examination that he had seen Bell at the apartment complex, and cross-examination was unlikely to significantly strengthen the force of this testimony. In any event, Bell's connection with illegal drugs was firmly established by undisputed evidence that his urine contained phencyclidine (PCP), and also by his admissions that he had used cocaine and marijuana.

When Bell testified as a prosecution witness, the prosecutor inquired on direct examination about Bell's use of intoxicating substances on the evening preceding the shooting of Sergeant Wolfley. Bell admitting using cocaine, marijuana, and beer, but he said he did not remember taking PCP and did not believe he had done so. Defense counsel expressly declined to object to this line of questioning, merely observing during a bench conference that the prosecutor appeared to be seeking to destroy the credibility of his own witness. But later, when the prosecution sought to introduce evidence that a sample of Bell's urine taken during the morning following the shooting had tested positive for PCP, the defense objected that the evidence was irrelevant and improper impeachment of the prosecution's own witness. The trial court overruled the objection.

Defendant argues that counsel's action permitting the questioning of Bell about PCP use was inconsistent with his later objection to the urine analysis evidence, thereby demonstrating that counsel lacked a consistent strategy. Because Bell's account of events in front of the service station was more favorable to the defense than that of the other prosecution witnesses, and because Bell was defendant's companion on the evening in question, excluding all evidence of Bell's PCP use would have benefited the defense. But

evidence of PCP use was clearly relevant to Bell's ability to accurately perceive and remember the events to which he testified, and defendant does not explain upon what ground it could properly have been excluded. Accordingly, any inconsistency in defense counsel's handling of the issue of Bell's PCP use did not result in prejudice to defendant.

On cross-examination of Candette Wolfley, defense counsel began by inquiring why she was riding with her husband on the night he was shot. She explained that the Rialto Police Department encouraged spouses to ride along with patrol officers occasionally to experience "the tension and pressures and the job stress" and thereby "to give them a better understanding." Counsel followed up by asking whether Sergeant Wolfley was "experiencing job pressures at that point in time in his life." She responded: "He was experiencing a very good time because he had just been promoted to sergeant and we had a new baby." Defendant contends counsel performed deficiently in eliciting this testimony of Sergeant Wolfley's recent promotion and new baby, facts that could only elicit the jury's sympathy for the witness and her slain husband.

We do not find ineffective assistance based on this cross-examination. Counsel's question was directed specifically to "job pressures." Counsel should not be faulted for failing to anticipate a nonresponsive answer that included details of Sergeant Wolfley's personal life.

### 2. *Failing to Present Exculpatory Evidence*

Defendant contends that trial counsel failed to elicit material exculpatory evidence that Sergeant Wolfley rather than defendant had possession of the gun when the fatal shot was fired. The evidence to which defendant refers is the testimony of Detective Amicone, during a hearing outside the jury's presence, recounting a statement by Roy Mayfield apparently summarizing statements in which defendant described the fatal shooting. As we have previously explained (see pt. IV.I.6., *ante*), defense counsel's failure to bring this testimony to the jury's attention was not deficient performance because it is clear that Amicone misspoke when he quoted the statement as being "The officer took it back" rather than "The officer tried to take it back."

### 3. *Failing to Object*

Defendant faults trial counsel for failing to object to (1) evidence that a knife was found behind the service station; (2) Deputy Stein's reading of defendant's alleged postarrest statement from Stein's report; (3) proceedings during the jury view; and (4) the prosecutor's racial references during closing argument.

We have already rejected defendant's claim that trial counsel performed inadequately by not bringing a motion before the trial began to exclude all evidence of the knife. Because the knife evidence was admissible, defense counsel's failure to seek its exclusion earlier did not prejudice defendant.

During a hearing out of the jury's presence to determine the admissibility of evidence, Deputy Stein testified to certain statements defendant made shortly after his arrest. (See pt. IV.A., *ante*.) During this testimony, the trial court noted for the record that the witness was reading from his report. Defendant contends that defense counsel should have objected and thereby forced Deputy Stein to testify from his own memory. According to defendant, this would have provided a dramatic test of Deputy Stein's claimed ability to remember defendant's long statement verbatim.

We are not persuaded. Defense counsel could reasonably conclude that an objection at that preliminary stage, even though legally well founded, would not gain any significant advantage for the defense. The witness properly could have used the report to refresh his memory (Evid. Code, § 771), and we may not speculate that testimony given in this manner would have revealed that Deputy Stein's memory was not as accurate as he claimed. Moreover, the mere fact that the witness chose to read from his report, rather than rely on his memory, provided ample support for this argument. In any event, as we have previously explained (see pt. IV.A.4., *ante*), even if Deputy Stein exaggerated the accuracy of his memory, the jury could reasonably conclude that the statement as it appeared in Deputy Stein's report, which was transcribed from notes that Deputy Stein wrote within minutes of hearing defendant's statement, was accurate as to substance even though not verbatim. (See Evid. Code, § 1237 [past recollection recorded].)

Defendant next faults counsel's conduct during the jury view. Specifically, defendant claims that counsel should not have entered into stipulations in defendant's absence and should have objected when the trial court undertook to answer questions posed by jurors. We have already considered and rejected this claim. (See pt. IV.B.2.-4., *ante*.)

In the final ineffective assistance claim, defendant faults trial counsel for not objecting to improper racial references in the prosecutor's guilt phase argument to the jury. We reject the claim. The prosecutor's argument did not contain improper racial references.

The first remark defendant cites is this: "It's not very often that I come right out and call an individual a liar, but sometimes you have to call a spade a spade." Having carefully examined the prosecutor's entire argument, and

especially the context in which this remark was made, we are persuaded that the prosecutor did not intend, nor would a reasonable juror have perceived, a racial reference in the word "spade."

Referring to defendant's tape-recorded telephone conversation with Yvonne Hester, the prosecutor said: "Then she goes on to say 'you're in this situation because you're hanging around with those losing niggers who ain't got nothing going for them.' She says, 'you know, you cannot talk back to a man with a gun. I realize you're big and you're strong and, yeah, you took the gun and you shot him. But that's not macho, it's not doing nothing for nobody. And the only person it's going to hurt in the long run is you.' " This was a direct quotation of Hester's statements as captured on tape, and it was relevant as an adoptive admission by defendant concerning the circumstances of the shooting ("you took the gun and you shot him"). Although the prosecutor could have made the point effectively without quoting the part of the statement containing the word "niggers," the brief and isolated remark, spoken originally by a person who was herself Black, was not likely to trigger racial prejudice in the jury.

Defendant also challenges this statement: "And it's no different, ladies and gentlemen, than going out and shooting a mad dog. You've got a man who has shot one officer, he's shot at two other individuals, he has shot the hostage there in the house, he is on a terror and a rampage. [¶] What are the officers to do? Let him go on and do what he wants to do? Are they to let him maybe get so agitated that he finally kills Haverstick? Or do we put upon them the charge to protect our society and eliminate the problem? And under those circumstances Dennis Mayfield was the problem. They were going to terminate that problem if they could, just the same as if you'd shoot a mad dog."

We do not agree that the jury would have understood the argument comparing defendant to a "mad dog" as a form of racial reference. Instead, the jury would have understood the reference as vigorous but fair argument based on the evidence of defendant's conduct at the time in question. (See, e.g., *People* v. *Hawkins*, *supra*, 10 Cal.4th 920, 961; *People* v. *Thomas* (1992) 2 Cal.4th 489, 537 [7 Cal.Rptr.2d 199, 828 P.2d 101].)

Finally, defendant faults trial counsel for stipulating at the penalty phase to the facts underlying defendant's prior felony convictions in terms that included the word "Negro." The stipulations were as follows:

"[O]n June 14th, 1977, the defendant, Dennis Mayfield, while personally armed with and using a knife, together with three other Negro males, robbed

Thomas Glore, age fifteen, of four dollars U.S. currency. The incident took place in a field area immediately east of Eisenhower High School in Rialto during the school lunch hour. [¶] . . . [O]n October 25th, 1981, the defendant, Dennis Mayfield, and two Negro females stole merchandise from the J. C. Penney Store in Arcadia, California. As Dennis Mayfield was being pursued by the J. C. Penney security agents, he, Mayfield, dropped the bags he was carrying as he, Mayfield, approached his vehicle. While the security agent, James Dewitt, stopped to recover the bags of stolen merchandise, Dennis Mayfield removed a pistol from his vehicle, pointed it at James Dewitt, and ordered Dewitt to give the bags of merchandise to Mayfield. Dewitt complied and Mayfield then drove his vehicle away from the J. C. Penney parking lot."

The stipulation is couched in language apparently taken from a police report or probation officer's report. The term "Negro" was unnecessary and should have been omitted, but in context it is not reasonably probable that the remark would have evoked racial prejudice in the jurors.

## U. *Cumulative Prejudice*

We reject defendant's contention that the cumulative effect of asserted errors in jury selection and at the guilt phase denied him his federal constitutional right to due process of law (U.S. Const., 5th & 14th Amends.) and requires reversal of the judgment as to both guilt and penalty. We have rejected nearly all of defendant's assignments of error. When we have found error, we have concluded that defendant was not prejudiced. The errors that occurred at defendant's trial, whether considered singly or collectively, were inconsequential. Defendant was not denied his due process right to a fair trial.

## V. SPECIAL CIRCUMSTANCE

As a special circumstance to the offense of first degree murder, the jury found that Sergeant Wolfley was a peace officer, that he was engaged in performing his duties when defendant intentionally killed him, and that defendant knew, or reasonably should have known, that Sergeant Wolfley was a peace officer engaged in performing his duties (§ 190.2, subd. (a)(7)). Defendant contends that the special circumstance finding must be set aside because there was insufficient evidence to prove, and the jury was erroneously instructed concerning, the engaged-in-duty element.

## A. *Sufficiency of the Evidence*

To determine the sufficiency of the evidence to support a special circumstance finding, we apply the same test used to determine the sufficiency of the evidence to support a conviction of a criminal offense. We

"review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People* v. *Johnson, supra*, 26 Cal.3d 557, 578; see also *Jackson* v. *Virginia, supra*, 443 U.S. 307, 317-320 [61 L.Ed.2d 560, 572-574].)

 As used in the peace-officer-murder special circumstance, the phrase "engaged in the course of the performance of his or her duties" means that the officer must have been acting lawfully at the time. (*People* v. *Gonzalez* (1990) 51 Cal.3d 1179, 1217 [275 Cal.Rptr. 729, 800 P.2d 1159].)

The record contains substantial evidence that Sergeant Wolfley was acting lawfully when he was killed. According to the testimony of Candette Wolfley, a credible witness, Sergeant Wolfley was dispatched to a service station to investigate an unspecified problem. Upon arriving, he was met by Tyrone Thomas, who said that "they" were "after" him and "going to kill" him. Thomas pointed to defendant and Howard Bell. He said "the guy in the coat" (that is, defendant) had a pistol. After speaking briefly to Bell, Sergeant Wolfley addressed defendant, saying "Stop, come here, I want to talk to you." Defendant continued to walk away from Sergeant Wolfley, quickening his pace. Sergeant Wolfley said "Stop, I want to talk to you." Sergeant Wolfley then drew his gun and commanded defendant to "freeze." Candette Wolfley could not see what happened next, but other evidence in the record, including defendant's own admissions, establishes that Sergeant Wolfley then approached defendant, who grabbed the gun away from Sergeant Wolfley and used it to kill him.

For the sake of discussion, we assume that when Sergeant Wolfley said "Stop, come here, I want to talk to you," Sergeant Wolfley was detaining or attempting to detain defendant rather than merely attempting to initiate a consensual encounter. (See *People* v. *King* (1977) 72 Cal.App.3d 346, 349-350 [139 Cal.Rptr. 926].) A detention is lawful "when the detaining officer can point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity." (*People* v. *Souza* (1994) 9 Cal.4th 224, 231 [36 Cal.Rptr.2d 569, 885 P.2d 982].) Here, Thomas's statements to Sergeant Wolfley were specific articulable facts providing an objective manifestation that defendant was involved in the criminal activity of planning to kill Thomas. Although Thomas's uncorroborated statements, particularly in view of his apparent drug intoxication, may not have provided Sergeant Wolfley with probable cause to arrest defendant, they warranted a detention for purposes of investigation.

Given Thomas's statement that defendant had a pistol, Sergeant Wolfley also had reasonable grounds to conduct a patdown search of defendant's person. (See *People* v. *Souza*, *supra*, 9 Cal.4th 224, 229.) To perform the patdown, Sergeant Wolfley acted lawfully in commanding defendant to "freeze" and also to raise his hands. Likewise, Sergeant Wolfley acted reasonably in drawing his gun, and this action did not convert the detention into an arrest. (*United States* v. *Lechuga* (7th Cir. 1991) 925 F.2d 1035, 1040 [stating that officer may draw weapon, without converting a detention to an arrest, when "the suspect is thought to be armed, or even when he is thought to be involved in criminal activity in which the use of weapons is . . . commonplace"]; *Alexander* v. *County of Los Angeles* (9th Cir. 1995) 64 F.3d 1315, 1320; *United States* v. *Del Vizo* (9th Cir. 1990) 918 F.2d 821, 824.)

### B. *Jury Instruction*

The trial court instructed the jury on the engaged-in-duty element of the peace-officer-murder special circumstance using the language of CALJIC Nos. 8.81.8 and 9.52 (4th ed. 1979). As here relevant, CALJIC No. 8.81.8 stated:

"The phrase 'in the performance of his duties,' as used in these instructions, means:

"Any lawful act or conduct while engaged in the maintenance of the peace and security of the community or in the investigation or prevention of crime.

"The lawful detention of or the lawful attempt to detain a person for questioning or investigation."

As here relevant, CALJIC No. 9.52 stated: "The phrase 'in the performance of his duties,' as used in these instructions, includes the lawful detention of or the lawful attempt to detain a person for questioning or investigation by a peace officer."

The trial court's instructions were given to the jury both orally and in writing. The written instructions, which were available to the jury during deliberations, were as quoted above. The trial court's oral recitation of CALJIC No. 8.81.8 was also exactly as quoted above. When the trial court read CALJIC No. 9.52 to the jury, however, the reporter's transcript indicates that the court stated: "The phrase, in quotation, in the performance of his duties, close quote, as used in these instructions includes the lawful detention of or the *unlawful* attempt to detain a person for questioning or investigation by a peace officer." (Italics added.)

Finally, the trial court instructed the jury, both orally and in writing, in the language of CALJIC No. 9.58 (1980 rev.): "A peace officer is not engaged in the performance of his duties if he: [¶] detains unlawfully or attempts to detain unlawfully a person for questioning or investigation . . . ."

 Defendant contends that the trial court erred to his prejudice when it orally instructed the jury that "the unlawful attempt to detain a person for questioning or investigation" was included within the definition of the engaged-in-duty element of the peace-officer-murder special circumstance. We reject the claim.

As this court has explained, "a single instruction is not to be viewed in 'artificial isolation'; instead, it must be evaluated 'in the context of the overall charge.' [Citations.]" (*People* v. *Espinoza, supra,* 3 Cal.4th 806, 823-824.) Viewing the instructions as a whole, as they would appear to a reasonable juror, we conclude that there was no reasonable likelihood that the jury was actually misled. Having been correctly instructed three times in writing and twice orally, a reasonable juror would not have disregarded all of these instructions in favor of the single incorrect instruction. (See *People* v. *Andrews* (1989) 49 Cal.3d 200, 215-216 [260 Cal.Rptr. 583, 776 P.2d 285].)

## VI. PENALTY PHASE

### A. *Motion to Replace Counsel*

 Defendant contends that the trial court erred in denying his motion, made before the penalty phase of the trial, to appoint new counsel to represent him. Defendant also contends that the trial court erred in denying a requested one-week continuance of the hearing on the motion.

### 1. *Facts*

On Monday, December 28, 1987, the date scheduled for commencement of the penalty phase, defendant's attorney, Gene Bristoll, informed the court that members of defendant's family wished to confer with defendant about the possibility of having new counsel appointed. The court granted a 20-minute recess to permit defendant to confer with his family, followed by an additional recess, at defendant's request, to permit defendant to confer with Bristoll. Thereafter, Bristoll told the court that defendant was concerned that Bristoll had not made sufficient efforts before the trial to contact witnesses who might have personal knowledge of prior violent conduct by Sergeant Wolfley. Defendant added that he had given Bristoll the names of potential

witnesses, including William Armstrong and football star Ronnie Lott. After recalling that the defense had moved for disclosure of Sergeant Wolfley's personnel records, and that its own in camera examination of those records had revealed nothing relevant (see *Pitchess* v. *Superior Court* (1974) 11 Cal.3d 531 [113 Cal.Rptr. 897, 522 P.2d 305]), the trial court invited Bristoll to comment on the failure-to-investigate charge. Bristoll replied that the investigator responsible for this phase of the trial preparation was not then available. The trial court denied the motion for new counsel, remarking that it could be renewed whenever defendant had additional evidence or grounds to present. The court added its own observation that throughout the trial up to that point defendant and Bristoll had appeared to have an unusually good and close working relationship.

On Tuesday, December 29, 1987, defendant renewed the motion for new counsel "because of a breakdown in communications as far as our differences in opinions on the proceedings." Defendant also requested counsel to advise him or represent him specially as to this motion.

On Wednesday, December 30, 1987, the trial court appointed Donald Ames to represent defendant for purposes of the motion to substitute counsel for the penalty phase.

On Monday, January 4, 1987, Ames submitted on defendant's behalf a written motion to relieve Bristoll as attorney of record "on the grounds of ineffective assistance of counsel, and breakdown of the attorney/client relationship." In particular, defendant alleged in the motion papers: (1) Bristoll failed to interview potential key defense witnesses regarding Sergeant Wolfley's alleged propensity for violence against Blacks; (2) Bristoll failed to object to the nonrandom jury selection method; (3) Bristoll solicited defendant as a client without disclosing that he had never tried a capital case; (4) Bristoll never asked defendant about the facts of the case; instead, Bristoll presented defendant with a "written story," told him "this is a story I can defend," and instructed him to "weave the truth into it"; (5) Bristoll did not supply defendant with copies of police reports and other discovery material and did not play the hostage negotiations tapes for defendant; (6) defendant never desired to testify and was unable to do so effectively because of lack of access to relevant materials; (7) Bristoll did not supply Dr. Kania, a psychologist appointed to interview defendant, with necessary materials about the case, never contacted Dr. Kania to discuss the case, and did not use Dr. Kania as a defense witness; and (8) Bristoll failed to have his investigator interview three county jail inmates whom the prosecution had identified as potential penalty phase witnesses against defendant.

The court held a hearing on the motion out of the prosecutor's presence, at which it heard testimony from an investigator for Ames, two investigators

for Bristoll, and Bristoll himself. In addition, defendant addressed the court directly. The substance of that testimony is discussed below. After further argument, the court denied the motion, finding that defendant had failed to show that Bristoll had acted incompetently or that there had been such a breakdown in communication between Bristoll and defendant as would jeopardize Bristol's ability to provide effective representation at the penalty phase.

### 2. *Merits*

A defendant seeking to discharge appointed counsel and substitute another attorney must establish either that appointed counsel is not providing adequate representation or "that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result." (*People* v. *Crandell* (1988) 46 Cal.3d 833, 854 [251 Cal.Rptr. 227, 760 P.2d 423].) We agree with the trial court that defendant failed to establish either that Bristoll had rendered ineffective assistance at the guilt phase or that Bristoll's relationship with defendant had so broken down that Bristoll could not provide defendant with effective representation at the penalty phase.

Regarding Bristoll's alleged failure to investigate Sergeant Wolfley's alleged propensity for violence, the evidence presented at the hearing shows that Bristoll did a thorough and conscientious investigation. Before trial, defendant gave Bristoll and his investigative team the names of four potential witnesses: William Armstrong, football star Ronnie Lott, Cedric Davis, and Donald Woodson. Upon being interviewed, Armstrong denied all knowledge of Sergeant Wolfley. Repeated attempts to contact Lott through his agent were unsuccessful, but Bristoll learned from other sources that Lott was not acquainted with Sergeant Wolfley. After investigating the background of Cedric Davis, a decision was made not to interview him because he had been convicted of killing a policeman. Woodson was not interviewed because he was then in state prison.

Apart from this investigation of names supplied by defendant, Bristoll's investigators reviewed the file of official complaints against police officers and 10 years of newspaper articles. They also contacted the local chapter of the NAACP and consulted their contacts in the police department. Finally, Bristoll moved for disclosure of Sergeant Wolfley's personnel file.

Against this evidence of a thorough and professional investigation, defendant offered only insubstantial evidence that an even more exhaustive investigation would have yielded helpful evidence. Dennis Hall, an investigator

hired to assist Ames on the motion to disqualify, testified that he interviewed Woodson, who gave him the names of some other individuals, one of whom claimed to have personal knowledge of Sergeant Wolfley's alleged propensity for violence. Hall testified that defendant had also given him the name of Al Macon, and that although he was unable to interview Macon, he interviewed Macon's mother, Minnie Davis, who claimed to have witnessed an incident in which Sergeant Wolfley referred to another of her sons, Steven Davis, as a "nigger mother fucker" and chased after him while waiving a gun. She said this incident occurred at a car wash and apparently had something to do with Steven Davis's possession of a car that was suspected of involvement in a burglary. But defendant had not given the name of Macon or Minnie Davis to Bristoll or his investigative team. Moreover, Bristoll stated that he was familiar with the backgrounds of Macon and Minnie Davis and would probably not have used either of them as a witness.

Bristoll's failure to object to the nonrandom jury selection method was not addressed during the hearing. We have already concluded, however, that counsel's failure to object did not constitute ineffective representation. (See pt. III.C., *ante*.)

Regarding the charge that Bristoll had solicited defendant as a client and had failed to disclose that he had never tried a capital case, Bristoll explained that he contacted defendant only after a municipal court judge had asked him to accept appointment as defendant's counsel. He advised defendant that he had handled many homicides, although not a death penalty case, and that he had previously worked as a deputy district attorney. At the hearing, defendant asserted that he did not remember Bristoll saying that this was Bristoll's first death penalty case. The trial court evidently resolved this conflict in the testimony against defendant. We accept its implied finding, supported by substantial evidence, that Bristoll accurately disclosed his qualifications and did not solicit defendant as a client.

Bristoll denied that he ever presented defendant with a "written story" or "script" for his testimony. He said that defendant's testimony was exactly what defendant had always told Bristoll about the circumstances of the charged offenses. In response, defendant said that Bristoll "gave me his version" and said that "this is the way he seen it" but that defendant had told Bristoll "we can't go with your version because we have to go with the truth" and that defendant's testimony had been the truth. We accept the trial court's implied finding, supported by substantial evidence, that Bristoll did not suborn perjury or otherwise improperly attempt to influence the contents of defendant's guilt phase testimony.

Regarding the playing of the hostage negotiation tapes, Bristoll admitted that he did not play for defendant, in advance of trial, the portion of the tapes involving Yvonne Hester, but Bristoll said that he had discussed that portion with defendant. We accept the trial court's implied finding, supported by substantial evidence, that Bristoll adequately prepared defendant for his guilt phase testimony.

Regarding defendant's willingness to testify in his own behalf during the guilt phase, Bristoll stated that he felt strongly that defendant needed to testify and so advised defendant. From the beginning, defendant indicated his willingness to testify. Defendant replied that he had not wanted to testify at first, but that eventually Bristoll had persuaded him to do so. We accept the trial court's implied finding that Bristoll performed competently in advising and persuading defendant to testify in his own behalf.

Regarding Dr. Kania, Bristoll stated that Dr. Kania was appointed to talk with defendant "concerning certain aspects of the case" and that Dr. Kania was "aware of what's going on." Bristoll stated that Dr. Kania was still involved in the case, but Bristoll did not want to disclose Dr. Kania's statements because he was still a potential witness. Because defendant presented no evidence that Bristoll performed incompetently with respect to Dr. Kania, the trial court acted properly in rejecting this ground.

Regarding the three county jail inmates whom the prosecution had identified as potential penalty phase witnesses against defendant, these inmates allegedly were witnesses of violent conduct by defendant during pretrial incarceration on the charges in this case. Bristoll's investigative team obtained reports of the incidents, investigated the backgrounds of all three inmates, and extensively interviewed one. Bristoll decided that none of them was a potential defense witness, and he successfully moved to exclude evidence of defendant's alleged violent conduct at the jail. We agree with the trial court's implied finding that Bristoll competently represented defendant with respect to this potential penalty phase evidence.

Regarding the charge of a complete breakdown in the attorney-client relationship, substantial evidence at the hearing supports the trial court's express finding that such a breakdown had not occurred. At the hearing, defendant affirmed that he still respected Bristoll, and he said that he did not agree with some of the things alleged in the motion, which he had not been afforded an opportunity to review before it was filed. Bristoll stated that a breakdown had occurred, but the breakdown he described was primarily with members of defendant's family, not with defendant. Bristoll said he had enjoyed an unusually good rapport with defendant during the guilt phase.

We will not disturb the trial court's finding that Bristoll's ability to provide defendant with effective representation at the penalty phase had not been seriously undermined by a breakdown in his relationship with defendant.

### 3. *Denial of Continuance*

On defendant's behalf, Ames requested that the hearing on the motion to substitute counsel be continued for one week to permit his investigators to obtain declarations from individuals claiming to have personal knowledge of Sergeant Wolfley's alleged propensity for violence, and to interview additional individuals who might have such knowledge. The trial court denied the motion. Reviewing this ruling under the deferential abuse of discretion standard (*People v. Hawkins, supra,* 10 Cal.4th 920, 945), we find no abuse of discretion. The evidence presented at the hearing revealed that Bristoll and his investigative team had performed a competent investigation of Sergeant Wolfley's alleged propensity for violence, and in particular had dealt appropriately with the four names that defendant had given him. Additional evidence would not have altered this conclusion.

### B. *Notice of Aggravating Evidence*

 Defendant contends that the prosecutor failed to provide him with timely notice of the evidence of aggravating circumstances to be presented at the penalty phase and that this failure violated section 190.3 and denied defendant his right to due process of law under the federal and state Constitutions (U.S. Const., 5th & 14 Amends.; Cal. Const., art. I, § 15). More particularly, defendant contends that the prosecution failed to provide him with timely notice of the identity of witnesses who would testify to the facts underlying two of defendant's prior felony convictions.

 As here relevant, section 190.3 provides that in a capital case the prosecution may present evidence in aggravation only if it has given the defendant "notice of the evidence to be introduced . . . within a reasonable period of time as determined by the court, prior to trial." (§ 190.3, 4th par.) To be timely, the notice must be given "before the cause is called to trial or as soon thereafter as the prosecution learns the evidence exists." (*People v. Pride* (1992) 3 Cal.4th 195, 258 [10 Cal.Rptr.2d 636, 833 P.2d 643].) To be sufficient as to content, the notice must afford the defendant " 'a reasonable opportunity to prepare a defense to the allegation[].' " (*People v. Arias, supra,* 13 Cal.4th 92, 166.) Generally, a defendant claiming lack of sufficient and timely notice must object at trial and request a continuance; failure to object is deemed a waiver of the point for appeal (Evid. Code, § 353; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1153 [36 Cal.Rptr.2d 235, 885 P.2d 1]),

while failure to request a continuance generally "precludes any showing of prejudice attributable to [the] delay" (*People* v. *Medina* (1995) 11 Cal.4th 694, 771 [47 Cal.Rptr.2d 165, 906 P.2d 2]).

 Here, the prosecution, well before the cause was called for trial, filed a notice listing eight categories of aggravating evidence that the prosecution intended to introduce at the penalty phase, including defendant's "record of prior felony convictions and facts and circumstances surrounding each offense." The notice further stated: "The specific names of witnesses are contained in the discovery provided to defendant. Which particular witnesses will be called will depend on the testimony and evidence presented by prior witnesses and any stipulations agreed to by counsel."

Defendant thereafter submitted a written objection to the notice as being "untimely and insufficiently specific." The prosecutor submitted a written reply, claiming (erroneously) that the notice was sufficiently specific because it listed the factors under section 190.3 as to which the prosecution intended to introduce evidence.

There the matter lay until the guilt verdicts were returned. On that day, the prosecutor gave defense counsel a list of 23 possible witnesses. Not all of these related to the two prior felony convictions, however, and when the court considered the defense objection to the sufficiency of the notice, the prosecutor listed just six witnesses that he anticipated calling to prove the circumstances of the two prior felony convictions. The court and counsel proceeded to discuss other proposed prosecution evidence, with the trial court excluding most of it. The court then ruled that the prosecution's notice was timely and sufficient. Thereafter, the defense and the prosecution entered into a stipulation specifying the circumstances of the two prior felonies, as a result of which the prosecution did not call any witnesses to testify as to those crimes.

We agree with the trial court that the prosecution's notice was adequate as to the circumstances underlying the two prior felony offenses. These offenses were charged in the information as sentence enhancements under section 667.5. Moreover, because defendant had been previously convicted of these offenses, he was necessarily well aware of the circumstances of the offenses and of the witnesses who could testify concerning them. We find it significant that defense counsel did not claim surprise when provided with a list of possible witnesses and did not request a continuance. Although the prosecution should have provided the defense with the list of potential penalty witnesses before the guilt trial began, rather than after the guilt verdicts, defendant was not prejudiced by the delay.

## C. *Evidence of 7-Eleven Robbery*

Defendant contends that the trial court erred in denying his motion to exclude evidence of the 7-Eleven robbery because it was insufficient to permit a rational trier of fact to find beyond a reasonable doubt that defendant was the robber, and that the error denied him his right to a reliable penalty determination (U.S. Const., 5th, 8th, & 14th Amends.). He observes that Fister, the store clerk and robbery victim, had selected someone else's photograph from a photographic lineup shortly after the offense and that Fister's physical description of the robber did not match defendant. Fister described the robber as being shorter than six feet one inch (Fister's own height) and estimated the robber's height at five feet ten or eleven inches, whereas defendant was six feet three inches. Fister described the robber as being of average build, not muscular, and estimated the robber's weight at 115 to 120 pounds, whereas defendant weighed 180 to 185 pounds and had a muscular build. Fister said the robber had no facial hair, whereas defendant had a mustache and hair on his chin.

Although these discrepancies undermined the strength of Fister's in-court identification of defendant, we agree with the trial court that the credibility of Fister's identification testimony was properly submitted to the jury because a rational juror could have been persuaded beyond a reasonable doubt that defendant was the robber. (See *People* v. *Clair* (1992) 2 Cal.4th 629, 680 [7 Cal.Rptr.2d 564, 828 P.2d 705].)

We note, first, that there was no evidence that the features of the person whose photograph Fister selected from the photo lineup differed significantly from those of defendant. Fister admitted he was not good at estimating height or weight, that he had paid little attention to the robber until he produced a knife, and that thereafter Fister was not thinking about the robber's height or weight or facial hair. The jury could also properly consider that the robbery occurred on the night that Sergeant Wolfley was killed and that the 7-Eleven market was located just a few blocks from the house where defendant was staying and just a few blocks from the service station at which Sergeant Wolfley had his fatal encounter with defendant. Also, Fister testified that the robber purchased a small package of sunflower seeds, a similar package was found in William Haverstick's bedroom after defendant's surrender, and Haverstick denied that the package was his. Finally, Fister testified that the robber left the scene on a 10-speed bicycle, and defendant was admittedly riding a 10-speed bicycle that evening.

## D. *Prosecutorial Misconduct*

Defendant contends that the prosecutor committed misconduct in closing argument to the jury by urging the jury to disregard sympathy, arguing facts not in evidence, appealing to passion and prejudice, and interjecting personal opinion. He further contends that this alleged misconduct violated his federal constitutional rights (U.S. Const., 5th, 6th, 8th, & 14th Amends.) and requires reversal of the penalty verdict and judgment of death.

With one exception, defense counsel did not object to any of the statements here challenged. ██ Absent objection, a claim of prosecutorial misconduct in argument is not reviewable on appeal. (*People* v. *Berryman*, *supra*, 6 Cal.4th 1048, 1072.) Recognizing this difficulty, defendant asserts that his attorney's failure to object deprived him of his right to the effective assistance of counsel. We reject each claim.

### 1. *Disregarding Sympathy*

██ During argument, the prosecutor told the jurors that if they allowed sympathy for the defendant to overwhelm them, "we might as well do away with the death penalty." After defense counsel objected that the prosecutor was improperly urging the jury to disregard sympathy, the prosecutor made this statement: "I want to make it clear. The law does provide that you can exercise sympathy. . . . You can exercise sympathy if you feel that that is what you want to do. And I'm not saying that you cannot use sympathy. I'm saying if you use sympathy as a basis, you might as well eliminate the death penalty. Every one of us has a mother. Every one of us has a father. Every individual that commits a crime would be able to come in and say I don't want my son to die. And because of sympathy you should not impose the death penalty. You, as jurors, have that decision. You have that determination to make as to what penalty."

A reasonable juror would not have understood this argument as an assertion, contrary to the court's instructions, that sympathy for the defendant could not be considered. Rather, a reasonable juror would have understood the prosecutor's argument to be that sympathy for the defendant should not be the exclusive penalty consideration and that in judging the weight to be given sympathy as a mitigating circumstance, the jurors should give relatively little weight to a showing that any capital defendant might be expected to make—for instance, that the defendant's execution would inflict suffering on his or her parents and close relatives. This argument was not improper. (See *People* v. *Arias*, *supra*, 13 Cal.4th 92, 177.)

## 2. *Facts Not in Evidence*

 Referring to defendant's prior felony convictions, the prosecutor stated: "And his family—and there were other people that worked with him. When he's convicted the courts don't throw him out in the water and say sink or swim, go and sin no more. You know that. There were people that worked with him. And he ignored it. He ignored the help that they offered him . . . ." Defendant contends that this was misconduct because no evidence was presented that the criminal justice system had provided rehabilitative services to defendant after his conviction.

Immediately after the argument just quoted, the prosecutor referred to the testimony of Gregory Snowden, a peace officer, that he did not want defendant put to death. Concerning this testimony, the prosecutor stated: "That is not the opinion of all law enforcement. Just because he's a law enforcement, he's family. You can ask a number of law enforcement officers in Rialto P.D. what they think. That opinion, just because Greg Snowden is law enforcement, a C.H.P. officer, does not express the view of law enforcement in general just because of the conduct of this man." Defendant contends that this remark was misconduct because there was no evidence before the jury that law enforcement officers other than Gregory Snowden did not share his opinion that defendant's life should be spared.

Neither of these arguments was misconduct. Regarding the availability of rehabilitative services, the prosecutor elicited testimony that defendant's family did not turn away from him after his convictions but instead continued to counsel and assist him. This appears to have been the main point the prosecutor was making. But the prosecutor could also properly refer to the availability of rehabilitative services through the criminal justice system, even though there was no evidence on this point, because counsel are permitted in argument to make reference to matters of common knowledge. (*People* v. *Washington* (1969) 71 Cal.2d 1061, 1085 [80 Cal.Rptr. 567, 458 P.2d 479].) Nor was it misconduct for the prosecutor to assert that Gregory Snowden's expressed wish that defendant not receive the death penalty was "not the opinion of all law enforcement." A reasonable juror would not have understood the argument as an assertion that the prosecutor had personal knowledge that particular officers held a different view. Rather, a reasonable juror would have understood the argument as being only that Snowden did not speak for all law enforcement personnel and that it was reasonably likely, based on matters of common knowledge, that at least some officers held the opposite view.

3. *Appeal to Passion*

■ Defendant challenges the following argument as an improper appeal to passion:

"We have those officers out there to protect us because there are individuals like Dennis Mayfield in our society. . . . But there's some people that have a total, an absolute disregard for our laws. Dennis Mayfield is one of those. . . . Unfortunately, we have people like Dennis Mayfield. And because of that we need people like [Detective] Amicone and [Sergeant] Wolfley and all the other officers that came in here, to help us live in this community, in this great state, in this free country that we have. It's free. Yes, it is. Free. We all have our free agency, our ability to choose and to decide. And unfortunately Mr. Mayfield exercised his free agency in a manner that goes contrary to the rules of society. . . . You remember what President John Kennedy said. Ask not what your country can do for you. Ask what you can do for your country. A lot of people that have given for their country that have made this a free land. [*Sic.*] He has not given. He has taken. Taken whatever Dennis Mayfield decided that he wanted throughout his entire adult life."

Defendant argues that the prosecutor's references "to patriotism and persons who have died fighting for our country, interspersed with references to police officers other than [Sergeant] Wolfley, could have been made only for the purpose of arousing passion and prejudice." Additionally, he argues that by his references to "individuals like Dennis Mayfield" and to "people that have a total, an absolute disregard for our laws," the prosecutor was urging the jury not to assess defendant's individual culpability, but instead to view him as a representative of the criminal element of society. We disagree.

Although it is misconduct for a prosecutor to make comments calculated to arouse passion or prejudice (*United States* v. *Koon* (9th Cir. 1994) 34 F.3d 1416, 1443), the comments defendant challenges here were not so calculated. A reasonable juror would discern two themes in the quoted comments: first, that the murder of a peace officer engaged in performing official duties is a particularly aggravated form of murder, and, second, that defendant's life history revealed him to be a person not deserving of sympathy or mercy.[15] Both lines of argument are permissible at the penalty phase of a capital case. Appeal to patriotism was not a significant theme of the argument, nor was the argument reasonably likely to inflame the passions of any

[15]In an aside, defendant argues that the prosecutor's comments amounted to improperly urging the jury to consider defendant's background and character as an aggravating factor. (See *People* v. *Edelbacher*, *supra*, 47 Cal.3d 983, 1033.) We disagree. The prosecutor argued

juror or to cause any juror to disregard defendant's individuality and to view him merely as a symbol or personification of society's criminal element. We find no misconduct.

### 4. Personal Opinion

 Finally, defendant challenges the prosecutor's concluding remarks as an improper expression of personal opinion:

"If there was ever an individual who has blatantly displayed his disregard and his contempt for our laws, it's Dennis Mayfield. And if there was anyone in our society, because of that conduct, that warrants the death penalty, it's Dennis Mayfield. And I would ask you to return that verdict."

The statements were not couched as an expression of personal opinion but as a conclusion to be drawn from the evidence. In any event, it is not misconduct for a prosecutor in the penalty phase of a capital case to express in argument a personal opinion that death is the appropriate punishment, provided the opinion is grounded in the facts in evidence. (*People* v. *Rowland* (1992) 4 Cal.4th 238, 280-281 [14 Cal.Rptr.2d 377, 841 P.2d 897].)

### E. Double Counting of Aggravating Evidence

 Section 190.3 lists the factors that a jury determining penalty in a capital case may consider. Among these are factor (a), "[t]he circumstances of the crime of which the defendant was convicted in the present proceeding . . . ," and factor (c), "[t]he presence or absence of any prior felony conviction." We have held that factor (c) does not include convictions in the capital proceeding itself, and that all such convictions are properly considered only under factor (a). (*People* v. *Visciotti, supra,* 2 Cal.4th 1, 76.) Defendant contends that in this case the court's instructions and the prosecutor's argument misled the jury into thinking that crimes of which the defendant was convicted in the present case could be "double counted" under both factor (a) and factor (c), thereby artificially inflating their aggravating effect. He argues that this error deprived him of his right to a reliable penalty determination under the Eighth and Fourteenth Amendments to the federal Constitution.

---

as aggravating factors the circumstances of the crime, defendant's prior convictions, and his prior violent criminal behavior. References to defendant's character and background were intended to rebut the defense evidence and the anticipated defense argument that these were entitled to substantial mitigating weight.

We find nothing misleading in either the instructions or the prosecutor's argument.

The trial court instructed the jury in the language of CALJIC No. 8.84.1 (1986 rev.). As here relevant, the instruction stated: "In determining which penalty is to be imposed on the defendant, you shall . . . consider, take into account and be guided by the following factors, if applicable: [¶] (a) The circumstances of the crime of which the defendant was convicted in the present proceeding . . . . [¶] . . . [¶] (c) The presence or absence of any prior felony conviction." This instruction is not erroneous or misleading; it does not imply that the jury may "double count" evidence under these factors. (*People* v. *Mincey, supra,* 2 Cal.4th 408, 474; *People* v. *Visciotti, supra,* 2 Cal.4th 1, 76.)

In argument to the jury, the prosecutor stated that under section 190.3, factor (a), the jury could consider "all of the evidence that was presented in the guilt phase, everything surrounding the shooting of that police officer, and the other offenses that occurred." Referring to factor (c), the prosecutor stated, ". . . in this particular case you have three separate prior felony convictions . . . ." He then proceeded to specify the three prior convictions, none of which occurred in the present proceeding. Later, however, the prosecutor, in support of his argument that defendant had shown "an absolute and total disregard for our laws ever since he has been an adult," made the following challenged remarks: "Not just once. Not just twice. But three times. Ten times, ladies and gentlemen. He has been, after your verdicts, has been convicted of ten felonies. Ten serious felonies. Acts that he has shown a flagrant disregard for the rules that you and I and all of the other law-abiding citizens use as a code of conduct in our society."

Viewing the instructions and argument as a whole, it is not reasonably likely that the jury would have understood the prosecutor to be urging it to "double count" the crimes of which defendant was convicted in the present proceeding under section 190.3, factors (a) and (c). Rather, the prosecutor carefully explained, in a manner consistent with the instructions, that the jury was to consider the crimes adjudicated in the present proceeding under factor (a) and that it was to consider under factor (c) only the three earlier felony convictions. The reference to defendant's 10 felony convictions was not linked to either factor (a) or factor (c); rather, it was part of the prosecutor's argument in rebuttal to the defense evidence, intended to show that defendant was not worthy of the jury's sympathy. The prosecutor did not suggest that any of the evidence was "more damning because it related to more than one factor." (*People* v. *Visciotti, supra,* 2 Cal.4th 1, 76, fn. omitted.)

### F. *Factor (d) Instruction*

Defendant contends that the trial court erred in instructing the jury, in the language of section 190.3, factor (d), and CALJIC No. 8.84.1 (1986 rev.) that in determining penalty it could consider, among other things, "[w]hether or not the offense was committed while the defendant was under the influence of *extreme* mental or emotional disturbance." (Italics added.) Defendant contends that the word "extreme" improperly restricted the jury's consideration of mitigating evidence contrary to requirements of Eighth and Fourteenth Amendments to the federal Constitution and article I, sections 7, 15, and 17 of the California Constitution.

As defendant acknowledges, we have frequently and consistently rejected the identical contention. (E.g., *People* v. *Ashmus, supra,* 54 Cal.3d 932, 1001-1003.) We decline defendant's invitation to reconsider our resolution of this issue.

### G. *Instruction Regarding Inapplicable Penalty Factors*

Defendant requests that we reconsider our decisions holding that it is not error for the trial court, when instructing the jury at the penalty phase of a capital case, to list all statutory penalty factors, including those as to which no evidence has been introduced, without designating whether each factor is potentially aggravating or mitigating. (E.g., *People* v. *Raley, supra,* 2 Cal.4th 870, 919.) We decline to reconsider our resolution of this issue.

### H. *Reasonable Doubt Instruction*

Defendant contends that the trial court erred when it refused his request to instruct the jury that it must find beyond a reasonable doubt each of the following: (1) one or more aggravating factors are present, (2) aggravating factors outweigh mitigating factors, and (3) death is the appropriate punishment for defendant in this case. The court did not err in declining to give the requested instructions. (*People* v. *Visciotti, supra,* 2 Cal.4th 1, 67-68.)

### I. *Jury Unanimity*

Defendant contends that the trial court erred when it refused his request to instruct the jury that before it could return a verdict of death all 12 jurors had to agree on the same factors in aggravation. The trial court did not

err; our death penalty law does not require this form of jury unanimity. (*People* v. *Price, supra*, 1 Cal.4th 324, 490.)

### J. Lingering Doubt Instruction

The trial court refused to give defendant's proposed jury instructions on lingering doubt as a mitigating factor. But the trial court did give an expanded instruction on section 190.3, factor (k), advising the jurors that they could consider in mitigation "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial." In addition, the court instructed the jury that "[m]itigating factors are unlimited" and that "[a]nything mitigating should be considered; mitigating factors provided in these instructions are merely examples of some of the factors you may take into account in deciding not to impose a death sentence." Under these two instructions, the jurors would have understood that they could consider lingering doubt as a mitigating factor. Accordingly, the trial court did not err in refusing defendant's requested lingering doubt instruction. (*People* v. *Osband* (1996) 13 Cal.4th 622, 716 [55 Cal.Rptr.2d 26, 919 P.2d 640]; *People* v. *Memro, supra*, 11 Cal.4th 786, 883; *People* v. *Davis, supra*, 10 Cal.4th 463, 544-545.) Moreover, as this court has explained, a defendant in a capital case "clearly has no federal or state constitutional right to have the penalty phase jury instructed to consider any residual doubt about defendant's guilt." (*People* v. *Rodrigues, supra*, 8 Cal.4th 1060, 1187.)

In rejecting defendant's proposed lingering doubt instructions, the trial court remarked that the authority cited in support of them involved retrials whereas in this case the same jury that decided guilt would be making the penalty determination. Defendant contends that these remarks effectively barred defense counsel from arguing to the jurors that they could and should consider as a mitigating circumstance any lingering doubt they might have about defendant's intent to kill Sergeant Wolfley.

Defendant reads too much into the trial court's brief and ambiguous remarks. The trial court did not direct defense counsel to refrain from arguing lingering doubt, and nothing in the record establishes that defense counsel was under the impression that such argument was precluded. Indeed,

counsel's argument did appear to suggest that lingering doubt was a proper penalty consideration.[16]

### K. *Defendant's Courtroom Demeanor*

The defense requested that the jury be instructed to consider in mitigation "sympathy, pity, compassion, or mercy for the defendant that has been raised by any aspect of the defendant's background or character, *or raised by your observation of the defendant* . . . ." (Italics added.) The trial court indicated at one point that the instruction was not objectionable as to content, but apparently found that it largely duplicated other similar instructions. The italicized wording was eliminated in the final editing of instructions without further discussion. Because the expanded section 190.3, factor (k) instructions quoted above were broad enough to include the jurors' observation of defendant in the courtroom, failure to give the requested instruction was not error.

### L. *Written Explanation of Verdict*

Defendant contends that the jury's penalty verdict is invalid, and violates his rights to due process of law, equal protection, and a reliable penalty determination under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, because it is not supported by a written statement of the aggravating evidence upon which the jury relied and the reasons for selecting the penalty of death. As this court has repeatedly held, such a written statement is not required. (*People* v. *Rodrigues, supra,* 8 Cal.4th 1060, 1194-1195; *People* v. *Wash* (1993) 6 Cal.4th 215, 272 [24 Cal.Rptr.2d 421, 861 P.2d 1107]; *People* v. *Price, supra,* 1 Cal.4th 324, 490.)

---

[16]Defense counsel argued:

"You've been told that you can consider all of the circumstances, both in the guilt phase and in the penalty phase, and you can. There was a terrible tragedy that occurred at that [gasoline] station. There's no question about it. There's also one thing that definitely, definitely was shown by the evidence. Mr. Mayfield did not go out that evening looking for Mr. Wolfley. He got caught up in some circumstances. You have said he done wrong. He did wrong. But he didn't select the circumstances. He didn't put Tyrone Thomas there. He didn't create that situation. He was at that station for a legitimate reason. I say this to you because if, as you're sitting there in the jury room talking about yourselves, if in your mind there's some lingering question about do I impose death, do I impose life in prison without the possibility of parole, then I say to you that you must impose life in prison without the possibility of parole. If you have that lingering question then you must vote life in prison without the possibility of parole."

## M. *Cumulative Prejudice*

We reject defendant's contention that the cumulative effect of asserted errors at the guilt and penalty phases of his trial denied him his federal constitutional right to a fair trial and a reliable penalty verdict (U.S. Constitution, 5th, 8th, & 14th Amends.) and requires reversal of the judgment as to penalty. We have rejected nearly all of defendant's assignments of error. When we have found error, we have concluded that defendant was not prejudiced. Whether considered singly or collectively, the guilt and penalty phase errors were inconsequential. Defendant was not denied his due process right to a fair trial.

## VII. POST-TRIAL CLAIMS

## A. *Motion for Self-representation*

Defendant contends the trial court erred in denying his motion for self-representation, first made after the jury had returned its penalty verdict.

In ruling on the motion, the trial court found that it was untimely because defendant had not made it a reasonable time before commencement of the guilt phase. Recognizing that an untimely motion for self-representation is addressed to a trial court's sound discretion, the trial court considered factors bearing on the proper exercise of its discretion and made these findings: (1) defendant's attorney had provided him with competent, high quality representation at the guilt and penalty phases; (2) defendant had not shown any prior proclivity to substitute counsel; and (3) granting the motion would delay further proceedings at least six months because defendant wanted and required the assistance of advisory counsel or cocounsel and an attorney appointed in either capacity would require at least that long to become familiar with the case and to assist defendant in preparing contemplated post-trial motions. The court denied the motion primarily because of the extensive delay that would result.

Although a defendant has a constitutional right of self-representation (*Faretta* v. *California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525]), the right is absolute only if asserted a reasonable time before trial begins; self-representation motions made after this time are addressed to the trial court's sound discretion. (*People* v. *Windham* (1977) 19 Cal.3d 121, 127-129 [137 Cal.Rptr. 8, 560 P.2d 1187].) The timeliness requirement "serves to prevent a defendant from misusing the motion to delay unjustifiably the trial or to obstruct the orderly administration of justice." (*People* v. *Horton* (1995) 11 Cal.4th 1068, 1110 [47 Cal.Rptr.2d 516, 906 P.2d 478].)

■ Defendant argues that the trial court erred in ruling the motion untimely because a capital sentencing proceeding is a phase separate from the trial and because granting self-representation for sentencing does not inconvenience prospective or sworn jurors.

We have held that, for purposes of assessing the timeliness of a motion for self-representation, the guilt and penalty phases in a capital prosecution are not separate trials but parts of a single trial, and a motion made between the guilt and penalty phases is thus untimely and subject to the trial court's discretion. (*People* v. *Hardy* (1992) 2 Cal.4th 86, 194 [5 Cal.Rptr.2d 796, 825 P.2d 781].) But we have not addressed the timeliness of a motion made after the penalty verdict. Even if we assume for the sake of argument that a postverdict self-representation motion may be timely if made a reasonable time before sentencing, we agree with the trial court that defendant's motion was untimely. In determining what constitutes a "reasonable time" before sentencing, a trial court must necessarily consider the delay that would be occasioned by granting the motion. Here, all parties agreed that the resulting delay would be at least six months, and very likely much longer. Even though a jury would not have been kept waiting during this period, a delay of this magnitude would compromise the orderly and expeditious administration of justice. The motion was therefore untimely.

In ruling on defendant's untimely motion for self-representation, the trial court properly considered "the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion." (*People* v. *Windham*, *supra*, 19 Cal.3d 121, 128.) Because two of these factors—the quality of counsel's representation and the disruption that granting the motion would cause—weighed strongly against the granting of the motion, denial of the motion was not an abuse of the trial court's discretion.

## B. *Motion to Disqualify Trial Judge*

■ When he moved for self-representation, defendant simultaneously moved to disqualify the trial judge, Judge Kayashima, for bias and racial prejudice. Judge Kayashima referred the disqualification motion to Presiding Judge Rouse. After considering documents submitted by defendant and Judge Kayashima's responding declaration, Judge Rouse denied the disqualification motion. Defendant contends that Judge Rouse did not have authority to rule on the challenge and that Judge Kayashima's responding declaration was defective.

██ Under our statutory scheme, a petition for writ of mandate is the exclusive method of obtaining review of a denial of a judicial disqualification motion. (Code Civ. Proc., § 170.3, subd. (d); *People* v. *Hull* (1991) 1 Cal.4th 266, 269 [2 Cal.Rptr.2d 526, 820 P.2d 1036].) Nevertheless, a defendant may assert on appeal a claim of denial of the due process right to an impartial judge. (*People* v. *Brown* (1993) 6 Cal.4th 322, 335 [24 Cal.Rptr.2d 710, 862 P.2d 710].) Accordingly, we construe defendant's contention as a due process claim.

██ Defendant's moving papers asserted that Judge Kayashima was prejudiced against him and had been "since the onset of proceedings in this case." He further alleged that Judge Kayashima was "racially prejudiced" against him "to such an extent that a reasonable person would entertain doubts that the judge can be impartial" and that Judge Kayashima had "shown this prejudice by his repeated denials of [defendant's] motions to relieve Mr. Bristoll." In his declaration, Judge Kayashima stated that he had no prejudice or bias against defendant and that he had been and would continue to be completely impartial in the case.

We have already concluded that Judge Kayashima did not err in denying defendant's motion to replace Bristoll as his attorney (pt. VI.A., *ante*). Having carefully reviewed the entire record, we find nothing in the judge's handling of that motion, or in any other part of the record, that supports the charge of bias or prejudice, racial or otherwise. Accordingly, we conclude that defendant was not denied his due process right to an impartial judge.

Nor do we find merit in defendant's procedural contentions. Although defendant told Judge Kayashima that he wanted Judge Ingro to hear the disqualification motion, he did not repeat the request when Judge Kayashima referred the matter to Presiding Judge Rouse, and defendant's failure to object when Presiding Judge Rouse undertook to decide the matter himself constitutes an implied consent (see *In re Horton* (1991) 54 Cal.3d 82, 91 [284 Cal.Rptr. 305, 813 P.2d 1335]), thus satisfying the statutory requirement that the disqualification motion be heard by a judge "agreed upon by all the parties . . ." (Code Civ. Proc., § 170.3, subd. (c)(5)). Although the statute refers to a "written verified answer" by the challenged judge (Code Civ. Proc., § 170.3, subd. (c)(3)), a written declaration under penalty of perjury, such as Judge Kayashima submitted, satisfies this statutory requirement. (See Code Civ. Proc., § 446, subd. (a); *Hollingsworth* v. *Superior Court* (1987) 191 Cal.App.3d 22, 25-26 [236 Cal.Rptr. 193].)

## C. *Motion for New Penalty Trial*

Through Bristoll, his appointed counsel, defendant moved for a new penalty trial on the ground that the trial court had "erred in the decision of [a] question of law" (§ 1181, subd. 5) when it denied his motion to replace Bristoll with other appointed counsel. The trial court denied the motion. We reject defendant's contention that the trial court erred in so ruling. We have already concluded that the trial court did not err when it denied the motion to replace counsel. (Pt. VI.A., *ante.*) Because this ruling was not erroneous, it did not provide a ground for a new trial.

## D. *Disproportionality of Death Penalty*

■ In support of the automatic motion to modify the verdict of death (§ 190.4, subd. (e)), defendant submitted motion papers arguing that the penalty verdict should be set aside because the penalty of death was disproportionate to his individual culpability. The trial court denied the motion. Defendant contends that the trial court erred in so ruling because the penalty of death is disproportionate in view of the lesser sentences imposed in other cases for crimes of greater culpability, the uncertainty of the evidence establishing defendant premeditated the killing of Sergeant Wolfley, and the circumstances under which the killing occurred.

Defendant was not entitled to intercase proportionality review comparing the facts of his case with those of other defendants who were not sentenced to death. (*People v. Crittenden, supra,* 9 Cal.4th 83, 156-157; *People v. Rodrigues, supra,* 8 Cal.4th 1060, 1196.) We have previously rejected defendant's claim that the evidence is insufficient to establish premeditation and deliberation in the killing of Sergeant Wolfley. (See pt. IV.K., *ante.*) We now reaffirm our conclusion that the evidence was sufficient to establish that defendant killed Sergeant Wolfley deliberately and with premeditation rather than submit to questioning and possible arrest. Although defendant testified that Sergeant Wolfley acted in a provocative and abusive manner, both the jury and the trial judge reasonably could and evidently did disbelieve that testimony. Given that defendant personally and intentionally killed Sergeant Wolfley, and given also defendant's record of prior felony convictions, the penalty of death is not "so disproportionate that it shocks the conscience and offends fundamental notions of human dignity. [Citations.]" (*People v. Livaditis* (1992) 2 Cal.4th 759, 786 [9 Cal.Rptr.2d 72, 831 P.2d 297]; see also *People v. Beeler* (1995) 9 Cal.4th 953, 994 [39 Cal.Rptr.2d 607, 891, 995 P.2d 153].) Accordingly, the trial court did not err in denying the motion to reduce the penalty of death.

## VIII. DISPOSITION

The judgment is affirmed.

George, C. J., Mosk, J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.

Appellant's petition for a rehearing was denied March 19, 1997, and the opinion was modified to read as printed above.